**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

EVELYN TENNYSON,

|  |  |  |
|---|---|---|
|  | Plaintiff, | 16-cv-929 (BKS/MJK) |

v.

POLICE OFFICER KELSEY FRANCEMONE, sued
herein in her capacity as an individual,

|  |  |
|---|---|
|  | Defendant. |

---

TANAJEE MADDOX, as Administratrix of the Estate of
GARY TERRANCE PORTER,

|  |  |  |
|---|---|---|
|  | Plaintiff, | 19-cv-678 (BKS/MJK) |

v.

SYRACUSE POLICE OFFICER KELSEY
FRANCEMONE, sued herein in her capacity as an
individual,

|  |  |
|---|---|
|  | Defendant. |

---

**Appearances:**

*For Plaintiffs Evelyn Tennyson and Tanajee Maddox:*
Fred B. Lichtmacher
The Law Office of Fred Lichtmacher, P.C.
116 West 23rd Street, Suite 500
New York, New York 10011

*For Defendant Kelsey Francemone:*
John G. Powers
Mary L. D'Agostino
Ryan M. Poplawski
Amanda C. Nardozza
Hancock Estabrook LLP
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202

Susan Katzoff
Corporation Counsel for the City of Syracuse
Todd M. Long
Senior Assistant Corporation Counsel
233 East Washington Street, Room 300
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

These separate actions under 42 U.S.C. § 1983 arise from alleged constitutional

violations that occurred the evening of June 19, 2016, in Syracuse, New York. Plaintiff Evelyn

Tennyson brings claims under 42 U.S.C. § 1983 alleging that Defendant Syracuse Police Officer

Kelsey Francemone violated Tennyson's right to substantive due process under the Fourteenth

Amendment and used excessive force against her in violation of the Fourth Amendment. (Dkt.

No. 1 in Case No. 16-cv-929.) Separately, Plaintiff Tanajee Maddox, as Administratrix of the

Estate of Gary Terrance Porter,[1] brings a claim under 42 U.S.C. § 1983 alleging that Defendant

used excessive force against him in violation of the Fourth Amendment. (Dkt. No. 1 in Case No.

19-cv-678.)[2]

Presently before the Court are Defendant's motion for summary judgment under Rule 56

of the Federal Rules of Civil Procedure against Tennyson in Case No. 16-cv-929, (Dkt. No. 221),

Defendant's associated motion to strike in Case No. 16-cv-929, (Dkt. No. 237), and both

Plaintiffs' *Daubert* motions in their respective cases, (Dkt. No. 222 in Case. No. 16-cv-929; Dkt.

---

[1] For the purposes of this decision, this Plaintiff will be referred to as "Porter."

[2] For simplicity, the Court rules on all motions in Case Nos. 16-cv-929 and 19-cv-678 in this decision, which the Court files on the dockets of both cases.

No. 219 in Case No. 19-cv-678.)[3] Defendant's motion for summary judgment is fully briefed, (Dkt. Nos. 231, 235 in Case No. 16-cv-929), as are Plaintiffs' *Daubert* motions, (Dkt. No. 240 in Case No. 16-cv-929; Dkt. No. 225 in Case No. 19-cv-678). Tennyson did not respond to Defendant's motion to strike. The Court heard oral argument on the pending motions on June 27, 2024.

For the reasons discussed below, Defendant's motion to strike is granted in part and denied in part, Porter's *Daubert* motion is granted in part and denied in part, Tennyson's *Daubert* motion is denied as moot, and Defendant's motion for summary judgment is granted.

## II.    FACTS[4]

### A.    Defendant's Motion to Strike

Defendant moves (1) to strike certain of Tennyson's responses to Defendant's Statement of Material Facts and to have the facts deemed admitted, and (2) to strike testimony from one of Tennyson's witnesses as elicited through an impermissibly leading question. (Dkt. No. 237.) In general, Defendant argues that certain paragraphs of her Statement of Material Facts should be deemed admitted because Tennyson has neither admitted nor denied those paragraphs and that certain responses to Defendants Statement of Material Facts should be struck and the corresponding paragraphs deemed admitted because the responses do not comply with the Local Rules. (*Id.* at 4–19.) Tennyson did not respond to Defendant's motion.

---

[3] The *Daubert* motions, which were filed on each case's docket, are identical.

[4] Because Defendant moves for summary judgment in Case No. 16-cv-929 against Plaintiff Evelyn Tennyson but does not move for summary judgment in Case No. 19-cv-678, all docket citations are to the docket in Case No. 16-cv-929. These facts are drawn from Defendant's Statement of Material Facts, (Dkt. No. 223), and Tennyson's response to Defendant's Statement of Material Facts, (Dkt. No. 231-3), to the extent the facts are well-supported by pinpoint citations, as well as exhibits attached thereto and exhibits attached to the briefing of the contemporaneous *Daubert* motion, (Dkt. Nos. 222, 238, 239). These facts are limited to those relevant to the issues raised in Defendant's motion for summary judgment and are construed in the light most favorable to Tennyson as the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Federal Rule of Civil Procedure 56(c)(1) requires that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute." Under Federal Rule of Civil Procedure 56(e), if a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," inter alia, "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Local Rule 56.1(a) requires that a Statement of Material Facts "set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue . . . [and] a specific citation to the record where the fact is established." "The opposing party shall file a separate Response to the Statement of Material Facts . . . by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs . . . [and] shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

Here, the Court will not deem admitted any of the paragraphs from Defendant's Statement of Material Facts that conflate the "initial shots" heard by Tennyson with the first shots fired the evening of June 19, 2016, (Dkt. No. 223, ¶¶ 8–9, 11, 13–14, 23), because Defendant has not supported those facts with a specific citation to the record, *see* N.D.N.Y. L.R. 56.1(a). Specifically, Defendant has failed to cite record support establishing that that the audio on which Defendant relies, (Dkt. No. 221-5), contains the initial exchange of gunfire on the evening of June 19, 2016, or that the initial shots heard by Tennyson were the first shots fired

that evening.[5] Nor will the Court deem admitted paragraph 25A, which is unsupported by Defendant's citation.

The Court will deem admitted paragraphs in which Defendant states what certain witnesses testified, (Dkt. No. 223, ¶¶ 10, 15, 19, 27), although the Court notes the peculiarity of Defendant's wording of these paragraphs; it is not clear why Defendant phrased some of these paragraphs in terms of witnesses' testimony as opposed to the fact ostensibly established by the testimony. The Court will not deem admitted paragraphs in which Defendant seeks an admission to Defendant's subjective beliefs and observations. (*Id.* ¶¶ 24, 26, 31.) The phrasing of these paragraphs is unhelpful: Defendant would have been better served by stating objective facts underlying the paragraphs.

The Court grants Defendant's motion to the extent that Tennyson's responses contain legal argument and extraneous factual assertions. The Court thus strikes Tennyson's arguments following her admissions to Defendant's Statements of Material Fact. (*Id.* ¶¶ 28–29.) A response to a Statement of Material Facts is not the proper location for legal arguments involving a fact from the record. *See Carlisle v. UPS, Inc.*, No. 15-cv-1376, 2017 WL 3738697, at *2, 2017 U.S. Dist. LEXIS 138909, at *5–7 (N.D.N.Y. Aug. 29, 2017). If Tennyson sought to establish additional facts as undisputed, she should have submitted a Statement of Additional Material Facts in Dispute. *See* N.D.N.Y. L.R. 56.1(b).[6]

Defendant also seeks to strike deposition testimony of Tennyson's witness, Tayshira Rodriguez-Rijo. Defendant cites the following question of Tennyson's counsel: "when

---

[5] The Court discusses in more depth below the audio proffered by Defendant, (Dkt. No. 221-5), and Tennyson's testimony that it was an "initial shot[]" that hit her, (Dkt. No. 221-2, at 102–03). *See infra* note 9.

[6] The Court has nevertheless considered all of the evidence in the record in the light most favorable to Tennyson in resolving the motion for summary judgment.

[Defendant] was running and shooting, were you under the impression that she was being reckless and she could have shot into the crowd?" to which Rodriguez-Rijo responded, "Yes," and Defendant objected. Defendant, citing, inter alia, *Newton v. City of New York*, 640 F. Supp. 2d 426, 444–45 (S.D.N.Y. 2009), argues that this testimony should be excluded because it was elicited from an impermissibly leading question. (Dkt. No. 237-1, at 18–19.)

The limited excerpt of Rodriguez-Rijo's deposition in the record concerns her observations of the shooting of Porter, who, as described below, was running away from the parking lot where Tennyson was injured in a different direction. (Dkt. No. 231-4, at 4–10.) There is nothing in the excerpt of Rodriguez-Rijo's testimony that describes Defendant "running and shooting," and there is no indication in the record that Rodriguez-Rijo had any personal knowledge of the shooting that allegedly injured Tennyson. Because there is no indication that Rodriguez-Rijo had personal knowledge about Defendant "running and shooting" when Tennyson was shot, the Court does not consider Rodriguez-Rijo's testimony to which Defendant objected. *See Parker v. Mandarich Law Group, LLP*, No. 19-cv-6313, 2021 WL 2351177, at *4, 2021 U.S. Dist. LEXIS 108197, at *7–8 (E.D.N.Y. June 9, 2021) ("'Materials submitted in support of or in opposition to a motion for summary judgment must be admissible themselves or must contain evidence that will be presented in admissible form at trial.' . . . '[W]here a party relies on affidavits or deposition testimony to establish facts, the statements "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."'" (second alteration in original) (first quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014), and then quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012))). The Court does, however, consider other testimony from Rodriguez-Rijo to which Defendant did not object.

### B.       Events of June 19, 2016

On June 19, 2016, a Father's Day party was held in an outdoor courtyard at an apartment

complex located between Tully Street and Otisco Street in the City of Syracuse. (Dkt. No. 223,

¶ 1; Dkt. No. 231-3, ¶ 1; *see also* Dkt. No. 1, ¶ 10.) The party began in the afternoon while it was

light out. (Dkt. No. 223, ¶¶ 1, 3; Dkt. No. 231-3, ¶¶ 1, 3.) A food tent was set up next to a

bouncy house in the courtyard, and at the end closest to Tully Street, a DJ was playing music.

(Dkt. No. 221-2, at 42, 49; Dkt. No. 231-4, at 8; Dkt. No. 231-5, at 5.)

Plaintiff Evelyn Tennyson and her boyfriend, Gary Porter, arrived at the party sometime

between 4:30 p.m. and 5:30 p.m. (Dkt. No. 223, ¶ 1; Dkt. No. 231-3, ¶ 1; Dkt. No. 221-2, at 42.)

Tennyson drove herself and Porter there in a rented black Chevrolet Malibu sedan. (Dkt. No.

223, ¶ 2; Dkt. No. 231-3, ¶ 2; Dkt. No. 221-2, at 42.)[7] She parked near the party in the Stone

Court South parking lot off of Tully Street, backing the Malibu into the parking spot where it

remained until she left that evening. (Dkt. No. 223, ¶¶ 4–5; Dkt. No. 231-3, ¶¶ 4–5.) Tennyson

estimated that when she and Porter arrived, there were more than fifty but less than a hundred

people already in attendance. (Dkt. No. 221-2, at 47.)

Tennyson testified that she stayed near her vehicle while she was at the party because she

"was pregnant and [] want[ed] to sit down." (Dkt. No. 221-2, at 50.) Porter traveled into the

courtyard "here and there," but generally stayed in the same area as the vehicle as well. (*Id*.) A

photograph from the party shows Tennyson and Porter, along with others, near the Malibu in the

Stone Court South parking lot. (Dkt. No. 221-4, at 3; Dkt. No. 221-2, at 51.)

---

[7] The Court notes that certain witnesses, namely, Tennyson's expert witness, refer to the vehicle as an Impala. (*See, e.g.*, Dkt. No. 221-8, at 96.) This is immaterial.

The party continued into the evening, past nightfall, with the noise and crowd drawing attention from local authorities. (*See* Dkt. No. 221-7, at 45; Dkt. No. 221-20, at 2.) At approximately 11:09 p.m., Defendant Kelsey Francemone, an officer of the Syracuse Police Department, was dispatched to the 300 block of Otisco Street "to address a loud noise complaint from a party in the vicinity." (Dkt. No. 221-19, ¶ 5.) "[G]iven the amount of people that were present," Defendant stated in her sworn statement, she requested backup "to help [her] address the noise complaint." (Dkt. No. 221-20, at 3.) Defendant estimated that three to four hundred people were at the party by the time she arrived. (Dkt. No. 221-19, ¶ 7; *see also* Dkt. No. 221-20, at 2.)[8]

While waiting for assistance and talking with a Syracuse Housing Authority employee on Otisco Street, Defendant "heard approximately fifteen gunshots in rapid succession . . . coming from an area of the party." (Dkt. No. 221-19, ¶¶ 8–9; *see also* Dkt. No. 221-7, at 19.)[9] In her sworn statement, Defendant stated that "[b]ecause of the way it sounded I was confident that at least two different guns were being fired." (Dkt. No. 221-20, at 3.) As people came running out of the apartment complex, (Dkt. No. 221-6; Dkt. No. 223, ¶ 17; Dkt. No. 231-3, ¶ 17; *see also* Dkt. No. 221-2, at 127; Dkt. No. 221-7, at 20), Defendant crossed Otisco Street and ran toward the party, (Dkt. No. 221-19, ¶ 11; *see also* Dkt. No. 221-7, at 21.) One witness testified that, although it was dark out, the surrounding buildings have "very bright light[s] when it gets dark." (Dkt. No. 231-6, at 4.)

---

[8] Other witnesses' estimates of the number of people at the party included "over 100," "a couple hundred," "over 200," and "a lot." (Dkt. No. 221-7, at 17–18; Dkt. No. 231-5, at 4; Dkt. No. 235-9, at 6; Dkt. No. 238-2, at 3.)

[9] Defendant suggests that a recording from the party, (Dkt. No. 221-5), which captured audio of approximately thirteen gunshots within approximately three seconds, represents the initial gunfire, (Dkt. No. 223, ¶ 9.) But it is not clear from the record before the Court who created the recording or what the recording demonstrates, and there is no evidence in the record before the Court establishing that the audio in the recording, which does not have a timestamp, includes the first gunshots fired that evening; Tennyson merely testified that the audio of the gunshots is "consistent with the first time that [she] heard shots that night." (Dkt. No. 221-2, at 96.)

A nearby surveillance camera recorded timestamped video that shows people running out of a courtyard, toward Otisco Street, beginning at 11:13:19 p.m. (Dkt. No. 221-6; Dkt. No. 223, ¶ 20; Dkt. No. 231-3, ¶ 20.) Tennyson's crime scene reconstruction expert testified that it is "reasonable" to infer that the timing of the initial gunfire is correlated with the time people began running out of the courtyard, (Dkt. No. 221-8, at 102), but there is no direct evidence establishing exactly when the gunfire began. One witness testified that he was in the Malibu before any shooting began and saw muzzle flashes from the direction of Tully Street. (Dkt. No. 222-3, at 3.)

At 11:13:37 p.m., Defendant entered, from the direction of Otisco Street, the area visible in the surveillance video and ran toward the courtyard and Tully Street. (Dkt. No. 221-6; Dkt. No. 223, ¶ 21; Dkt. No. 231-3, ¶ 21.) Eight seconds later, at 11:13:45 p.m., she exited the camera's frame of view. (Dkt. No. 221-6; Dkt. No. 223, ¶ 22; Dkt. No. 231-3, ¶ 22.)

Defendant stated that she ran into the courtyard, and "[a]s [she] rounded the corner . . . [she] saw muzzle flashes from at least three handguns near a car that was parked in a small parking lot off Tully Street." (Dkt. No. 221-19, ¶ 14.) Defendant proceeded to the Stone Court South parking lot, and, facing Tully Street, "she observed individuals in the vicinity of [a] black sedan that were firing weapons." (Dkt. No. 223, ¶ 24; Dkt. No. 231-3, ¶ 24.) Defendant stated in her sworn statement that she saw three people "actively shooting handguns from the area of the car . . . at something to either the west or south of them." (Dkt. No. 221-20, at 3.)[10] According to Defendant's sworn statement, one shooter was firing "from the position of the driver's door," one shooter was firing "from the driver's side rear door," and one shooter was firing "from the

---

[10] Defendant also stated in her sworn statement that she saw another individual "firing a handgun near the rear entranceway to 410 Otisco Street." (*Id.*) Otisco Street, however, is on the other side of the courtyard and apartment buildings as compared to the Stone Court South parking lot, where Defendant had been before the shooting began. (*Id.* at 3.)

passenger side of the car." (*Id.*) Defendant stated that she believed "the individuals at the sedan were engaged in the felony use of weapons and were a threat of death or serious bodily injury to [Defendant] and other civilians in the area." (Dkt. No. 221-19, ¶ 23.)

One witness saw a man in a white T-shirt shooting toward Tully Street, (Dkt. No. 231-6, at 6.) Defendant stated she "repeatedly yelled at the individuals at the sedan, identifying [her]self as a police officer and telling them to stop, drop their weapons, and show [her] their hands[,] . . . [but] the individuals did not comply with [her] orders." (Dkt. No. 221-19, ¶ 22.) Defendant stated in her sworn statement that she yelled "Police! Drop your gun! Show me your hands!" multiple times. (Dkt. No. 221-20, at 4.) Multiple witnesses, however, disputed that Defendant identified herself as a police officer, testifying that she did not identify herself and did not tell anyone to drop their gun. (Dkt. No. 231-7, at 3; Dkt. No. 231-12, at 3–4.)

Defendant, in her sworn statement, described her subsequent her conduct as follows:

> I remember that the male in the yellow shirt [near the rear of the driver's side of the Malibu] just looked at me then turned and continued to fire his handgun. I knew then that this male, who continued to fire his handgun despite seeing me and ignoring my verbal commands to drop his weapon, could easily kill me or one of the other hundreds of people present. In response to this threat, I discharged several rounds of ammunition from my handgun in the direction of the male with the yellow shirt. He seemed to take notice of the fact I was shooting at him, because he turned towards me like he wanted to run but tripped up and fell with the gun still in his hand. It was at this same time that I also had what I felt to be a malfunction with my handgun, because it was no longer firing when I was pulling the trigger. Because of this I racked the slide and loaded a new magazine.

(Dkt. No. 221-20, at 4.)

The parties agree that Defendant discharged five rounds from her firearm "in the direction of the individuals firing weapons next to the black sedan." (Dkt. No. 223, ¶ 28; Dkt. No. 231-3, ¶ 28.) Citing the deposition of her crime scene reconstruction expert, Tennyson notes

that "at least one of [Defendant]'s shots hit the car and possibly others hit or were under the vehicle." (Dkt. No. 231, at 6; *see also* Dkt. No. 231-8, at 9–11.) Tennyson's expert testified that it was fair to conclude that Defendant "was directing her fire at locations where there were individuals discharging their firearms." (Dkt. No. 223, ¶ 29; Dkt. No. 231-3, ¶ 29.) Defendant stated that she "discharged [her] service firearm . . . at the individuals located next to the black sedan." (*Id.* ¶ 24.) Defendant also stated that after she fired five shots, her firearm malfunctioned, and she cleared the malfunction. (Dkt. No. 221-19, ¶¶ 24, 27–28.) Defendant also stated that "[a]t no time did [she] target, nor even notice, Evelyn Tennyson in the area of this parking lot." (Dkt. No. 221-19, ¶ 26.)

Tennyson stated that at some point after nightfall, she was in the vicinity of the Malibu when she heard "more than ten gunshots." (Dkt. No. 223, ¶¶ 6–7; Dkt. No. 231-3, ¶¶ 6–7.) She sensed that the gunshots were coming "from the side and behind her," and from "this way, that way, just from all over." (Dkt. No. 223, ¶ 7; Dkt. No. 231-3, ¶ 7; Dkt. No. 221-2, at 101.) Tennyson attempted to get into the driver's side of Malibu, but her access was blocked by someone. (Dkt. No. 223, ¶ 12; Dkt. No. 231-3, ¶ 12; Dkt. No. 221-2, at 85, 93.) While on the driver's side of the Malibu facing Tully Street, Tennyson was shot in her left leg. (Dkt. No. 221-2, at 97; *see also* Dkt. No. 236, at 2.)

There is no conclusive evidence establishing the exact time Tennyson was shot. None of the witnesses, including Tennyson, saw who shot the bullet that hit her leg. (Dkt. No. 223, ¶ 11; Dkt. No. 231-3, ¶ 11; Dkt. No. 235-2, at 6–7; Dkt. No. 235-3, at 5; Dkt. No. 235-5, at 3–4; Dkt. No. 235-7, at 10; Dkt. No. 235-8, at 6–7.) Witnesses described the scene at the time gunfire erupted as chaotic. (Dkt. No. 231-5, at 4; Dkt. No. 231-7, at 6–7; Dkt. No. 221-7, at 20.) The parking lot in which Tennyson was standing was in close proximity to the DJ booth. (Dkt. No.

221-2, at 53.) In addition to the noise of gunshots and the crowd scattering, "[w]hile the shooting was occurring, the music was still playing." (Dkt. No. 231-4, at 8.) The record does not reflect how many people were near or in the Malibu when Defendant discharged her weapon.

Defendant pursued and shot Porter after she fired the shots toward the Malibu. (Dkt. No. 221-19, ¶¶ 28–30; Dkt. No. 221-20, at 4.) The parties dispute whether Porter had a gun and whether he turned to face Defendant.

Witnesses provided limited additional information.[11] One witness, who testified that he was in the Malibu when he first heard shooting, testified as follows: He saw muzzle flashes from the direction of Tully Street and a man in a white shirt "directly in the front" shooting in the air. (Dkt. 222-3, at 3; Dkt. 231-7 at 3, 7.) The Malibu "rolled out" after two of the tires were shot. (Dkt. No. 231-7, at 3–4.)[12] The witness testified that "[t]here was just random shots at first," but when "the car rolled forward and everything, everything was dying down, [he] remembered someone yelling 'Bitch, stop shooting,'" and Tennyson "got shot somewhere in the midst." (*Id.* at 5.) Tennyson was shot near the car. (*Id.* at 8.) The witness testified that "right after" the tires got shot and the car rolled, a "female officer" was on the scene. (*Id.* at 3.) The witness was "just laying on the ground, covering [his] head" when the tire got shot. (*Id.* at 8.) He saw "the cop" after a friend near him "grabbed [Tennyson] up." (*Id.* at 5.) The witness kept hearing "like one person was just still shooting," and "that's when she came," "pointing a gun and swinging it back and forth." (*Id.* at 6.) He did not know that she was an officer. (*Id.*) She did not identify herself; rather, she "came out of nowhere running, and it wasn't in a controlled

---

[11] The Court has done its best to provide a chronological description of the witnesses' testimony from the limited deposition excerpts in the record.

[12] Tennyson's expert noted the tire damage and opined that, based on the forensic evidence, "it cannot be known if the damage to the tire was the result of a bullet strike or some other event prior to the vehicle being seized." (Dkt. No. 231-11, at 10–11.)

fashion . . . like how you would expect a person in the military or enforcement to move." (*Id.* at 3–4, 6.) "It was panicked, desperation. . . ." (*Id.* at 4.) The witness stated that the officer "basically ran into the crowd of us [] swinging the gun back and forth," pointing the gun at "[e]veryone that was right there" and "swinging it wildly," causing the witness to fall back as the officer ran by. (*Id.* at 4, 6, 12.) The witness testified that "there would be no way for [the officer] to even tell where any [sic] . . . there was so many people were shooting out there and so many bullets going off there would have been no way for her to even tell anything." (*Id.* at 6–7.)

Another witness described hearing gunshots hit the car, stating that "[y]ou can just hear it. It was just, like, dinging, and it just was, like, a lot going on." (Dkt. No. 231-6, at 5.) This witness testified that Defendant ran with her gun out and then stopped. (*Id.* at 5.) When questioned when Defendant fired her weapon, the witness stated "as she was running down, she fired a" —and the next page of the deposition transcript was not included. (*Id.* at 5.) Later, the witness testified that Defendant "was running and shooting" in what appears to be a description of the shooting of Porter. (*Id.* at 7.)

Some of the other witnesses appeared to describe Defendant's shooting of Porter. A witness who was questioned about whether Defendant appeared to shoot at Porter responded that "from the looks of it [Defendant] was just shooting just to shoot"; she did not "say the police or nothing, she was just shooting." (Dkt. No. 231-12, at 3.) When the witness was later questioned about whether Defendant said "police" or "drop the gun," he responded that she "didn't say nothing, she ran in the car, she was just shooting, and that's when everybody started going crazy." (Dkt. No. 231-12, at 3–4.)[13] Another witness when questioned whether Defendant "was

---

[13] It is not clear what "she ran in the car" refers to. From the limited excerpts provided by Tennyson—two nonconsecutive pages—it appears that the witness is describing the shooting of Porter. (Dkt. No. 231-12, at 3–4.)

aiming at" Porter testified that "[i]t just looked to me like [Defendant] was aiming at a crowd. That's why I keep saying if it wasn't him there, it would have been somebody else. Just like it wasn't just only him that got shot. Didn't his fiancé or something like that get shot in the leg, too?" (Dkt. No. 231-4, at 10.)

### C.    Expert Analysis

Both parties solicited experts to prepare reports evaluating the incident. (Dkt. No. 231-11; Dkt. No. 239-2.) After considering the location of expended casings[14] and other evidence found in and around the Stone Court South parking lot, both experts concluded, and the parties agreed, that at least three shooters, other than Defendant, fired guns in the vicinity of the parking lot. (Dkt. No. 231-11, at 17; Dkt. No. 239-2, at 25; *see also* Dkt. No. 223, ¶ 25; Dkt. No. 231-3, ¶ 25.) The following diagram from Tennyson's expert illustrates this conclusion:

---

[14] Casings result from the firing of certain firearms and, according to Tennyson's expert, can provide a general location of a person discharging a firearm. (Dkt. No. 221-8, at 105, 121–23.) The expert witnesses distinguish casings from "projectiles," which, though not defined, appear to be bullets that have been fired from a firearm. (Dkt. No. 231-11, at 16; Dkt. No. 239-2, at 25, 27, 43.) At oral argument, the parties agreed on these definitions.



*Figure 24:* Annotated section of CITY000434 with Impala added in the parking lot

(Dkt. No. 231-11, at 17.)[15] As demonstrated by the clusters of forensically related casings in the diagram, two of the shooters were in close proximity to the Malibu (referred to in the diagram as an Impala) and at least one was near Tully Street (near the bottom of the diagram), outside the Stone Court South parking lot. (Dkt. No. 231-11, at 17; Dkt. No. 239-2, at 25.)[16]

Defendant fired five rounds in the direction of the individuals firing weapons next to the Malibu. (Dkt. No. 223, ¶ 28; Dkt. No. 231-3, ¶ 28; Dkt. No. 221-19, ¶¶ 20, 22, 24.) Tennyson's

---

[15] The Court notes that the unannotated version of the diagram was prepared by the Syracuse Police Department. (*Id.* at 13, 17.) Defendant's expert reviewed a differently annotated version of the diagram. (Dkt. No. 239-2, at 43–45.) Defendant's expert concluded there were four shooters in the vicinity of the parking lot. (*Id.* at 25, 41.)

[16] Tennyson also testified that she saw flashes of light to the west of the Malibu, on the other side of a fence by the parking lot, after she first heard shots being fired behind her. (Dkt. No. 221-2, at 129–31; *see also* Dkt. No. 221-3, at 2.) Tennyson's expert testified that if another shooter was using a revolver, there may not have been any evidence with which to establish their location. (Dkt. No. 221-8, at 121–22.)

expert agreed that it is reasonable to conclude that Defendant was directing her fire at locations where there were individuals discharging firearms. (Dkt. No. 223, ¶ 29; Dkt. No. 231-3, ¶ 29: Dkt. No. 221-8, at 118–19.) Both parties' experts concluded that Defendant directed her shots at the driver's side of the Malibu. (Dkt. No. 231-11, at 17–18; Dkt. No. 239-2, at 25.) The experts indicated that Defendant was the only shooter firing from her location. (Dkt. No. 231-11, at 17–18; Dkt. No. 239-2, at 25.)

These conclusions are consistent with the physical evidence. The expended casings from Defendant's firearm were identified near a sidewalk connecting the courtyard to the Stone Court South parking lot (near the top of the diagram). (Dkt. No. 231-11, at 16; Dkt. No. 239-2, at 25, 43.) A live round and a magazine from Defendant clearing her firearm's malfunction were also found in this area, closer to the Malibu. (Dkt. No. 231-11, at 17–18; Dkt. No. 239-2, at 26, 28; Dkt. No. 221-8, at 129–30.) Two projectiles identified as bullets fired from Defendant's firearm were recovered from beneath where the Malibu was parked. (Dkt. No. 231-11, at 16; Dkt. No. 239-2, at 26.) Additionally, examination of the Malibu revealed one projectile that entered the trunk of the Malibu through the driver's side rear wheel well. (Dkt. No. 231-11, at 8–11.)[17] Analysis of the projectile from the trunk of the Malibu had characteristics consistent with Defendant's firearm but not enough to establish conclusively that it was fired from her gun. (*Id.* at 13, 17.) That projectile, however, "d[id] not associate . . . with any of the other firearms from this incident." (*Id.* at 13; *see also id.* at 17.) Tennyson's expert included a trajectory rendering of the projectile that hit the trunk in his diagram. (*Id.* at 17.) Tennyson's expert ultimately concluded that

> it is clear that the trajectory of the bullet aligns with the approximate location where the majority of the cartridge cases from Officer

---

[17] Analysis also revealed multiple bullet holes and impacts in the driver's side rear door. (*Id.* at 10–12.)

> Francemone's weapon were recovered, even without the angles for the trajectory rod (which were not measured). No other firearms-related evidence was recovered from the location of Officer Francemone's cartridge cases to indicate that another weapon was fired from the same area. The class information from the bullet recovered from the trunk associated it with Officer Francemone's firearm and not with any other firearm present during the incident.

(*Id.* at 17–18.)

Police also recovered, among other objects, a third projectile from beneath where the Malibu was parked; analysis again could not "identify or eliminate the bullet[] as having been fired from" Defendant's firearm, but there was "[a]greement of class characteristics" with Defendant's firearm. (Dkt. No. 231-11, at 15–17.)

The bullet that struck Tennyson entered and exited her left leg, (Dkt. No. 221-2, at 142), and was not recovered.

## III.   *DAUBERT* MOTIONS

Plaintiffs move to preclude Defendant from offering at trial expert testimony from Edward Flosi, Defendant's "proposed expert in Law Enforcement Practices." (Dkt. No. 221-1.)[18] Defendant argues that none of the opinions disclosed in Flosi's expert report are subject to preclusion. (Dkt. No. 240.)

### A.   Expert Witnesses

Under Rule 702 of the Federal Rules of Evidence, a district court is charged with a "gatekeeping" obligation with respect to the testimony of an expert witness—the district judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the

---

[18] Because, as discussed below, *see infra* Section IV, the Court grants Defendant's motion for summary judgment with respect to all of Tennyson's claims, the Daubert motion is denied as moot in Case No. 16-cv-929. Accordingly, citations to the record within this section are to documents in Case No. 19-cv-678.

task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Rule 702

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"To determine whether a witness qualifies as an expert, courts compare the area in which the

witness has superior knowledge, education, experience, or skill with the subject matter of the

proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

In determining the reliability of an expert's testimony, courts employ a "flexible" inquiry,

*Daubert*, 509 U.S. at 594, and the factors to be considered "depend[] upon the particular

circumstances of the particular case at issue," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150

(1999). In general, "factors relevant to determining reliability include the theory's testability, the

extent to which it has been subjected to peer review and publication, the extent to which a

technique is subject to standards controlling the technique's operation, the known or potential

rate of error, and the degree of acceptance within the relevant scientific community." *Restivo v.*

*Hessemann*, 846 F.3d 547, 575–76 (2d Cir. 2017) (internal quotation marks omitted). When

applying the gatekeeping obligation to non-scientific expert testimony, a district court may

choose to use some or all of the above *Daubert* factors or it may look to other indicia of

reliability. *See Kumho Tire Co.*, 526 U.S. at 150. "In undertaking this flexible inquiry, the district

court must focus on the principles and methodology employed by the expert, without regard to

the conclusions the expert has reached or the district court's belief as to the correctness of those

conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

"Thus, when an expert opinion is based on data, a methodology, or studies that are simply

inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of

that unreliable opinion testimony." *Id.* Ultimately, a district court has "the same broad latitude

when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability

determination." *Kumho Tire Co.*, 526 U.S. at 142. Moreover, "[v]igorous cross-examination,

presentation of contrary evidence and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509

U.S. at 596.

As to the substance of an expert witness's testimony, while it "is not objectionable just

because it embraces an ultimate issue," *see* Fed. R. Evid. 704(a), expert testimony that expresses

a legal conclusion is inadmissible, *see Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("[The

Second Circuit] requir[es] exclusion of expert testimony that expresses a legal conclusion.");

*United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony encompassing an

ultimate legal conclusion based upon the facts of the case is not admiss[i]ble . . . ."); *Callahan v.

Wilson*, 863 F.3d 144, 153 (2d Cir. 2017) ("[E]xpert testimony is not admissible under Federal

Rule of Evidence 702 if it 'usurp[s] . . . the role of the jury in applying th[e] law to the facts

before it,' as such testimony 'undertakes to tell the jury what result to reach, and thus attempts to

substitute the expert's judgment for the jury's.'" (alterations in original) (quoting *Nimely v. City

of New York*, 414 F.3d 381, 397 (2d Cir. 2005))).

**B.    Discussion**

Plaintiffs' "primary objection" is that, under Rule 702(b), Flosi's testimony is based on

insufficient facts. (Dkt. No. 219-1, at 10.) Plaintiffs also argue that Flosi's testimony is "not the

product of reliable principles and methods" as required by Rule 702(c) and that Flosi comes to

impermissible legal conclusions. (*Id.* at 10–17.) Defendant argues that Flosi's testimony is not subject to preclusion "merely because it 'embraces an ultimate issue'"; that Plaintiffs do not challenge the majority of Flosi's opinions which should therefore not be excluded; and that Plaintiffs' argument that Flosi's opinions are not based on sufficient facts is meritless. (Dkt. No. 225, at 6–24.)[19]

With regard to Plaintiffs' arguments that Flosi's testimony should be precluded under Rule 702 because it is based on insufficient facts and employs unreliable principles and methods, Plaintiffs' position boils down to the contention that Flosi makes impermissible credibility determinations in reaching his conclusions. (*See, e.g.*, Dkt. No. 219-1, at 8 ("Flosi chose to ignore [certain] witnesses and instead chose to adopt Francemone's testimony in its entirety in forming his opinion."), 15 ("Flosi does not tell us why he merely adopts unquestioningly the Defendant's testimony apparently without any methodology to reject the numerous witnesses contradicting Francemone."), 16 ("Flosi[] just takes most of what Francemone says as fact, with no explanation as to how he ignores and/or discredits everyone else's testimony to come to his conclusion she acted appropriately.").)[20] Plaintiffs do not identify a basis under *Daubert* and Rule 702 for the Court to conclude that Flosi's expert opinion should be precluded wholesale.

---

[19] Defendant also argues that Flosi is qualified to provide an expert opinion and that Flosi's testimony will be useful and relevant to the issues before the jury. (*Id.* at 3–6, 15–18.) "The threshold question under Rule 702 is whether the witness is qualified to provide expert testimony on the subject matter at hand," *Tardif v. City of New York*, 344 F. Supp. 3d 579, 595 (S.D.N.Y. 2018), by "compar[ing] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *Tin Yat Chin*, 371 F.3d at 40. Given Plaintiffs' lack of argument to the contrary, and given Flosi's qualifications, (Dkt. No. 224, ¶ 2; Dkt. No. 224-1), the Court finds no reason to exclude Flosi's testimony on this basis. Nor do Plaintiffs challenge the usefulness or relevance of Flosi's testimony, and the Court therefore need not address that argument from Defendant.

[20] Flosi provides an exhaustive list of documents related to the underlying incident he reviewed to conduct his analysis, including, among others, all police reports and witness statements; all surveillance video; social media posts; reports, diagrams, and other documentation of physical and forensic evidence; Porter's autopsy report; a gunshot-residue testing analysis; grand jury testimony from Carlos Stackhouse and Khalil Davis; deposition testimony from Tennyson, Arian Drake, Knariana Hoyle, Tasheonna Days, Tayshira Rodriguez Rijo, and Dana Greely; and the Syracuse Police Department's use of physical force and use of deadly physical force policies. (Dkt. No. 224-2, at 8–10; *see also* Dkt. No. 224, ¶¶ 4–5.) Flosi also states that he reviewed transcripts of the depositions of Carlos Stackhouse and Zhashayl Hall-Rodriguez, as well as transcripts of the depositions of Khalil Davis and Luis Zulueta, after preparing his report

In his report, Flosi does credit Defendant's testimony while discrediting (or otherwise ignoring) the testimony of other witnesses. (*See, e.g.,* Dkt. No. 224-2 , at 23–30 (analysis of Defendant's first five shots fired), 30–36 (analysis of Defendant's next two shots fired).) At oral argument, however, Defendant's counsel stated that Defendant would not elicit expert opinion that rests on credibility determinations. Defendant's counsel cited Flosi's declaration, in which he states that his "expert opinions do *not* rely on making credibility determinations as [he] does not consider that to be a part of [his] role as a police expert" but that he does "include opinions that opine on whether a hypothetical account of the facts is consistent or not with police training and practices, which [he] would expect would be tested on cross-examination concerning any disputed issues of fact." (Dkt. No. 239, ¶ 5.) At oral argument, Plaintiffs' counsel stated that he does not object to this form of testimony.

An expert may not evaluate the credibility of witnesses. *See Nimely*, 414 F.3d at 398; *see also Fate v. Village of Spring Valley*, No. 11-cv-6838, 2013 WL 2649548, at *6, 2013 U.S. Dist. LEXIS 83425, at *17–18 (S.D.N.Y. June 13, 2013) ("[An expert witness] may not . . . offer testimony about what he believes actually happened or about the credibility of any witness. His expert testimony . . . cannot rest on implicit credibility determinations."); *Paul v. City of New York*, No. 16-cv-1952, 2023 WL 3724152, at *6, 2023 U.S. Dist. LEXIS 93383, at *19 (S.D.N.Y. May 30, 2023) ("[An expert witness] will not be permitted to opine on the credibility of other witnesses."); *Scism v. Ferris*, No. 18-cv-672, 2022 WL 2915745, at *5, 2022 U.S. Dist. LEXIS 131109, at *14 (N.D.N.Y. July 25, 2022) (precluding expert testimony where "the 'facts'

---

and "determined that a supplemental report was unnecessary because [his] opinions, as set forth in the original expert report, did not change based on this additional testimony." (*Id.* ¶¶ 3–4.) Thus, as noted above, the Court construes Plaintiffs' position not as suggesting that Flosi failed to consider *sufficient* facts in reaching his conclusions but rather as arguing that Flosi impermissibly engaged in credibility determinations by crediting certain testimony and adopting certain conclusions based thereon while ignoring other testimony with respect to disputed facts.

relied on by the experts [we]re not really facts [but were] conclusions reached by each experts' credibility determinations and selective reading of the evidence.") Accordingly, the Court grants Plaintiffs' motion to preclude Flosi's testimony to the extent that such testimony is based, either implicitly or explicitly, on a determination of the credibility of any witness.[21] However, Flosi may, as he suggests in his declaration, "opine on whether a hypothetical account of the facts is consistent or not with police training and practices," (Dkt. No. 224, at 4 ¶ 5), so long as he makes clear that any hypothetical assumptions are expressly identified as such. *See Stern v. Shammas*, No. 12-cv-5210, 2015 WL 4530473, at *5, 2015 U.S. Dist. LEXIS 97879, at *12 (E.D.N.Y. July 27, 2015) ("To avoid making improper credibility determinations, . . . [an expert witness] must explain that his opinions assume certain facts to be true."); *Fate*, 2013 WL 2649548, at *6, 2013 U.S. Dist. LEXIS 83425, at *17–18 ("[The expert witness's] testimony on the reasonableness of the police practices in this case must be expressly characterized as based on the assumption that certain facts are found to be true; it cannot rest on implicit credibility determinations.").[22]

　　　Furthermore, Plaintiffs are correct that an expert may not testify as to a legal conclusion. *See Hygh*, 961 F.2d at 363; *Bilzerian*, 926 F.2d at 1295. Expert testimony is not admissible "if it usurp[s] . . . the role of the jury in applying th[e] law to the facts before it as such testimony undertakes to tell the jury what result to reach, and thus attempt[] to substitute the expert's judgment for the jury's." *See Callahan*, 863 F.3d at 153 (second, third, and fourth alterations in

---

[21] For instance, Flosi may not testify that Porter had a handgun in his hand or that he pointed it at Defendant, (Dkt. No. 224-2, at 31), because reaching those conclusions, which rely on crediting Defendant's testimony while discrediting other witnesses' conflicting testimony, is properly left to the jury.

[22] "[C]ontentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony," *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)), and "[v]igorous cross-examination [and] presentation of contrary evidence. . . are the traditional and appropriate means of attacking shaky but admissible evidence," *Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 390 (S.D.N.Y. 2017) (Nathan, J.) (quoting *Amorgianos*, 303 F.3d at 267); *see also Restivo*, 846 F.3d at 577.

original) (quoting *Nimely*, 414 F.3d at 397). "When an expert offers an opinion relevant to applying a legal standard . . . , the expert's role is limited to describing sound professional standards and identifying departures from them." *Restivo*, 846 F.3d at 580 (quoting *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013)). Thus, the Court grants Plaintiffs' motion insofar as Flosi may not testify, as he has stated in his expert report, (*see, e.g.*, Dkt. No. 224-2, at 30, 35), that any action taken by Defendant was objectively reasonable. *See Callahan*, 863 F.3d at 153 ("In this case, [the expert's] suggestions that [the defendant] did not act reasonably under the circumstances intrude on the jury's exclusive role as the finder of facts. The district court therefore acted within its discretion in precluding [the expert] from testifying with respect to plaintiffs' excessive force claim against [the defendant]."); *Passino v. Tucker*, No. 17-cv-1028, 2021 WL 2766979, at *3, 2021 U.S. Dist. LEXIS 124086, at *9 (N.D.N.Y. July 1, 2021) ("It would not be appropriate . . . for the expert to testify as to whether the conduct of the police officers was objectively reasonable or unreasonable, as that decision is for the jury to make based upon its application of [the court's] instruction and their common sense.").[23] But Flosi may testify as to police training and practices and whether a hypothetical account of the facts is

---

[23] As Defendant points out, the Syracuse Police Department's Use of Physical Force policy "*expressly* direct[s] officers to follow the teachings of *Graham v. Connor*," (Dkt. No. 224, at 7 n.5; Dkt. No. 223-4, at 2), which requires that police officers' actions be "'objectively reasonable' in light of the facts and circumstances confronting them," *Graham v. Connor*, 490 U.S. 386, 397 (1989). But it does not follow that Flosi may therefore testify as to whether Defendant acted in compliance with *Graham*. Defendant points to no in-circuit caselaw to suggest otherwise, and in fact, the in-circuit caselaw Defendant cites for the proposition that "district courts . . . routinely admit expert testimony from police experts as to whether an officer's use of force comported with relevant police practices, procedures, and training" suggests just the opposite—an expert cannot testify as to the objective reasonableness of a police officer's actions, *see Passino*, 2021 WL 2766979, at *3, 2021 U.S. Dist. LEXIS 124086, at *9 ("It would not be appropriate . . . for the expert to testify as to whether the conduct of the police officers was objectively reasonable or unreasonable, as that decision is for the jury to make based upon its application of [the court's] instruction and their common sense."); *Stern*, 2015 WL 4530473, at *3, 2015 U.S. Dist. LEXIS 97879, at *8 ("Defendants are correct that [the expert witness] cannot testify as an expert regarding any opinions that the force used by [the d]efendants was 'unreasonable' . . . ."); *Fate*, 2013 WL 2649548, at *6, 2013 U.S. Dist. LEXIS 83425, at *18 ("[The expert witness] may not testify that the defendant officers acted in accord with the standard of reasonableness imposed by the Fourth Amendment, nor may he assert in his testimony that actions deemed reasonable when measured against standard police practices are 'reasonable' as a matter of constitutional law.").

consistent with such training and practices. For example, Flosi may opine on law enforcement training and practices relevant to responding to gunfire in an area with innocent people and the use of deadly force. And, assuming he appropriately couches hypothetical assumptions as such, Flosi may opine on whether the actions Defendant took "were consistent with current law enforcement practices and training." (Dkt. No. 239-2, at 18–36.)[24]

In sum, Plaintiffs' *Daubert* motion is denied in that the Court will not preclude Flosi from testifying at trial under *Daubert* and Rule 702. But Plaintiffs' motion is granted to the extent that Flosi's testimony at trial may not be based, implicitly or explicitly, on a determination of the credibility of any witness, and Flosi may not testify that any action taken by Defendant was objectively reasonable.[25]

## IV.   MOTION FOR SUMMARY JUDGMENT

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson*, 477 U.S. at 247–48. A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The

---

[24] To the extent there are further discrete objections as to Flosi's testimony at trial, the Court will rule on them as they arise.

[25] In light of the Court's ruling on Defendant's motion for summary judgment, Tennyson will not proceed to trial, and the *Daubert* motion in Case No. 16-cv-929 is therefore denied as moot.

moving party may meet this burden by citing "particular parts of materials in the record," *see* Fed. R. Civ. P. 56(c)(1)(A), or by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *see Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593

F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B.      Discussion

Defendant moves to for summary judgment on both of Tennyson's claims. (Dkt. Nos.

223, 235.)[26] Tennyson opposes Defendant's motion. (Dkt. No. 231.)

### 1.      Causation

Defendant initially argues that she is entitled to summary judgment on both of

Tennyson's claims because Tennyson has not raised an issue of fact on the causation element of

her § 1983 claims. (Dkt. No. 224, at 14.) Specifically, Defendant argues that (1) Tennyson

"admits to a lack of evidence that she was shot by" Defendant; (2) Tennyson "herself was unable

to identify the individual that shot her"; and (3) "indisputable video evidence indicates that

[Defendant] did not shoot Ms. Tennyson." (*Id.* at 14–22 (emphasis omitted).) Tennyson argues

that the testimony of her expert, Peter Valentin, in conjunction with other testimony, including

Tennyson's, points to Defendant having shot Tennyson and that Defendant's "'26 Second'

Defense"—that is, Defendant's argument that video evidence in conjunction with Tennyson's

deposition testimony indicate that Defendant did not shoot Tennyson—is misplaced. (Dkt. No.

231, at 15–21, 24–25.)

To establish a § 1983 claim, the plaintiff must show that the injury was proximately

caused by the constitutional violation. *County of Los Angeles v. Mendez*, 581 U.S. 420, 430–31

(2017) ("[P]laintiffs [bringing § 1983 claims] can . . . generally recover damages that are

proximately caused by [the] violation." (citing *Heck v. Humphrey*, 512 U.S. 477, 483 (1994);

---

[26] Defendant moves for summary judgment in Case. No. 16-cv-929 against Plaintiff Evelyn Tennyson but does not move for summary judgment in Case No. 19-cv-678 against Plaintiff Tanajee Maddox, as Administratrix of the Estate of Gary Terrance Porter.

*Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 306 (1986))). Thus, the question is whether Tennyson has "come forth with evidence sufficient to permit a reasonable juror to return a verdict in . . . her favor on" the causation element of her § 1983 claims. *See Selevan*, 711 F.3d at 256 (quoting *Omnicom Grp.*, 597 F.3d at 509). Tennyson has met that burden.

It is undisputed that when Tennyson was shot, she was standing on the north side—that is, the driver's side—of the Malibu. (Dkt. No. 223, ¶¶ 4–6, 12; Dkt. No. 231-3, ¶¶ 4–6, 12.) Defendant was standing north of the Malibu when she fired five shots toward it. (Dkt. No. 221-19, ¶¶ 20, 22, 24.) Both parties' experts concluded that Defendant directed her shots at the driver's side of the Malibu sedan. (Dkt. No. 231-11, at 17–18; Dkt. No. 239-2, at 25.) These experts also concluded that the evidence suggested that Defendant was the only shooter firing from her location. (Dkt. No. 231-11, at 17–18; Dkt. No. 239-2, at 25.) Furthermore, two projectiles definitively identified as bullets fired from Defendant's firearm were recovered from beneath where the Malibu was parked. (Dkt. No. 231-11, at 16; Dkt. No. 239-2, at 26.) And analysis of the bullet recovered from the trunk of the Malibu had characteristics consistent with Defendant's firearm and did not "associate . . . with any of the other firearms from this incident," suggesting that this bullet too could have been fired by Defendant. (*Id.* at 13, 17–18.) Defendant fired five rounds, (Dkt. No. 223, ¶ 28; Dkt. No. 231-3, ¶ 28; Dkt. No. 221-19, ¶¶ 24), leaving two rounds unaccounted for. While Defendant points to the fact that there were other shooters in the area, that Tennyson testified that she "sense[d] gunfire behind her and to her side, which she described as coming from 'this way, that way, just from all over,'" and that Tennyson did not see who shot her, (Dkt. No. 224, at 16–18), there is no forensic evidence in the record indicating that any shooter other than Defendant fired shots toward Tennyson.[27]

---

[27] Defendant also argues that Tennyson cannot identify Defendant as the shooter by circumstantial evidence because such a conclusion would require expert testimony. (*Id.* at 16 n.11; *see also* Dkt. No. 235, at 12.) But expert testimony,

Defendant's principal argument in support of summary judgment on the issue of causation relies on the surveillance video, which shows Defendant enter the vicinity of the Stone Court South parking lot approximately twenty-six seconds after the shooting began, (Dkt. No. 221-6; *see also* Dkt. No. 224, at 18–22), in conjunction with Tennyson's testimony that it was an "initial shot[]" that hit her, (Dkt. No. 221-2, at 102–03). But the term "initial shot" is itself unclear.[28] And even assuming that Tennyson meant that it was one of the first shots fired that evening that hit her, such a conclusion is contradicted by her very own testimony. For example, Tennyson testified that the "initial shots" were coming from behind her. (*Id.* at 97, 129–30.)[29] But both experts opined that the only shooter behind Tennyson—assuming she was, as she testified, facing Tully Street—was Defendant. (Dkt. No. 231-11, at 17–18; Dkt. No. 239-2, at 25.) Tennyson also testified that "the first thing" Porter did after Tennyson got shot was run, that as he did, Tennyson "turned [her] head to see where he was going," and that Defendant "was right here [and] shot him." (*Id.* at 103–04.) But if, as Defendant suggests, Tennyson was shot by the gunfire that caused the crowd to run in the surveillance video, Defendant would not have been "right [t]here" to shoot Porter until after (1) at least twenty-six seconds had elapsed, allowing Defendant time to enter the area, (Dkt. No. 221-6); and (2) Defendant had fired five

---

[28] including testimony related to bullet trajectories, is precisely what Tennyson's expert provides. (*See* Dkt. No. 231-11; Dkt. No. 221-8.) Equally unpersuasive is Defendant's argument that Tennyson may rely on no evidence other than her expert's testimony in establishing her prima facie case. (Dkt. No. 224, at 14–16.) While Tennyson's most recent answer to the relevant interrogatory mentioned only her expert, (Dkt. No. 221-14, at 6), Tennyson did not withdraw her prior responses, (Dkt. No. 221-17, at 6), which made reference to witness statements and deposition testimony, (Dkt. No. 221-11, at 4). And in any event, the Court does not premise dismissal of Tennyson's claims on such a minute procedural dispute.

[28] Tennyson testified about the "first time that [she] heard shots that night," (Dkt. No. 221-2, at 96), but Defendant does not point to evidence in the record demonstrating that the first gunshots Tennyson heard were necessarily the first gunshots fired that evening. As discussed above, the record does not reflect when or how the audio of approximately thirteen gunshots being fired within approximately three seconds, (Dkt. No. 221-5), was created.

[29] Elsewhere, Tennyson testifies that shots were being fired "this way, that way, just from all over." (*Id.* at 101.)

shots toward the Malibu and fixed a malfunction in her gun, (Dkt. No. 223, ¶ 28; Dkt. No. 231-3, ¶ 28; Dkt. No. 221-19, ¶¶ 24, 27–30). That timeline does not square with Tennyson's testimony.

The Court notes these discrepancies not in making a credibility determination, which is not permitted, *see Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017), but rather in concluding that there exists a genuine dispute as to when Tennyson was shot—that is, based on the record before the Court, Tennyson is correct that, "[a]s the incident seemingly lasted for minutes, it is not possible to exactly calculate when Tennyson was shot," (Dkt. No. 231, at 20). The Court cannot conclude as a matter of law that Tennyson was shot before Defendant arrived at the Stone Court South parking lot.

Thus, construing the facts in the light most favorable to the Tennyson and resolving all ambiguities and drawing all reasonable inferences against Defendant, the Court finds that there is enough evidence in the record from which a reasonable juror could find that Defendant shot Tennyson. Accordingly, the Court will not grant Defendant's motion for summary judgment on that basis.

### 2.      Fourth Amendment

Defendant next argues that Tennyson cannot establish a Fourth Amendment violation as a matter of law because "there is no evidence that Plaintiff was the intended object of the force utilized by" Defendant. (Dkt. No. 224, at 22–24.) In her opposition to the motion for summary judgment, Tennyson primarily argues that her substantive due process claim should survive, but she does assert that Defendant could be found liable for excessive force "in light of her reckless behavior." (Dkt. No. 231, at 21–24.)

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, the Fourth

Amendment prohibits the use of excessive force by a police officer "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). Since "[t]he Fourth Amendment prohibits unreasonable seizures," "the first step in any Fourth Amendment claim . . . is to determine whether there has been a constitutionally cognizable seizure." *Medeiros v. O'Connell*, 150 F.3d 164, 167 (2d Cir. 1998) (citing *Michigan v. Summers*, 452 U.S. 692, 696 (1981)).[30] "[A] Fourth Amendment seizure . . . occur[s] . . . only when there is a governmental termination of freedom of movement *through means intentionally applied*," *see County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596–597 (1989)), not as a result of "accidental effects of otherwise lawful government conduct," *see Medeiros*, 150 F.3d at 168 (quoting *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990)).[31]

Defendant relies principally on the Second Circuit's decision in *Medeiros* in support of her argument. (Dkt. No. 224, at 23–24.) In *Medeiros*, the court considered "whether the accidental shooting of a hostage or innocent bystander can give rise to a claim under the Fourth Amendment." 150 F.3d at 168. In that case, a gunman hijacked a school van and took the driver and two teenaged passengers hostage. *Id.* at 166. Police officers followed the van and eventually pinned it against a guardrail. *Id.* at 167. The gunman fired at the officers, who returned fire. *Id.*

---

[30] Tennyson styles her claim as an excessive force claim rather than an unreasonable seizure claim. (Dkt. No. 1, at 4; *see also* Dkt. No. 231, at 21–24.) But "[a]n excessive force claim [under the Fourth Amendment] is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *See Mendez*, 581 U.S. at 428.

[31] Once a seizure through force intentionally applied has occurred, the analysis turns to whether the force used was excessive under the Fourth Amendment's "reasonableness" standard, which involves "balancing . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *See Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016) (alteration in original) (quoting *Graham*, 490 U.S. at 395–96). Because Tennyson has failed to adduce a material issue of fact from which a jury could find that there was a seizure under the Fourth Amendment, the Court does not address the reasonableness of Defendant's force.

Ultimately, the officers killed the gunman in the shootout, but a bullet fired by one of the officers ricocheted off a metal support bar and injured one of the teenagers, who died fifteen months later. *Id.* at 166–67. The teenager's mother brought suit, alleging violations of the Fourth and Fourteenth Amendments. *See id.* at 166.

Citing the Supreme Court's decision in *Brower* and caselaw from the First and Fourth Circuits, the Second Circuit noted that "seizure under the Fourth Amendment is purposeful conduct" and that there was no Fourth Amendment seizure of the teenage boy "because the police did not intend to restrain" him. *Id.* at 168–69. "The deflection of the bullet intended for [the gunman]," the court concluded, "did not transform the troopers' rescue efforts on the hostages' behalf into a seizure" *Id.* at 169. The court distinguished the facts in *Medeiros* from those in cases where "the police shoot an innocent victim mistakenly believing that he is the suspect whom they are pursuing" because "in such cases, the victim was indeed the object of an intentional act of seizure, even if the police were mistaken as to the victim's identity." *See id.* (citing *Hill v. California*, 401 U.S. 797, 802–05 (1971)). The court reasoned that "where the hostage is hit by a bullet intended for the hostage-taker, the mishap is the 'unintended consequence[] of government action[]' and . . . that such consequences cannot 'form the basis for a fourth amendment violation.'" *Id.* (first alteration in original) (quoting *Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991)).

Following *Medeiros*, courts within the Second Circuit have dismissed Fourth Amendment claims brought by plaintiffs who were the unintentional victims of force exerted by police officers. *See Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 605–06 (S.D.N.Y. 2017) (collecting cases).

The parties agree that Defendant discharged five rounds from her firearm "in the direction of the individuals firing weapons next to the black sedan." (Dkt. No. 223, ¶ 28; Dkt. No. 231-3, ¶ 28.) Defendant states that she "did not target, nor even notice," Tennyson and that "[a]ll five of [Defendant's] shots were in the direction of the rear of the black sedan, where [she] could see the individuals engaged in the felony use of their weapons." (Dkt. No. 221-19, ¶¶ 25–26; *see also* Dkt. No. 223, ¶ 31.)

Tennyson, for her part, has not cited any fact in the record before the Court from which a jury could find that she was the intended target of Defendant's force. At oral argument, Tennyson's counsel agreed that there is not a genuine issue of material fact from which a jury could find that Tennyson was the intended target of Defendant's force. Tennyson argues that Defendant exhibited "reckless behavior" and that Defendant was deliberately indifferent to the threat she presented to human life. But these disputes go to the reasonableness of Defendant's conduct, not to the issue of intentionality—that is, the issue of whether there was a seizure under the Fourth Amendment. *See Dancy*, 843 F.3d at 117 ("The seizure and reasonableness inquiries are distinct and should not be conflated." (quoting *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010))).

Thus, because Tennyson has failed to adduce facts from which a jury could find that she was the intended target of Defendant's force, Defendant's motion for summary judgment is granted with respect to Tennyson's Fourth Amendment claim.

### 3.    Fourteenth Amendment

Defendant argues that Tennyson cannot establish a Fourteenth Amendment claim as a matter of law because Defendant's conduct, which, Defendant contends, was not intentional or malicious, does not shock the conscience. (Dkt. No. 224, at 24–26.) Tennyson argues that Defendant's conduct shocks the conscience for the purposes of the Fourteenth Amendment

because it was reckless and because Defendant was deliberately indifferent to Tennyson's safety. (Dkt. No. 231, at 8–15.) At oral argument, Tennyson clarified that she is arguing that Defendant's conduct was "extremely" reckless.

"[T]he Due process Clause of the Fourteenth Amendment embodies a substantive component that protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Although, in general, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims," the Second Circuit "permit[s] a narrowly drawn Fourteenth Amendment [substantive due process] claim" arising from a use of force in the "non-seizure, non-prisoner context . . . where no seizure within the meaning of the Fourth Amendment has taken place." *See Medeiros*, 150 F.3d at 169 (first alteration in original) (first quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994), then citing *Rodriguez v. Phillips*, 66 F.3d 470 (2d Cir. 1995), and then citing *Lewis*, 523 U.S. at 843).

The "central inquiry" underlying a Fourteenth Amendment claim is "whether the government action was rationally related to a legitimate government objective." *Edrei v. Maguire*, 892 F.3d 525, 536 (2d Cir. 2018) (citing *Lewis*, 523 U.S. at 846). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846 (citation omitted). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.

The Supreme Court has noted that while "deliberate indifference [or recklessness] can rise to a constitutionally shocking level," it does so when the state actor "ha[s] time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *See id.* at 852–53. "But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). In *Lewis*, a passenger on a motorcycle who was hit and killed by a police officer engaged in a high-speed chase aimed at apprehending the suspect-driver asserted that the officer acted with reckless disregard for life. *See id.* at 836–37. The Supreme Court affirmed summary judgment for the police officer, holding that "only a purpose to cause harm unrelated to the legitimate" government objective would "satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Id.* at 836, 854. "[H]igh-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." *Id.* at 854; *see also Medeiros*, 150 F.3d at 170 ("[B]ecause the police must act in high-tension situations 'in haste, under pressure, and frequently without the luxury of a second chance,' even an intermediate level of fault, such as recklessness, is not enough to impose constitutional liability." (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986))).

The Second Circuit has held that the standard from *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015), "provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment." *Edrei*, 892 F.3d at 537 (2d Cir. 2018). Under *Kingsley* and *Edrei*, a plaintiff must show that "the force purposely or knowingly used against him was objectively unreasonable." *Edrei*, 892 F.3d at 534 (quoting *Kingsley*, 576 U.S. at 397).

Here, the undisputed facts demonstrate that Defendant encountered an ongoing gunfight, (Dkt. No. 223, ¶¶ 24–26; Dkt. No. 231-3, ¶¶ 24–26)—with many innocent partygoers in the area, (Dkt. No. 221-2, at 47; Dkt. No. 221-7, at 17–18; Dkt. No. 221-19, ¶ 7; Dkt. No. 221-20, at 2; Dkt. No. 231-5, at 4; Dkt. No. 235-9, at 6; Dkt. No. 238-2, at 3)—which posed an imminent and significant security threat. There is testimony that Defendant did not identify herself as a police officer or issue commands; that she was panicked; and "with so many people shooting," there would have been "no way for her to even tell anything." (Dkt. No. 231-7, at 3–4, 6–7; Dkt. No. 231-12, at 3–4.) The parties agree, however, that, as it pertains to Tennyson, Defendant discharged five rounds from her firearm "in the direction of the individuals firing weapons next to the black sedan." (Dkt. No. 223, ¶ 28; Dkt. No. 231-3, ¶ 28.) Tennyson argues that this case is different from the high-speed chase at issue in *Lewis* because Defendant was extremely reckless in shooting in an area with so many people. Tennyson has not, however, cited, and the Court has not found, evidence of an intent to commit harm unrelated to the use of force directed at individuals firing weapons. Even construing all of the facts in the light most favorable to Tennyson, she has pointed to no authority for the proposition that the discharge of five rounds in the direction of individuals firing weapons under the "high-tension" circumstances of public gunfire, where Defendant acted "in haste, under pressure, and . . . without the luxury of a second chance," constitutes egregious official conduct. *See Medeiros*, 150 F.3d at 170 (quoting *Whitley*, 475 U.S. at 320). The Court has not found any caselaw support for Tennyson's claim. *See id.*; *Pickering v. Mercado*, No. 03-cv-5654, 2006 WL 1026677, at *8, 2006 U.S. Dist. LEXIS 102582, at *20–21 (E.D.N.Y. Apr. 17, 2006); *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (requiring a purpose to commit harm, not recklessness or deliberate indifference, where defendant police officers accidentally shot and killed an

innocent bystander when responding to a "gunfight in progress [that] threatened the lives of the 50 to 100 people"); *Terrell v. Larson*, 396 F.3d 975, 979 (8th Cir. 2005) (en banc) (noting that "every circuit to consider the issue has applied the *Lewis* intent-to-harm standard to 'those myriad situations involving law enforcement and government workers deployed in emergency situations'" and collecting cases from the Sixth, Seventh, Ninth, and Tenth Circuits).[32] In any event, as set forth below, Defendant is entitled to qualified immunity because the unlawfulness of her conduct was not clearly established at the time.

Therefore, Defendant's motion for summary judgment is granted with respect to Tennyson's Fourteenth Amendment claim.

### 4. Qualified Immunity

Finally, Defendant argues that she is entitled to qualified immunity with respect to each of Tennyson's claims. (Dkt. No. 224, at 24, 26.) Tennyson disagrees. (Dkt. No. 231, at 25.)

Public officials are entitled to qualified immunity on a § 1983 claim "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)) (internal quotation marks omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense on which defendants bear the burden of proof. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). "The Court first construes disputed facts in favor of the plaintiff[] but then is required

---

[32] Tennyson principally cites *Pendergraph v. City of Syracuse*, No. 19-cv-291, 2020 WL 777254, 2020 U.S. Dist. LEXIS 26928 (N.D.N.Y. Feb. 18, 2020), in support of her position. But that decision involved a motion to dismiss under Rule 12(c) for which the court was obligated to accept all well-pleaded allegations as true, and Judge Mordue made clear that his denial of the defendant's motion to dismiss was premised on the "as-yet unclear" circumstances of the shoot-out at issue. *See id.*, 2020 WL 777254, at *3, 2020 U.S. Dist. LEXIS 26928, at *6. Here, the parties have had the benefit of fulsome discovery, and there are no facts indicating that Defendant was able to make "unhurried judgments, upon the chance for repeated reflection, . . . uncomplicated by the pulls of competing obligations," *see Lewis*, 523 U.S. at 853. The other cases Tennyson cites are similarly unavailing.

to 'dismiss the claim if, at the time of the defendant's conduct, the law was unclear whether the facts so construed[] constituted a violation of the plaintiff['s] constitutional rights.'" *Barzilay v. City of New York*, 610 F. Supp. 3d 544, 602 (S.D.N.Y. 2022) (quoting *Lynch v. Ackley*, 811 F.3d 569, 573 (2d Cir. 2016)).

A clearly established right "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Radwan*, 55 F.4th at 114 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This requires that controlling authority or a robust consensus of cases of persuasive authority have recognized the right at issue." *McKinney v. City of Middletown*, 49 F.4th 730, 738–39 (2d Cir. 2022) (citation and internal quotation marks omitted). A case "directly on point" is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Radwan*, 55 F.4th at 114 (citation omitted). "[C]ourts must be careful 'not to define clearly established law at a high level of generality'" because the "dispositive question" is "whether the violative nature of particular conduct is clearly established." *McKinney*, 49 F.4th at 739 (citations omitted). That is, the inquiry is whether "the official being sued had fair warning that his or her actions were unlawful." *Edrei*, 892 F.3d at 539 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014)).

Here, construing disputed facts in the light most favorable to and drawing all inferences in favor of Tennyson, Defendant is entitled to qualified immunity because the unlawfulness of her conduct was not clearly established at the time.

As to Tennyson's Fourth Amendment claim, *Medeiros* establishes that where the police "d[o] not intend to restrain" the plaintiff, the plaintiff "was never seized within the meaning of the Fourth Amendment." *See Medeiros*, 150 F.3d at 168. And as discussed, under the caselaw

within the Second Circuit following *Medeiros*, the plaintiff must be the *intentional* object of the defendant's force. *See Cox*, 271 F. Supp. 3d 591, 605–06 (collecting cases). Accordingly, even assuming Defendant did recklessly shoot Tennyson and that that could now be the basis for a Fourth Amendment violation, such conduct was not a well-established violation of the Fourth Amendment—that is, it was clearly not "beyond debate," *Radwan*, 55 F.4th at 114, and Defendant did not have "fair warning," *see Edrei*, 892 F.3d at 539, that her conduct was unlawful and exposed her to Fourth Amendment liability.

Similarly, there is no clearly established law that a police officer who approaches an ongoing public gunfight—without identifying herself or directing people to drop their guns—and recklessly shoots in the direction of individuals firing weapons where there are also innocent people, thereby injuring an innocent bystander, violates the Fourteenth Amendment. As Defendant points out, no circuit-court case applying *Lewis* has reached the conclusion that this is a constitutional violation. *See, e.g., Davis v. Waller*, 44 F.4th 1305, 1324 (11th Cir. 2022) (Pryor, J., dissenting) ("We largely lack guidance in what constitutes reasonable use of deadly force when hostages or innocent bystanders are caught in the crossfire between the police and a gunman."). Second Circuit caselaw suggests that it is not. *See Medeiros*, 150 F.3d at 170 ("Substantive due process . . . does not afford a cause of action for police negligence. Further, because the police must act in high-tension situations 'in haste, under pressure, and frequently without the luxury of a second chance,' even an intermediate level of fault, such as recklessness, is not enough to impose constitutional liability." (citations omitted)). Other circuit courts suggest the same. *See Terrell*, 396 F.3d at 979. Thus, even if Defendant's conduct did violate the Fourteenth Amendment, since there is no clearly established law, she is entitled to qualified immunity.

Tennyson points to no caselaw to the contrary.[33] Therefore, the Court concludes that, even construing all of the facts in the light most favorable to Tennyson, the unlawfulness of Defendant's conduct under either the Fourth or the Fourteenth Amendment was not clearly established, and Defendant is accordingly entitled to qualified immunity as to both of Tennyson's claims.

The Court recognizes and is sympathetic to the tragedy of this event for Tennyson, who was an innocent victim. But under the caselaw, Defendant, a police officer who responded to the scene of an active gunfight, is not liable under § 1983.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to strike in Case No. 16-cv-929, (Dkt. No. 237), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendant's motion for summary judgment, (Dkt. No. 221), is **GRANTED**; and it is further

**ORDERED** that Tennyson's claims in Case No. 16-cv-929 are **DISMISSED**; and it is further

**ORDERED** that Tennyson's *Daubert* motion, (Dkt. No. 222 in Case No. 16-cv-929), is **DENIED as moot**; and it is further

**ORDERED** that the Clerk of Court is directed to close Case No. 16-cv-929; and it is further

---

[33] Rather, Tennyson's argument is limited, with no caselaw support, to her statement that "[i]t is a little difficult to imagine that any officer would not know that shooting randomly at a car with several people in it would not violate well established law." (Dkt. No. 231, at 25.)

**ORDERED** that Porter's *Daubert* motion, (Dkt. No. 219 in Case No. 19-cv-678), is

**GRANTED in part** and **DENIED in part**, as set forth above; and it is further

**ORDERED** that trial in Case No. 19-cv-678 will begin on October 21, 2024.

**IT IS SO ORDERED.**

Dated: July 12, 2024
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge