UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TANAJEE MADDOX as
Administratrix of the Estate of GARY
TERRANCE PORTER,

*Plaintiff,*

- v -

SYRACUSE POLICE OFFICER
KELSEY FRANCEMONE sued
herein in her capacity as an individual

*Defendant.*

Civil Action No.: 5:19-CV-
0678 (BKS/MJK)

## <u>POLICE OFFICER KELSEY FRANCEMONE'S TRIAL BRIEF</u>

This lawsuit arises from an attempt by a single female police officer to stop a gang-related firefight at the James Geddes Housing Complex ("Geddes Housing Complex") in the City of Syracuse on the evening of June 19, 2016. What began in that location as a Father's Day barbeque involving hundreds of local partygoers descended into chaos after 11:00 p.m., when multiple shooters—no less than five—discharged more than 37 rounds in the vicinity of a small parking lot (referred to as the "Stone Court parking lot") located off of Tully Street, directly next to the barbecue. Officer Francemone who was the first, and only, police officer on the scene for several minutes, lawfully and correctly discharged her firearm at the shooters, including the decedent Mr. Porter. Although Mr. Porter was tragically killed in the process, his death was not the result of any alleged constitutional violation by Officer Francemone.

## SUMMARY FACTUAL BACKGROUND OF THE CASE

Gary Porter[1] and Evelyn Tennyson arrived at the Father's Day barbecue between 4:30 p.m. and 5:30 p.m., in a rented black Chevy Malibu sedan, parking in the Stone Court South parking lot off of Tully Street.



Evelyn Tennyson, who was driving, backed the Malibu into the second spot from the northwest corner of the parking lot. And it remained in the same parking spot the entire time while Mr. Porter and Ms. Tennyson were at the barbecue. For their parts, Mr. Porter and Ms. Tennyson, remained in the general vicinity of the rented Malibu over the next six hours.

The Geddes Housing Complex is in a high gun crime area in the City of Syracuse and is tracked by the Onondaga Crime Analysis Center ("OCAC") as a gang territory for a westside Syracuse gang. The barbecue itself was advertised on social media as being sponsored by a local gang. The Syracuse Police Department

---

[1] Confusingly, Gary Porter also went by the name "Terry Maddox" and the street names: "T-Lover" or "T-Luva". Witnesses in the case will use these names interchangeably.

issued warnings to its officers responding to calls in that area that day, that violence was expected. Although it began during the day, the barbecue continued on into the night as a party involving several hundred attendees, who were dancing, drinking, and, in certain cases, using drugs.

In June of 2016, Officer Francemone was 22 years old and had been a police officer for just under two years. She was working First Platoon, Patrol, assigned to the "631" territory on the near westside of the City, which included the Geddes Housing Complex. At approximately 11:09 p.m., Officer Francemone was dispatched to 310 Otisco Street to both respond to a report of an unconscious person who was reported to be lying on the porch at that address, and to address a loud noise complaint from a party in the same vicinity. She arrived on location at approximately 11:10 p.m. and spoke to two females present at 310 Otisco Street, who could not confirm the facts related to the call or identify the reported male who had passed out. At 11:12:22 p.m., she called in to Dispatch that there was no one at the reported location matching the description given during the call and confirmed that that Dispatch could cancel the previously dispatched ambulance.

While she was present at 310 Otisco Street, Officer Francemone observed a large crowd, which she estimated to be 300-400 people, and heard loud music from a courtyard within the Geddes Complex, which she reported to Dispatch. While standing at the 300 block of Otisco Street, she heard approximately 15 gunshots in rapid succession, from more than one firearm, coming from an area of the party somewhere within the Geddes Housing Complex to the south.



Upon hearing the initial gunfire, Officer Francemone immediately called in "shots fired" to Dispatch on her radio and ran across Otisco Street and in between two buildings into the courtyard from where she believed the shots were coming. As she entered the courtyard, a sea of people, reacting to those same shots, were running *out of the courtyard* toward her and around her (in a northern direction), screaming as they fled the area.

Evelyn Tennyson, who was standing in the Stone Court parking lot at the time of the initial gunfire, heard "more than 10" gunshots as she tried to enter the driver's side of the Malibu. Ms. Tennyson testified that she sensed the firing coming "from the side and behind [her]," and she described the initial firing as occurring "this way, that way, just from all over." Ms. Tennyson confirmed that the crowd in the area of the barbecue began to run out of the courtyard as soon as the firing started.

At 11:13:19 p.m., surveillance video of the north end of the courtyard (the "Schoeneck Court North" camera), depicted a large number of individuals *suddenly* react to the gunfire and begin to run *en masse* out of the courtyard toward Otisco Street. Officer Francemone first appeared in the video, going toward

the firefight—and in the *opposite* direction of the crowd—19 seconds after the crowd first began to run out of the courtyard. Officer Francemone did not leave the camera frame until *26 seconds after the shots first started*, (at 11:13:45 p.m.,), continuing to run south in the direction of the Stone Court south parking lot and Tully Street.





Thus, Officer Francemone arrived at the Stone Court parking lot 30 seconds or more after the firing started, as indicated by when the crowd began to run. As Officer Francemone approached the Stone Court parking lot, she saw muzzle flashes coming from the parking lot, and observed at least three active shooters around a dark sedan, including a male in a yellow t-shirt. *Plaintiff's* crime reconstruction expert will testify that the forensic evidence—specifically expended casing piles—indicate that there were three active shooters in the vicinity of the parking lot, including one on either side of the rear of the Malibu.[2]

---

[2] Plaintiff's expert, Peter Valentin, mistakenly but synonymously refers to the Malibu in his report as the "Impala," a car model with an identical body type.



Figure 24 from Plaintiff's Expert Report identifying additional shooters (other than defendant) by casing piles denoted in yellow, lavender, and pink in the vicinity of the Stone Court parking lot. [Valentin Tr. at 119:14-25]

These events are also confirmed by surveillance video depicting a portion of Stone Court parking lot from a building across Tully Street (the "427 Tully St. camera"). Like the Schoeneck Court video, the 427 Tully St. video also depicts the point in time when all the people began to run away from the parking lot. Approximately 32 seconds after the initial firing occurred—or in the exact same time frame that Officer Francemone would have arrived at the parking lot—a figure can be seen in long pants, a gray hat, and a bright colored shirt, firing a weapon on the passenger side of the Malibu. The video depicts muzzle flashes occurring at the end of the figure's right arm. Forensic video expert Michael Primeau will testify that the bright toned shirt depicted in the surveillance video, based on the type of camera, resolution ratio, and pixilation, would be consistent with someone wearing a yellow shirt.



When Officer Francemone's commands to the active shooters to drop their weapons went unheeded, she discharged her .45 caliber department-issued firearm five times at the shooters in the vicinity of the Malibu. Plaintiff's crime reconstruction expert will testify that the forensic evidence indicates that Officer Francemone's firing was directed at the active shooters on either side of the Malibu.

Following her fifth shot, Officer Francemone's service firearm jammed. She took a knee and cleared the jammed round, dropping her magazine and inserting a replacement magazine. When she rose, she noticed one of the original shooters to the west of her position and began to chase him. She will testify that she believed at the time the individual was wearing a white shirt; however, she would learn later that the individual she was chasing was the shooter in the yellow shirt—i.e., Gary Porter. While Plaintiff's counsel will attempt to make much of this inconsistency,

given the fact that she had just experienced five muzzle flashes in front of her face in rapid succession, the short-term effect to the cones of her eyes would have impaired her ability to perceive ordinary color gradations.

Officer Francemone will testify that Mr. Porter was holding a weapon as she was chasing him, and that she reasonably believed he continued to be a threat to use the firearm. She perceived him to be unresponsive to her commands to drop his weapon, and he appeared to turn toward her while holding his weapon. Consistent with her training, Officer Francemone fired two additional shots at Mr. Porter as she was pursuing him. Mr. Porter ran out of the courtyard, turned right and collapsed in the next courtyard. Blood spatter evidence was recovered in the alleyway, showing evidence of bleeding immediately prior to Mr. Porter turning to the right.

Two other individuals who were present, 12-year-old Carlos Stackhouse and 18-year-old Khalil Davis, testified under oath before an Onondaga County Grand Jury that they observed Mr. Porter holding a weapon prior to him being shot. Khalil Davis testified that Mr. Porter threw the weapon while he was being chased, and that several individuals, including Khalil Davis himself, attempted to retrieve the weapon from where it was thrown. During his police interview, through the use of a photo array, Khalil Davis identified the individual who ran off with Gary Porter's gun as Takim Hawkins (also known as "Devon Black"). Mr. Hawkins, who will be identified as having a gang affiliation by OCAC analyst Sarah Pierce, is visible in social media photographs of the barbecue as well as surveillance video after the incident.

It is anticipated that Plaintiff will offer multiple witnesses who are friends or family members of the deceased or his daughter, who will testify that Mr. Porter did not have a gun at various points of time during the event. Cross-examination

of these witnesses will show that they have grossly exaggerated or misrepresented confirmed facts and are, thus, not credible and are also biased. Nonetheless, the question of whether Mr. Porter was armed or otherwise participated in the firefight will be a key question of fact for the Jury to decide.

Once Mr. Porter collapsed in the adjacent courtyard, three women began to attempt to render first aid to him by providing compression to his wounds. Officer Francemone was accosted by a hostile crowd that was surrounding Mr. Porter. At a certain point, she was assaulted by the crowd and thrown to the ground. Portions of her uniform were ripped from her body. Because of the out-of-control and dangerous crowd, who were throwing bottles and rocks, the scene was not deemed safe for the ambulance personnel, causing a delay in treatment of Mr. Porter. Even when the ambulance crew did arrive, they were pushed away by the crowd, who attempted to steal their equipment and began to pound on the ambulance sides and doors once Mr. Porter was secured inside.

By all accounts, Mr. Porter was not conscious while he was laying prone in the adjacent courtyard. While certain individuals who were there will testify that they perceived him to be breathing, they have not identified him as being responsive to voice or touch. When the ambulance personnel were eventually able to reach Mr. Porter, they indicated that he was unresponsive, and never regained consciousness. Mr. Porter was pronounced dead at Upstate University Hospital the same evening.

SECTION I:

CLAIMS TO BE TRIED

The Complaint alleges one cause of action under 42 U.S.C.§ 1983 for excessive force, alleging violation of the Fourth and Fourteenth Amendments of the U.S. Constitution. *See* Dkt. No. 1 at ¶¶ 24-29.

### Fourth Amendment

The Fourth Amendment claim is governed by the well-settled standards set forth in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). Under those standards, as long as the officer, under the totality of the circumstances, "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," the use of deadly force is constitutionally permissible. *Garner*, 471 U.S. at 11. In particular, where "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* at 11-12.

However, the determination of what is reasonable must *also* be viewed in light of the ground rules set forth in *Graham v. Connor*. The Court and the Jury must evaluate a police officer's use of force from the understanding of a reasonable police officer responding to the events at the incident itself—not with "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Indeed, the Jury's determination of the reasonableness of the officer's actions "*must* embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (emphasis added). Officer Francemone's split second reactions and decisions in the course of the night-time firefight she was responding to, is a prime example of such a "tense, uncertain, and rapidly evolving" event.

### Fourteenth Amendment

Plaintiff's reliance on the Fourteenth Amendment in the Complaint is in

error. The Supreme Court has made clear that claims of excessive force against the police prior to arrest are to be analyzed under the Fourth Amendment, *not* the Fourteenth Amendment. *See Graham*, 490 U.S. at 395 ("*All* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach") (emphasis added); *see also Barrett v. City of Newburgh,* 720 Fed. App'x 29, 31 (2d Cir. 2017) (it is well-established that "the Fourth Amendment is the only source of constitutional right to be free from excessive force in an arrest or seizure").  The Court should therefore reject any attempt by the Plaintiff to seek application of the Fourteenth Amendment to this case.

## SECTION II:

## ANTICIPATED LEGAL/EVIDENTIARY ISSUES AT TRIAL

### A. Impeachment of Khalil Davis and Carlos Stackhouse.

As mentioned above, within a few months of the incident both Khalil Davis and Carlos Stackhouse testified under oath before an Onondaga County Grand Jury that Gary Porter was carrying a gun while, or shortly before, he was shot by Officer Francemone. Both gave video-recorded interviews to Syracuse Police detectives providing great detail regarding their observations in this regard, including volunteering additional unprompted facts.

Khalil Davis

Mr. Davis first volunteered to police officers that he "**saw the whole thing**" and that Officer Francemone had "**no choice, she told him to drop [the gun] and he didn't, she didn't have a choice, she had to do what she had to**

**do, that's a fact**." Within several hours after volunteering these statements, Mr. Davis was brought to the Public Safety Building where he was interviewed on video by two detectives, where he volunteered his observations that (i) Mr. Porter possessed a gun, (ii) that he discharged it in the presence of Officer Francemone, and (iii) that he disregarded her clear commands to drop the weapon. Likewise, Mr. Davis described:

> I'm going to tell you like this. She basically was saving everybody that was hiding. She was saving everybody that was -- because everybody was -- you know how the apartments is over here, right? And they got like how you could back up into it. That's basically she was doing. She was keeping people safe. Like she was only doing her job. I'm not saying that what she did was wrong and I'm not saying what she did was right but the only thing she was doing, she was doing her job. She had to do what she had to do. It was a lot of gunfire. She was just saving other -- she was just saving innocent bystanders basically**.**

Mr. Davis stated on video during this interview that: (1) during the incident, several shooters were firing at Officer Francemone and that she returned fire, Powers Decl. [Dkt. No.73-1], Exh. I, p. 19, lns. 1-19;[3] (2) Mr. Porter [the man in the "bright green" shirt] "had a gun in his hand" as he was running from the gunfight, *id*. at p. 9, lns. 4-16; and (3) Officer Francemone told Mr. Porter to "drop the gun" "five or six times" before she shot at him. *Id*. at p. 9 -10, lns. 20-25, 4-16.

Later, Mr. Davis testified before the Onondaga County Grand Jury, describing a "lot of gunfire that night" with "shots coming from all type of direction." Powers Decl. [Dkt. No. 73-1], Sealed Exhibit F at p. 22, lns. 11-15. Mr. Davis further testified that:

> Q.   And included in that group was the man that ultimately died?
> A.   Yes, sir.
> Q.   And he had a gun?
> A.   Yes, sir.
> Q.   So he was shooting towards the East Side?

---

[3] The video of this interview was also conventionally filed with the Court. *See* Powers Decl. [Dkt. No. 73-1], Exh. H.

A.    Yes, sir.
Q.    And how many shots?
A.    A lot.
Q.    Like a lot?
A.    A lot. A lot of shots. A whole lot of shots.

*See id.* at p. 10, lns. 14-25. Mr. Davis confirmed in his testimony that Officer Francemone gave at least *four* clear commands to drop the gun, which Mr. Porter ignored. *See id.* at p. 14, lns. 4-14. Mr. Davis also confirmed that as Mr. Porter was fleeing toward Skiddy Park, he turned his body toward Officer Francemone and said that "**all she know is the gun in his hand**" as Mr. Porter turned. *See id.* Based on what he observed concerning Mr. Porter's actions on that evening, Mr. Davis thought that Officer Francemone believed Mr. Porter was turning to point the gun at her. *See id.* at p. 15, lns. 17-19. And that is when he heard Officer Francemone discharge her weapon at Mr. Porter. *Id.* at p. 15, ln. 25, p. 16, ln. 1.

As part of this civil lawsuit, at Defendant's request, this Court issued an Order directing Clinton Correctional Facility ("the Facility") to produce Mr. Davis for a deposition. *See* Dkt. No. 42. On March 3, 2021, this Court signed a subpoena commanding Mr. Davis to appear and give testimony at the Facility. *See* Dkt. No. 43. At the deposition, Mr. Davis appeared but refused to testify. *See* Dkt. No. 73-5.

By Order to Show Cause, Defendant moved for an order holding Mr. Davis in contempt. Dkt No. 73. On December 1, 2021, this Court entered an Order holding Mr. Davis in contempt of court. Dkt No. 89. That order of contempt is still in place and has not been purged by Mr. Davis.

Several years later, Plaintiff's counsel provided the Court with a handwritten letter, purporting to be from Mr. Davis and addressed to Plaintiff's counsel directly, wherein Davis is alleged to have written, among other things, that he was not at the Father's Day barbeque. At the request of Plaintiff's counsel, the Court ordered

a second deposition to be held at the federal courthouse under the supervision of Magistrate Judge Baxter. However, Mr. Davis again refused to answer the questions posed by Defendant's counsel, even after being sternly lectured by Magistrate Judge Baxter.

A writ has recently been issued directing Mr. Davis' appearance at the upcoming trial at the request of Defendant. *See* Dkt. No. 261. It is anticipated based on his past contempt, that Mr. Davis is going to take one of three potential courses of action: (1) refuse to testify again; (2) feign a lack of memory; or (3) fabricate a new narrative that he was not present at the Father's Day barbecue.

Carlos Stackhouse

SPD police officer John Nye was investigating an unrelated "prowler" complaint in the City during the early morning hours of June 28, 2016 when he encountered Mr. Stackhouse and two of his friends. *See* Dkt. No. 125-9. Mr. Stackhouse offered to Officer Nye that he observed "[w]hat went down on the west side last week." *Id.* Specifically, Mr. Stackhouse indicated that he observed Mr. Porter "'shootin' at someone'" before being told by Officer Francemone to "'drop the gun.'" *Id.* Mr. Stackhouse also volunteered that when Mr. Porter began to flee, he thereafter disposed of the gun by throwing it to the ground. *Id.*

As a result of the information he volunteered to Officer Nye, Mr. Stackhouse and his mother were brought to the Public Safety Building so that Mr. Stackhouse could provide a statement under the pseudonym "Citizen C" in an interview that was videotaped.  Mr. Stackhouse recounted to Detective Kilburn that he initially heard a significant amount of gunfire prior to Officer Francemone arriving in the courtyard of the Complex. He stated that after the initial series of shots, he observed a man in a "lime green - - shirt," discharge his firearm prior to discarding it. *See* Dkt. No. 125-11 pp. 18-19. He stated that after Mr. Porter "dropped his

gun," Porter fled toward Skiddy Park. *See id.*, p. 18; *see also* Dkt. No. 125-12. Mr. Stackhouse's statements clearly reflect his firsthand observations of Mr. Porter both brandishing and firing a gun.  This police interview occurred nine days after the events in question.

Mr. Stackhouse was also called by the Onondaga County District Attorney's Office to testify before an Onondaga County Grand Jury. His testimony occurred on July 14, 2016—less than one month after the Skiddy Park Incident. *See* Dkt. No. 125-8.

After being sworn to testify under the penalty of perjury, Mr. Stackhouse confirmed that he was present on the evening of June 19, 2016 and that he initially heard gunshots coming from the vicinity of Tully Street and Otisco Street. He observed several individuals firing guns prior to Officer Francemone arriving in the courtyard. Upon Officer Francemone's arrival, Mr. Stackhouse observed a man in a "lime green shirt"—*i.e.*, Gary Porter—firing a gun. More specifically, he testified: **"[t]he man with the lime green shirt ran two steps past [Officer Francemone], took his gun out and was shooting then the cop turned around and was shooting at him and then he um, shot his gun to the ground and was running ...."** *See* Dkt. No. 125-8 at pp. 3-4.

After Mr. Stackhouse's Grand Jury testimony was unsealed by County Court Judge Thomas J. Miller, this Court issued an Order directing Hillbrook Juvenile Detention Center ("the Facility") to produce Mr. Stackhouse for a deposition at the federal courthouse. *See* Dkt. No. 29.

. This Court signed a subpoena commanding Mr. Stackhouse to appear and give testimony at the federal courthouse. *See* Dkt. No. 31. The deposition was held on the morning of March 30, 2021. *See* Dkt. No. 125-7.

With counsel, a videographer, stenographer, and Mr. Stackhouse's criminal

attorney present on the morning of March 30, 2021, Mr. Stackhouse was sworn in and acknowledged that he was appearing in response to the subpoena. *See* Dkt. No. 125-7 p. 5. Though he also acknowledged that he was appearing to testify relative to the events of June 19, 2016, he immediately claimed to have no recollection of the underlying events, his police interview, or his prior testimony before the Onondaga County Grand Jury. *See generally* Dkt. No. 125-7.

Indeed, in a deposition that lasted less than an hour, Mr. Stackhouse asserted that he could not remember *no less than 34 times*. *See generally* Ex. Dkt. No. 125-7. And despite being shown his police interview and Grand Jury testimony, he indicated that his recollection could not be refreshed. *See generally* Dkt. No. 125-7. At one point during the deposition, Mr. Stackhouse claimed that not only had he *not* attended the Father's Day event on June 19, 2016, *but that he had never been to the Geddes Housing Complex*;[4] an assertion that is contradicted by several photographs that were taken *at* the Housing Complex during the Father's Day barbeque *on* June 19, 2016:



---

[4] Dkt. No. 125-7, Tr. 22, lns. 8-12.

Much like the deposition of non-party witness Khalil Davis, Plaintiff's counsel expressed great pleasure by this turn of events.

<u>The Video Interviews are admissible for impeachment purposes and
the Grand Jury testimony comes in for its truth</u>

If, when confronted with their prior statements, Mr. Davis and Stackhouse refuse to testify, feign a lack of memory, or deny the truth of their prior statements, Defendant intends to mark and publish their respective Grand Jury testimony and video interviews to the Jury.

As an initial matter, where a witness's recalcitrance to testify offends the Court's primary goal in the search for the truth, the Court retains great deference with respect to admitting prior inconsistent statements. *See Di Carlo v. United States*, 6 F.2d 364, 369 (2d Cir. 1925) ("The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge."); *United States v. Murray*, 297 F.2d 812, 817 (2d Cir. 1962) (prior inconsistent statements may be admissible to establish affirmative fact).

Rule 613 of the Federal Rules of Evidence provides as follows:

**(a) Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.

**(b) Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

Thus, extrinsic evidence of a prior statement is admissible (1) if the statement is inconsistent; and (2) the witness is given an opportunity to explain or

deny the statement, or (3) "if justice so requires." Fed. R. Evid. 613(b). In addition, in the Second Circuit, the statement must relate to a "non-collateral matter," *i.e.*, one that is relevant to the issues in the case and could be independently proven. *United States v. Rivera*, 273 Fed. Appx. 55, 58 (2d Cir. 2008).

A statement is *inconsistent* if there is "[*a]ny variance* between the statement and the testimony that has a *reasonable bearing on credibility*." *United States v. Trzaska*, 111 F.3d 1019, 1025 (2d Cir. 1997) (internal citation omitted). Inconsistency is not limited to diametrically opposed answers but may be found in *evasive answers*, *inability to recall*, *silence*, or *changes of position*. *United States v. Causey*, 834 F.2d 1277, 1282-83 (6th Cir. 1987) ("Causey argues that as Mrs. Jackson claimed only an inability to recall, the testimony of Agent Harrington was therefore not technically inconsistent with her statement. That contention is without merit.")

Thus, importantly, *lack of memory* about an event is sufficient to establish inconsistency. *McDonnell v. United States*, 472 F.2d 1153, 1155 (8th Cir. 1973) ("the witness's faulty memory concerning the events ... makes his prior testimony inconsistent." ); *United States v. Insana,* 423 F.2d 1165, 1170 (2d Cir. 1970) (witness's lack of memory is inconsistent with prior testimony) [5] Thus, if  Mr.

---

[5] *See also United States v. Dean*, 823 F.3d 422, 427 (8th Cir. 2016) ("Moreover, Maxwell's testimony on redirect examination that she did not remember whether Dean had a gun on the night of the assault is *inconsistent* with her prior grand jury testimony that he did have a gun."); *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 757 (5th Cir. 2008) ("a witness's 'feigned' memory loss can be considered inconsistent ... The breadth and depth of Edgardo's claimed memory loss is facially suspect to say the least, and the district court reasonably have concluded that this selective memory loss was more convenient than actual."); *United States v. Gajo*, 290 F.3d 922, 931 (7th Cir. 2002) ("a lack of memory is inconsistent with the description of specific details before the grand jury."); *United States v. Matlock*, 109 F.3d 1313, 1319 (8th Cir. 1997) (testimony that 'attempted to minimize' defendant's role and that 'was far less incriminating and therefore far less helpful to the government' inconsistent with prior testimony); *United States v. Russell*, 712 F.2d 1256, 1258 (8th Cir. 1983) (a witness's inability to recall "is sufficiently inconsistent with his grand jury testimony for the trial court to admit the previous testimony."); *United States v. Murphy*, 696 F.2d 282, 284 (4th Cir. 1982)("The grand jury

Stackhouse repeats his prior performance from his deposition, where he thwarted the search for the truth by claiming a lack of memory regarding *every detail* of the incident, his conduct establishes inconsistency.

Similarly, if Mr. Davis refuses to answer counsel's questions, as he has in the prior two depositions, that conduct too is sufficiently inconsistent under Fed. R. Evid. 613(b). *Causey*, 834 F.2d at 1282-83 (Inconsistency is not limited to diametrically opposed answers but "can be found in ... *silence*") (emphasis added); *United States v. Rogers,* 549 F.2d 490, 496 (8th Cir.1976) ("A statement's inconsistency may be determined from the circumstances and ... may be implied through silence"). In *United States v. Kelly*, police officers tape-recorded the statement of the defendant's son, who identified the gunman as being the defendant. 436 F.3d 992, 994 (8th Cir. 2006). At trial, the son refused to cooperate on the stand, refusing to answer questions. The trial court admitted the son's taped interview as a prior inconsistent statement under Fed. R. Evid. 613(b). *Id.* The defense argued that the trial court erred because the son, who refused to testify, was not given an opportunity to explain or deny the statement as required by Rule 613(b). *Id.* at 996. The court rejected the argument, finding that by taking the stand, the son had the opportunity to explain himself and opposing counsel had the opportunity to cross examine. *Id.* The court found that extrinsic evidence of the statement—*i.e.*, the tape-recorded statement—was admissible. *Id.* Thus, extrinsic evidence of Stackhouse's and Davis's prior statements—the videotaped interviews—can be admitted and published.

---

testimony was properly admitted under Rule 801(d)(1) of the Federal Rules of Evidence"); *United States v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981) ("the trial court did not abuse its discretion when it admitted the challenged grand jury testimony"); *United States v. Rogers*, 549 F.2d 490, 495-96 (8th Cir.1976) ("The trial judge should have considerable discretion to determine whether evasive answers are inconsistent").

It is of no moment if these witnesses were to admit to the prior statements on the stand, but now claim they were false. Opposing counsel has argued this in prior cases as a bar to the admission of extrinsic evidence of the prior statement—i.*e.*, that even though the witness is testifying inconsistently, all he need do is admit he made the prior statement to bar the jury from seeing evidence of that statement. This view does not represent the majority position in the federal courts, or the position of the Second Circuit.

In *Gordon v. United States*, the Supreme Court addressed this precise issue and explained why the admission of extrinsic evidence of the statement was still important even though the witness had admitted to making the prior inconsistent statement:

> The Court of Appeals affirmed on the ground that Marshall's admission, on cross-examination, of the implicit contradiction between the documents and his testimony removed the need for resort to the statements and the admission was all the accused were entitled to demand. We cannot agree. We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence, providing it meets all other requirements of admissibility and no valid claim of privilege is raised against it... *the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction.* We hold that the accused is entitled to the application of that rule, not merely because it will emphasize the contradiction to the jury, but because *it will best inform them as to the document's impeaching weight and significance.*"

344 U.S. 414, 420-21 (1953)(emphasis added).

In *United States v. Lashmett*, the Seventh Circuit observed that "authorities go both ways" on this issue. 965 F.2d 179, 182 (7th Cir. 1992). The Seventh Circuit agreed with the courts that have found that an admission that the statement was previously made does *not* defeat the admission of extrinsic evidence under Fed. R. Evid. 613(b). *Id.* The court observed that the preferred view is that "extrinsic evidence should be permitted, because it is generally more persuasive to a jury than

a witnesses' simple acknowledgement that he or she made the false or inconsistent statement." *Id.*; *see also Williams v. United States*, 403 F.2d 176, 179 (D.C.Cir.1968) (error to exclude written prior inconsistent statement even though witness admits making it). Importantly, the *Lashmett* Court also cited to the Second Circuit's decision in *United States v. Browne*, 313 F.2d 197, 199 (2d Cir.), *cert. denied*, 374 U.S. 814 (1963), as persuasive authority its ruling. *Id.* ("We agree. Prior inconsistent statements can severely undermine the credibility of a witness, by showing either a flimsy recollection of events or worse, a propensity to lie, and we think the better view is to give Rule 613(b) a broad reading").

Other decisions from the Second Circuit indicate that it conforms with this preferred view. *See, e.g.*, *United States v. Strother*, 49 F.3d 869, 876 (2d Cir. 1995) ("Extrinsic evidence of a prior inconsistent statement is more persuasive to a jury than a witness's acknowledgement of inconsistencies in a prior statement."). And, *Wigmore* and *McCormick* both suggest that the preferred view allows for the publication of the extrinsic evidence even when the witness admits to the prior inconsistent statement:

> *Even where the witness admits having made the other statements,* this does not prevent the opponent from offering it in evidence by his own witnesses; for he may prefer to have it clearly brought out and emphasized, and it would be unfair to restrict him to the unemphatic mode of proving it by the witness's admission and to subject him to the necessity of disputing whether the admission has been full and exact. The purpose of the question is not to prove the statement, but merely to warn that it will be proved; and there is no reason why an admission on the stand should here cut off the right to make such proof, for it does not ordinarily in other respects * * * have such an operation."

3A Wigmore, Evidence, § 1037, pp. 1044–1046 (Chadbourn rev. 1970); McCormick, Evidence, § 37, p. 159, n. 12 (6th ed. 2006) ("the liberality of [Rule 613] in permitting extrinsic evidence of the prior inconsistent statement before the witness's attention is called to the statement should be extended so that in the

judge's discretion the extrinsic evidence can be introduced even if the witness has admitted the statement beforehand.").

The Grand Jury Testimony is independently admissible under Fed. R. Evid. 801

In *United States v. Insana*, the Second Circuit approved of the trial court's admission of a non-party witness's grand jury testimony at trial where the witness refused to testify, feigning a lack of memory in order to "escape testifying against Insana" to avoid prejudicing him at trial. 423 F.2d. at 1170. The witness's grand jury testimony was allowed in evidence not only as prior inconsistent testimony but also for its truth. *Id.*

The Grand Jury and Video Interviews are also admissible under the residual exception

In *United States v. Yonkers Contracting Co.,* the Southern District found grand jury testimony admissible under the residual hearsay exception because it has circumstantial guarantees of its trustworthiness, was probative on a material issue, and because the interests of justice are served by its admission. 701 F. Supp. 431, 436 (S.D.N.Y. 1988); *see also United States v. Mastrangelo*, 533 F. Supp. 389, 391 (E.D.N.Y. 1982) (grand jury testimony admitted under residual hearsay exception where witness was unavailable and testimony was supported by "circumstantial guarantees of trustworthiness").

In *United States v. Garner* 574 F.2d 1141 (4th Cir. 1978), like here, a material witness, threatened with contempt, nonetheless indicated to the district court that he would not testify at trial and/or was "unwilling to say anything that would incriminate either" of the defendants. *Id.* at 1143. In response, the trial court allowed for the admission of that material witness's grand jury testimony at trial. *Id.* at 1142. Reviewing that decision on appeal, the Fourth Circuit reviewed multiple prior decisions, holding that the use of the grand jury testimony at trial

was entirely appropriate under the residual hearsay exception where there are "substantial guarantees of trustworthiness" *Id.* at 1144-45; *see also United States v. Myers*, 626 F.2d 365, 366 (4th Cir. 1980) (no reversible error where trial court admitted grand jury testimony of witness who "refused to testify because she was afraid").

In *United States v. Earles*, 113 F.3d 796 (8th Cir. 1997), grand jury testimony from a non-party witness was admitted for the truth after the witness refused to testify at trial. *Id.* at 801. The Eighth Circuit upheld the district court's determination that the testimony had "circumstantial guarantees of trustworthiness surrounding the testimony and its overall probative value, the admission of this evidence increased the likelihood that the jury would ascertain the truth" about the matters in dispute. *Id.*; *see also United States v. Carlson*, 547 F.2d 1346, 1354–55 (8th Cir. 1976) (grand jury testimony of a non-party witness was properly admitted at trial after the witness expressed an "obstinate refusal to testify").

### A. Mr. Porter's prior felony gun convictions are admissible

Defendant seeks to offer a Certificates of Conviction of Mr. Porter's 2008 conviction for Criminal Possession of a Weapon 2nd for a Loaded Firearm, a "C" Felony, and Criminal Possession of a Weapon 3rd for a "defaced" firearm, as well as an earlier 1993 conviction for Criminal Possession of a Weapon 3rd. As a result of these convictions, Mr. Porter was sentenced to 3.5 years in prison, and another 2.5 years of post-release supervision.

Federal Rule of Evidence 404(b) provides that

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.... This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident.

The Second Circuit follows an "inclusionary rule, allowing the admission of such evidence *for any purpose* other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

When it comes to past convictions, "[t]he Second Circuit generally allows into evidence relevant facts regarding a defendant's prior crimes except to the extent such prior crimes would tend to prove *only* criminal propensity." *East Coast Novelty v. City of New York*, 842 F. Supp. 117, 119 (S.D.N.Y. 1994) (emphasis added). This inclusionary approach provides that "evidence of prior crimes, wrongs, or acts is admissible *for any purpose other* than to show defendant's criminal propensity, as long as it is relevant to *some disputed issue in trial*, and satisfies probative-prejudice balancing test." *U.S. v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (emphasis added) (quoting *United States v. Harris*, 733 F.2d 994, 1006 (2d Cir. 1984); *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980)).

## Opportunity

Courts in the Second Circuit have held that admission of prior firearm convictions can be acceptable for the proper non-propensity purposes of demonstrating opportunity and lack of mistake. *See e.g.*, *U.S. v. Bumagin*, 136 F. Supp.3d 361, 370 (E.D.N.Y. 2015) (evidence of prior gun use is admissible to show defendant accused of a robbery had "access to and knowledge of firearms"). Indeed, a "prior gun possession is directly relevant to the issues of opportunity and absence of mistake and also admissible to demonstrate [an individual's] ability to access such a weapon." *U.S. v. Taylor*, 767 F. Supp. 2d 428, 438 (S.D.N.Y. 2010); *see also*, *U.S. v. Slaughter*, 248 F. App'x 210, 212 (2d Cir. 2007) ("Evidence

showing that a defendant possessed a handgun prior to the charged crime is properly admitted to show access to such a weapon"); *United States v. Zappola,* 677 F.2d 264, 270 (2d Cir.1982) (concluding that it was not error to admit testimony that the defendant possessed a handgun six months before he was alleged to have fired a handgun because such evidence "was properly admitted as probative of his access to such a weapon").

Here, whether or not Mr. Porter possessed a firearm on the night of the Father's Day barbeque is the most critical issue in the case. Mr. Porter's prior felony gun convictions for possessing a loaded firearm, and one with a defaced serial number, are relevant to permit an inference that he knew how to handle, load, and *access* firearms. The prior convictions make it, therefore, more plausible that he possessed a firearm on the night in question.

For example, in *Taylor*, the Southern District held that a defendant's prior gun possession was admissible where the current jury was to decide whether the defendant had committed a Hobbs Act robbery and also violated 18 U.S.C. §§ 924(c) by "using a weapon during a crime of violence." 767 F. Supp. 2d at 43. What was at issue in the trial was whether the defendant used a weapon during the commission of a crime. The Southern District held that the defendant's prior unrelated gun possession was "directly relevant" to the "issue of opportunity and absence of mistake and also admissible to demonstrate [defendant's] access to such a weapon." *Id.* at 438.

Similarly, in *United States v. Lomas*, the Eighth Circuit upheld the admission of testimony that a defendant was in possession of a firearm weeks prior to the bank robbery he was charged with. 826 F.3d 1097, 1103 (8th Cir. 2016). The court reasoned that this evidence demonstrated that the defendant had knowledge of firearms and that he carried a similar looking firearm in the weeks prior to the

robbery. *Id.* Defendant's knowledge of firearms made it more likely that he was in possession of a firearm during the bank robbery. *Id.* Therefore, the court held that "it cannot be said that this testimony 'clearly had no bearing on the case and was introduced solely to prove [Defendant's] propensity to commit criminal acts.'" *Id.* at 1104 (citing *U.S. v. Yielding*, 657 F.3d 688, 701 (8th Cir. 2011)).

These cases provide clear authority for the admission of Mr. Porter's gun convictions.

*Motive and consciousness of guilt*

One of the relevant mysteries in this case is why Mr. Porter chose to run away from the Stone Court parking lot at the moment that he did. Based on all of the witnesses' accounts, including Plaintiff's own witnesses, Mr. Porter did not run away from the Stone Court parking lot when the firing began. Evelyn Tennyson described rounds coming from all directions and Arian Drake described the parking lot as a "war zone," yet Mr. Porter did not leave. Knariana Hoyle described her Uncle Gary Porter as being unafraid, so much so that he yelled at one of the shooters, criticizing him for not know what he was shooting at. By all accounts, Mr. Porter did not attempt to run away until *after* Officer Francemone arrived, some 30 seconds after the firing started. While Plaintiff's counsel has argued that Mr. Porter ran because he was "afraid," that explanation is unsupported by any evidence and does not otherwise float analytically in light of the above facts.

Courts have been willing to admit prior convictions where a police officer is being sued for a fatal shooting when those convictions would provide the decedent with a motive to evade arrest. *See e.g.*, *Estate of Casillas v. City of Fresno*, Case No. 1:16-CV-1042 AWI-SAB, 2019 WL 586747, at *4 (E.D.CA. 2019). The rationale for admitting these convictions is that a fleeing individual with prior convictions may be more violent or unpredictable because they possess a greater

motivation to evade arrest than an individual with a clean record. *Id.* With respect to the admissibility of prior convictions for this purpose, the court stated that "since this is a case where the parties dispute the events just prior to Officer Shipman's fatal shooting of [plaintiff], the jury must be allowed to hear competing evidence of [plaintiff's] motive and intent on that day." *Id.* at *4.

In this case, it is much more likely that Plaintiff ran away *after* Officer Francemone arrived, because he had previously served time for felony gun convictions and did not want to get caught in the Stone Court parking lot, participating in a firefight. Those prior convictions provided him a *motive* to run away once Officer Francemone arrived (whereas, if fear was *actually* his motive, he would have run away immediately). If avoiding arrest was his motive (which makes more sense given the timing of his flight), that motive is also  conversely relevant to whether or not he was actively participating in the gunfight at the time. *C.f. United States v. Steele*, 390 F. App'x 6, 11 (2d Cir. 2010) ("it is well-settled that flight can, in some circumstances, evidence consciousness of guilt"). For this reason too, the gun convictions are admissible under Rule 404(b).

### Relevance to wrongful death damages

New York's wrongful death statute allows for a decedent's heirs to attempt to recover for "loss of parental guidance" associated with the "nurture, care, and guidance" taken from them by the death of their parent. *Collado v. City of New York*, 396 F. Supp. 3d 265, 281 (S.D.N.Y. 2019). This particular measure of damages can focus on such facts as how close the decedent was to their children, what moral training they provided, and whether they serve a mentor or role model (*i.e*, loss of guidance). *See, e.g., Lelchook v. Islamic Republic of Iran*, No. 16-CV-7078 (ILG), 2020 WL 12656283, at *9 (E.D.N.Y. Nov. 23, 2020) ("Alexander had an 'extremely close' relationship with his younger brother, who 'looked up to him

as a mentor.'").

A decedent's prior convictions are *highly* relevant to this particular damages issue. *See, e.g., Estate of Casillas*, 2019 WL 586747, at *4 (decedent's prior convictions are relevant to non-economic damages to counter plaintiff's "expected testimony" that the decedent was in a "loving and supporting relationship with them."). Indeed, where damages are sought for loss of intellectual, moral, and physical guidance, evidence of decedent's character, including prior convictions, can be introduced. *See Sanchez v. City of New York*, 97 A.D.3d 501, 505 (1st Dep't 2012) (plaintiff's prior guilty plea to a shop lifting office was properly admitted as being relevant to the decedent's ability to give "intellectual, moral, and physical guidance" to the plaintiff daughter); *see also Freeman v. Corbin Ave. Bus Co.*, 60 A.D.2d 824, 825 (1st Dep't 1978). In *Freeman*, the Appellate Division, First Department affirmed that the decedent's welfare record, family court records, *and* record of criminal conviction concluding all relevant to the plaintiff's damages claim. 60 A.D.2d 824 at 825.

In *Russell v. Cirillo*, the trial court admitted, over the objection of the plaintiff, evidence of periods of incarceration of the decedent prior to his death. 17 A.D.2d 1005, 1005 (3d Dep't 1962). The plaintiff's counsel characterized this as an attempt to "defame" the decedent, as Plaintiff's will undoubtedly argue here. *Id.* The Appellate Division, Third Department affirmed, however, finding that the plaintiff's wrongful death claim necessarily put the "character, qualities and habits" of the decedent at issue. *Id.*

Here, not only was the fact that Gary Porter was away from his children for long periods of time while he was incarcerated relevant to his ability to provide care, comfort, and guidance, but his convictions for felony gun possession (*and* felony narcotics crimes) made him a poor role model for his children. Thus, his

prior convictions are highly relevant to his wrongful death damages claim.

*Relevance to rebutting testimony about Mr. Porter's good character*

It is well settled that testimony offered to support an inference that a party has a positive reputation in the community or was a good person or a good parent opens the door to the admission of criminal convictions. *See, e.g.*, *Wilson v. Mazzuca*, 570 F.3d 490, 505 (2d Cir. 2009) (party "opened the door to the admission of [his] criminal history by calling a witness to testify about Wilson's *reputation in the community*.") (emphasis added); *see also Presley by & through Presley v. Irby*, 2008 WL 11414562, at *3 (W.D. Tenn. Apr. 4, 2008) (testimony that the decedent was a "good mother" would open the door to decedent's arrests and/or convictions).  In *Gov't of Virgin Islands v. Roldan*, the Third Circuit found that where a relative of a party testified that he "*was a man that never bother[ed] anybody*," the district court properly found that the door had been opened to question the witness about his prior murder convictions. 612 F.2d 775, 777 (3d Cir. 1979) (emphasis added); *see also McDaniel v. Sorber*, No. CV 21-738, 2023 WL 4566246, at *8 (E.D. Pa. July 17, 2023) (testimony that defendant "*was a peaceful, calm person*" opened the door for admission of his prior conviction for assault) (emphasis added); *c.f. Evans v. Kirkegard*, No. CV 11-112-M-DWM-JCL, 2012 WL 5380169, at *10 (D. Mont. Oct. 31, 2012) (testimony that party "*was a good person ... and had a good future*" would have opened the door on cross-examination to his criminal history consisting of 18 misdemeanors and 12 infractions on 20 different occasions, consisting primarily of resisting or obstructing an officer, disorderly conduct, and drug and alcohol related offenses).

Here, Mr. Porter's criminal history would rebut any presumption that he was a good person, a law-abiding person, non-violent person, or a good parent. Rather, he had a multi-year period of incarceration and was convicted for many crimes,

including drug and gun related crimes. Plaintiff's counsel has already elicited testimony from witnesses during discovery that Mr. Porter was a good person and a good parent. It is anticipated that he will attempt to do the same thing at trial, or otherwise his witnesses will spontaneously offer such testimony.

Defendant will mark and identify certified copies of the Certificates of Conviction for the following crimes. The felony gun convictions are relevant under all the above paragraphs, the other convictions are relevant to damages and as rebuttal evidence should Plaintiff's witnesses open the door.

Gary Porter's Criminal Convictions

| Date | Penal Law Provision | Charge |
|---|---|---|
| 4/1/93 | NY Pen. L. 240.20(1) | **Disorderly Conduct** – engaging in fighting or in violent, tumultuous or threatening behavior (violation) *Sentence: Conditional Discharge* |
| 9/27/93 | NY Pen. L. 265.02 | **Criminal Possession of a Weapon 3rd** *Sentence: five years' probation; time served* |
| 5/2/97 | LOC 24-53 | **Loitering, Obstructing Public Street** *Sentence: fine* |
| 12/19/97 | NY Pen. L. 240.26(1) | **Harassment 2nd** - striking, shoving, kicking or otherwise subjecting such other person to physical contact, or attempting or threatening to do the same (Violation) *Sentence: 1Y time served* |
| 12/19/97 | NY Pen. L. 240.20(1) | **Disorderly Conduct** – engaging in fighting or in violent, tumultuous or threatening behavior (violation) *Sentence: time served* |
| 7/20/98 | NY Pen. L. 110;220(3) | **Attempted Criminal Possession of a Controlled Substance 7th Degree** (B Misdemeanor) *Sentence: 1Y Probation* |
| 4/16/99 | NY Pen. L. 110-221.03 | **Attempted Criminal Possession of a Controlled Substance 7th** (A Misdemeanor) Sentence: 90 days |
| 5/13/99 | NY Pen L. 190.25(1) | **Criminal Impersonation 2nd** - - impersonating another with intent to obtain a benefit or to injure or defraud another (A Misdemeanor) *Sentence: 90 days* |

| 10/12/2001 | NY Pen. L. 221.03 | **Criminal Possession of a Controlled Substance 7th** (A Misdemeanor) <br> *Sentence: 1Y Conditional Discharge* |
| | NY Pen. L. 221.05 | **Unlawful Possession of Marijuana** (Violation) <br> *Sentence: 1Y Conditional Discharge* |
| 3/31/2003 | NY Pen. L. 221.10(1) | **Criminal Possession of Marijuana 5th** (B Misdemeanor) <br> Sentence: Conditional Discharge (1Y) |
| 3/5/2007 | NY Pen. L. 221.10(1) | **Criminal Possession of Marijuana 5th** (B Misdemeanor) <br> Sentence: 1Y Probation |
| 11/3/2008 | NY Pen. L. 265.02(3) | **Criminal Possession of a Weapon 2nd** – possessing a weapon that is defaced for purpose of hiding a crime or misrepresenting the identification (D Felony) <br> *Sentence: 3 ½ years confinement; 2 ½ years post release supervision* |
| 2/9/12 | NY Pen. L. 220.12(1) | **Criminal Possession of Narcotics 3rd** (B Felony) |
| | NY Pen. L. 220.03 | **Criminal Possession of Controlled Substance 7th** (A Misdemeanor) |

## B. Mr. Porter's out of court statements are party admissions and not hearsay

Plaintiff may argue that Mr. Porter, as the decedent, is not technically the plaintiff, and therefore his statements are not admissible as party admissions.

The Sixth Circuit in *Estate of Shafer v. C.I.R.*, held that the decedent was a party to an action through his estate for the purposes of the admissibility of the decedent's statements as party admissions under Rule 801(d)(2)(A). 749 F.2d 1216, 1219 (6th Cir. 1984); *see also Phillips v. Grady County Bd. Of County Comm'rs*, 92 Fed. Appx. 692, 696 (10th Cir. 2004) (decedent's statements were admissible against her estate as admissions of a party-opponent); *Tamez v. City of San Marcos, Texas*, 118 F.3d 1085 (5th Cir. 1997); *Swiss v. Stiglich*, No. 2:05-CV-203-PRC, 2008 WL 763015, at *5-6 (N.D. Ind. Mar. 20, 2008) (same); *Tyrrell v. BNSF Ry. Co.*, No. 4:17-cv-04120, 2018 WL 2944529, at *6 n.4 (D.S.D. June 12,

2018); *Todd v. City of Chicago*, 28 F. Supp. 2d 1062, 1064 & n.2 (N.D. Ill. 1998) (it is "plain" that the decedent's statements would be admissible against his estate if that question were at issue; declarant's "intervening death makes no difference" for purposes of admissions); *see also Schroeder v. de Bertolo*, 942 F. Supp. 72, 19 A.D.D. 579 (D.P.R. 1996) (deceased resident's statements to nonparties were admissible against her estate as party admissions under Rule 801(d)(2)(A)).[6]

### D. Defendant will be relying on circumstantial evidence

There will be first-hand testimony offered by both sides on the issue of whether Gary Porter had a gun at the time, or immediately before, he was shot. However, Defendant also intends to offer circumstantial evidence that, *when taken together*, indicates that it was more likely than not that Mr. Porter had a gun on him that day.

It is anticipated that Plaintiff's counsel will argue that each piece of circumstantial evidence, *taken in isolation*, is not directly probative of whether Mr. Porter had a gun and is therefore improper. Such an argument ignores the proper role of evidence, *especially circumstantial evidence*.

Indeed, it is a common and clever tactic for a trial lawyer to ask a judge to consider the probative value of a single piece of circumstantial evidence *in isolation and without regard to the mosaic of other pieces of evidence* that all combine together toward convincing the Jury of a particular fact. We respectfully ask the Court to be aware of this tactic and note its impropriety.

Indeed, "[u]nder our system," "a party offers his evidence not *en masse*, but item by item." *See McCormick on Evid.* § 185 (8th ed). "An item of evidence, being

---

[6] *But see In re Cornfield*, 365 F. Supp. 2d 271, 277 (E.D.N.Y. 2004). To the extent *In re Cornfield* held differently, it is not consistent with the majority position. *In re Cornfield* does not appear to have been cited by any other Second Circuit court as authority for this issue. Nor does the Second Circuit appear to have ruled on this issue before.

but a single link in the chain of proof, *need not prove conclusively the proposition for which it is offered*." *Id.* (emphasis added) "It *need not* even make that proposition appear *more probable than not* or *more probable than any single alternative*." *Id.* "**It is enough if the item could reasonably show that *a fact is slightly more probable* than it would appear without that evidence**." *Id.* "Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable."  "**Thus, the common objection that the inference for which the fact is offered '*does not necessarily follow*' is untenable**. *Id.* "**It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet**." *Id.* A brick is not a wall." *Id.*

The evidence at trial will show that the Father's Day barbecue was not a benign community picnic, but rather a gang-sponsored and gang-produced event. The Geddes Housing Project is the designated gang territory for a long-standing City gang, as tracked by OCAC and local law enforcement. The individuals present at the barbecue whom Mr. Porter's girlfriend and niece have identified as his "closest friends" are all tracked by OCAC as gang members. Defendant will offer circumstantial evidence that Mr. Porter was engaged in the criminal sale of narcotics in the Stone Court parking lot during the barbecue. Plaintiff's own witnesses will describe the firefight that led to Officer Francemone's involvement as a gang-initiated gunfight with a rival east-side gang. Social media photos taken by or of many of Mr. Porter's witnesses show them flashing the local gang hand sign, suggesting loyalty to that criminal organization/enterprise. After the incident, a gang representative put out a social media post encouraging the community to ascribe to a certain contrived narrative of the events whereby Officer Francemone was the "*only*" person firing a weapon at an otherwise completely

peaceful event. Several of the Plaintiff's witnesses subscribed to this false narrative in their deposition testimony. All of this context is relevant to the Jury's understanding of the issues and consideration of whether it is more likely than not that Mr. Porter was armed.

A. *Engaging in the sale of narcotics is relevant to gun possession*

Plaintiff's counsel will likely challenge any attempt to argue that Mr. Porter was engaged in the illegal sale of narcotics on the day of his death as an unfair smear that is not probative of whether he had a gun on him at the time he was shot. This is not the case. Federal case law recognizes that guns are "tools of the trade for drug dealers" and that "*guns and violence go hand in hand with illegal drug operations.*" *United States v. Gray,* 544 F. App'x 870, 885 (11th Cir. 2013); *United States v. Golter*, 880 F.2d 91, 94 (8th Cir. 1989) (there is a "well recognized nexus between drugs and firearms," which would create an inference that a cocaine dealer would carry a firearm while distributing cocaine); *United States v. Calderon,* 785 F.3d 847, 852 (2d Cir. 2015) ("guns are among the tools of the narcotics trade"); *United States v. Payne*, 805 F.2d 1062, 1065 (D.C. Cir. 1986) ("it has uniformly been recognized that substantial dealers in narcotics possess firearms and that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia"). Thus, if the Jury finds that it is more likely than not that Mr. Porter was engaged in narcotics trafficking in the Stone Court parking lot at the barbecue, then that fact is probative of whether he had a gun because it was "slightly more probable" that he had a gun on him as part of that trafficking activity. [It should also be noted that Mr. Porter's avocation as a drug dealer is relevant to his estate's damages claim for the loss of his comfort, care, and guidance as a role model for his children and is admissible for that purpose.]

B. <u>Gang affiliation is probative and admissible to gun possession</u>

There are numerous sources of information that the Father's Day barbecue was sponsored by a west side gang and attended by many members of different west side gangs and west side-affiliated criminal enterprises. Plaintiff's counsel will likely contend that *any* reference to the gang connection for this event is a veiled racist trope—equating gang membership with race. But as uncomfortable as the reality of local gangs may be, it is an accurate factual description of the event, and has nothing to do with race. The Jury is entitled to hear about things as they actually are, even if that accurate account is uncomfortable. Unfortunately, gang activity in certain areas of the City has long been a fact of life. Indeed, the United States Attorney's Office of the Northern District of New York. has pursued several comprehensive RICO prosecutions targeting City gangs over the years.

Like narcotics trafficking, there is an undeniable nexus between gang activity and gun violence. *See, e.g*. *United States v. Cavera,* 550 F.3d 180, 204 (2d Cir. 2008) (for "street gangs of all stripes," "guns are tools of the trade and gun violence a routine form of communication.") *Calderon*, 785 F.3d at 852 (the "Latin Kings and the Bloods would frequently "shoot at" each other to "show face" or to protect their drug-selling territory"). The Father's Day barbecue was directly in the middle of a west side gang territory and multiple individuals in the vicinity of the Stone Court parking lot were OCAC-confirmed gang members, including individuals identified as Gary Porter's "closest friends." This certainly doesn't mean that everyone who was at the barbecue was a gang member, but it makes it "slightly more probable" that those who decided to stay in the Stone Court parking lot (rather than run away) once the gunfight began possessed firearms.

"[C]ourts routinely admit evidence of gang membership where the evidence is relevant for a proper purpose." *U.S. v. Samuels*, 2024 WL 1777720, at *2 (2d

Cir. 2024) (internal quotations and ellipses omitted) *quoting U.S. v. Williams*, 930 F.3d 44, 63 (2d Cir. 2019). Evidence of gang membership is particularly relevant to an individual's "motive and opportunity to possess a gun." *Williams*, 903 F.3d at 63, *citing U.S. v. Gordon*, 496 F. App'x 579, 582-83 (6th Cir. 2012); *see also U.S. v. Smothers*, 652 F.Supp.3d 271, 286 (E.D.N.Y. 2023) (finding evidence of a party's prior gang affiliations was relevant to—*and direct evidence of*—the defendant's possession of a firearm during a drug trafficking crime). Further, a party and witness's gang affiliations are admissible to establish their personal relationships to one another. *See U.S. v. Cummings*, 60 F. Supp. 3d 434, 439 (S.D.N.Y. 2014) (reversed on other grounds) (evidence of gang membership was admissible because it explains the parties' and witnesses relationship to one another); *Troche v. LaManna*, 2019 WL 2619339, at 1 (E.D.N.Y. Jun. 26, 2019) (while a defendant's gang membership could not be used as evidence of the crime charged, it was admissible to shed light on his relationship with certain witnesses); *Smothers*, 652 F.Supp.3d at 286 (gang affiliation was relevant to explain the defendant's relationship with members and associates of that gang).

When a party or a witness's gang affiliation is relevant, evidence of such affiliation may take several forms. Specifically, evidence of gang membership may include gang related tattoos, hand gestures, handshakes, coded language, and informal social media posts (among others). *See U.S. v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (admitting tattoo images to demonstrate party's gang membership); *see Williams*, 930 F.3d at *64, n*3 (district court did not err in admitting photographs from the defendant's Facebook page, which depicted defendant and others making purported gang signs; allowing testimony relating to the defendant's post-arrest statement admitting to gang membership); *U.S. v. Lewis*, 599 F. Supp. 3d 93, 99 (E.D.N.Y. 2022) (admitting photographs of the defendant's

use of "hand gestures that signify Bloods membership" and admitting evidence of uncharged individual's gang membership through their use of "gang signifiers and lingo"); *U.S. v. Murray*, 2023 WL 3301840, at *1 (S.D.N.Y. May 8, 2023) (denying motion to preclude detective's testimony explaining the "the meaning of relevant [gang] code").

    C.  Gunshot residue found on Gary Porter's right hand is probative and thus admissible

One of Gary Porter's hands tested positive for the presence of gunshot residue. A gunshot residue analyst will testify as to those results and that the presence of the constituent elements of lead, antimony, and barium found in residue on Gary Porter's hand is consistent with him firing a gun. As an initial matter, gunshot residue analysis conducted via scientifically based techniques is considered "admissible under the requirements set forth in Fed. R. Evid. 702." *States v. Paloscio*, No. 99 CR. 1199 (LMM), 2002 WL 1585835, at *1 (S.D.N.Y. July 17, 2002); *United States v. Eldridge*, No. 09-CR-329, 2013 WL 6096520, at *7 (W.D.N.Y. Nov. 20, 2013) (taking "note of cases, both inside and outside of this Circuit, where gunshot residue evidence was found to be admissible")

Plaintiff's counsel will argue that are there two *other* possible explanations for the positive result on Mr. Porter's hand: (1) that the residue came from the bullet that struck him; or (2) the residue was transferred to his hand from Officer Francemone's hands. He will argue that the other possible explanations render the results inconclusive and not probative of Mr. Porter having fired a gun.

As discussed above, relevancy is not determined in a vacuum and is not negated if there are other alternatives, even more probable alternatives. *See McCormick On Evid*. § 185 (8th ed) (the piece of evidence "need not even make that proposition [to be proved] appear more probable than not or more probable

than any single alternative.") Rather, the offered fact need only make the proposition to be proved "slightly more probable." *Id.*

Simply put, if Gary Porter had had no gunshot residue on his hands, that would certainly be relevant, if not highly probative, for Plaintiff's case. *See, e.g., Williams v. Boley*, No. 421CV00068, 2023 WL 4351500, at *9 (S.D. Ind. July 5, 2023) (absence of gunshot residue relevant to police officer's defense that decedent plaintiff had fired a gun at him prior to the use of force). But, if this is the case, then the converse is *also* true—*i.e.*, the fact that *there* was residue from gunfire on his hand makes the proposition to prove "slightly more likely" than if the residue was not there. The presence of other alternative explanations for the presence of the residue is also relevant for the jury to consider *as to the weight of the testimony*, but that does not affect the admissibility of the fact itself. *See, e.g., Westfall v. Hornbeak*, No. CIV S-09-3211 EFB P, 2012 WL 28635, at *7 (E.D. Cal. Jan. 4, 2012):

> defendant's right hand tested positive for gunshot residue. The defense claimed this was because defendant had touched the victim when she found him on the love seat. However, the jury was not obliged to believe that explanation and could reasonably have concluded that the gunshot residue was a result of her shooting the victim.

*Id., see also United States v. Bonugli*, 162 F. App'x 326, 328 (5th Cir. 2006) (argument that gunshot residue on defendant's hand could have come from the hands of police officers who cuffed him "went to the weight of the evidence rather than its admissibility").

Further, here, there is an additional fact bearing on the probative value of the testing. Mr. Porter had lifts taken from *both* of his hands. There was heavy residue on his right hand and no residue on his left hand. Mr. Porter was right-handed. *See Rogers v. Warden, BeCI*, No. 2:16-CV-0638, 2018 WL 2009686, at *5

(S.D. Ohio Apr. 30, 2018)[7] (noting the evidentiary significance of the fact that there was no gunshot residue on the left hand but there was on the right hand).

### E. **The measure of damages is not clear under Second Circuit law**

Sections 1983 and 1988 have been held deficient in describing the damages recoverable in a wrongful death survival action. *See Robertson v. Wegmann*, 436 U.S. 584, 588 (1978)). "When federal law is thus deficient, § 1988 instructs [courts] to turn to the common law, as modified and changed by the constitution and statutes of the forum State, as long as these are not inconsistent with the Constitution and laws of the United States." *Id.* (internal quotations omitted); *see also McFadden v Sanchez*, 710 F.2d 907, 910 (2d Cir 1983). As has been done by other Circuits, the Second Circuit has invoked New York EPTL § 5-4.3 (the "survival statute"), which defines claims for wrongful death under New York tort law, to provide the measures of damages for a § 1983 case resulting in death. *Duchesne v. Sugarman,* 566 F.2d 817, 821 n.2 (2d Cir. 1977) ("[i]t is well-settled that pursuant to 42 U.S.C. § 1988 state survival statutes are applicable to civil rights actions brought under 42 U.S.C. § 1983.").

*Wrongful Death Survival Statute damages*

Recovery under New York's survival statute is strictly limited to pecuniary losses "i.e. the economic value of the decedent to each distributee at the time decedent died." *Hollingsworth v. Roseland Wake Park, LLC*, 2019 W.L. 6455605, at *4 (W.D.N.Y. Nov. 29, 2019). New York's survival statute expressly authorizes recovery for reasonable medical expenses and reasonable funeral expenses. N.Y. EPTL § 5-4.3. However, courts have interpreted the survival statute to allow recovery for: (1) loss of earnings; (2) loss of services and voluntary assistance; (3)

---

[7] *report and recommendation adopted*, No. 2:16-CV-0638, 2018 WL 3619653 (S.D. Ohio July 30, 2018).

loss of inheritance; (4) loss of parental guidance and services; (5) loss of inheritance. *Id.*: *Odom v. Byrne*, 104 A.D. 863, 864 (2d Dep't 1984) ("Damages in a wrongful death action are limited by statute to fair and just compensation for the 'pecuniary injuries' suffered by the decedent's survivors, including loss of support, services, voluntary assistance, the prospect of inheritance and medical and funeral expenses.").

### Conscious Pain and Suffering

Courts in this Circuit have also awarded § 1983 claimants damages based on a decedent's pain and suffering during the period of time between the unconstitutional act and the death. *See, e.g. Collado v. City of New York*, 396 F.Supp.3d 265, 277-78 (S.D.N.Y. Aug. 23, 2019). In determining damages for conscious pain and suffering the Court may consider the amount of time that lapsed between the decedent's injury and death, along with the decedent's behaviors prior to death. *See id.*

"[D]amages for conscious pain and suffering are available *only* where a plaintiff offers proof of a decedent's cognitive awareness before death." *Kohl v. Young*, No. 817-CV-692, 2018 WL 3104447, at *4 (N.D.N.Y. June 22, 2018) (emphasis added) (Sannes, C.J.) (citing *Keenan v. Molloy*, 137 A.D.3d 868, 871 (2d Dep't 2016)); *see also Annexstein v. Inzerilli*, No. 10-cv-3655, 2012 WL 526647, at *2 (E.D.N.Y. Feb. 16, 2012) (explaining that "no damages could be awarded without supporting documentation" of conscious pain and suffering). Stated differently, pain and suffering is not a compensable component of damages in the absence of *competent* evidence that the decedent exhibited some level conscious awareness. *See generally Cummins v. Cnty. of Onondaga*, 84 N.Y.2d 322, 325 (1994) ("Without legally sufficient proof of consciousness following an accident, a claim for conscious pain and suffering must be dismissed"); *Smith v. N.*

*Manhattan Nursing Home, Inc.*, 195 A.D.3d 508, 509 (1st Dep't 2021) ("The court should not have allowed the jury to award damages for pain and suffering without first determining that the decedent 'experienced some level of cognitive awareness following the injury'").

<em>Loss of enjoyment of life</em>

New York tort law, under the survival statute, precludes any recovery in a wrongful death action for post-death loss of enjoyment of life, *i.e.*, so-called post-death hedonic damages. *Nussbaum v. Gibstein*, 73 N.Y.2d 912, 914 (1989) (to the extent that loss of enjoyment of life is recoverable it is "only a factor to be considered by the jury in assessing damages for conscious pain and suffering" while the patient is still alive). Federal statutory law is *also* silent on whether such a category of damages is recoverable under § 1983. *See Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1102 (9th Cir. 2021) (noting that "the relevant federal law is silent as to loss of life damages" in wrongful death cases)[8].

However, in *Valenzuela v. City of Anaheim*, the Ninth Circuit was posed with a question of whether the State of California's preclusion of recovery of loss of enjoyment of life damages governed a § 1983 claim for wrongful death. *Id*. at 1101-02. The Ninth Circuit, with one judge dissenting, concluded that since "§ 1983 was meant to be a remedial statute and should be 'broadly construed'" that a wrongful death plaintiff in federal court should recover a broader scope of damages— including the admittedly amorphous "loss of life" measure—because it would serve

---

[8] "42 U.S.C.A. § 1983 generally provides a private right of action against every person who, under the color of state authority, commits a violation of the civil rights of another person, but the statute includes no remedial provisions. Consequently, 42 U.S.C.A. § 1988 directs courts to determine whether a suitable remedy is provided by the law of the state in which the court presides, and if a governing law exists the court may apply it, unless it is found to be inconsistent with the Constitution or federal law, in which case the court may fashion a suitable remedy." 81 A.L.R. Fed. 3d Art. 5 (Originally published in 2023).

the remedial purposes of § 1983 and act as a deterrent for official misconduct. *Id.* at 1102-03. In so finding, the Ninth Circuit admitted that *the measurement* of loss of life damages are speculative, but concluded that since the Jury decides other categories of damages without "direct sensory experience of the issue before them" the speculative nature of the award should not prohibit recovery. *Id.* at 1103.

The Sixth Circuit has held the exact opposite. In *Frontier Ins. Co. v. Blaty*, the Sixth Circuit held, based on Supreme Court precedent, that "the purpose of § 1983 damages is to compensate injured persons *for their actual harm*." 454 F.3d 590, 601 (6th Cir. 2006) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)). The Sixth Circuit held that "[h]edonic or loss of enjoyment of life damages are only available to a plaintiff still living, in order to compensate that individual for aspects of their life they may no longer enjoy due to the tortious actions of another." *Id.* at 600. "Therefore, any hedonic damages needed to be assessed at the moment before death occurred and not by considering death as the ultimate loss of enjoyment of life." *Id.* The Sixth Circuit held that "[t]here is no requirement under federal law that a state go further than this in providing damages for wrongful death" and that "loss of enjoyment caused by death is not 'actual,' in the sense that is relevant here, because it is not consciously experienced by the decedent." *Id.*; *see also Tinch v. City of Dayton*, 77 F.3d 483 (6th Cir. 1996) (reversing a monetary damage award for post-mortem loss of enjoyment of life suffered by the decedent victim of a police shooting).

District courts from the Fifth Circuit and the Eleventh Circuit have also ruled that loss of life damages are *not* recoverable under § 1983. *See Estate of Sturdivant v. Smith*, 2021 WL 4048600 (S.D. Miss. 2021) (damages for the decedent's loss of enjoyment of life were unavailable in an action brought under 42 U.S.C.A. § 1983, where Mississippi's wrongful death statute expressly prohibited the recovery of

hedonic damages); *Greer v. Ivey*, 2020 WL 5678725 (M.D. Fla. 2020), *aff'd on other grounds*, 2022 WL 2914471 (11th Cir. 2022) (loss of life damages not available in a § 1983 action involving a decedent who was killed by a police gunshot, where Florida's wrongful death statute that did not allow hedonic damages).

However, in *Collado v. City of New York,* after noting that the "the Supreme Court and the Second Circuit have not squarely addressed the issue," Judge Chin stated "*I hold* that damages for the loss of enjoyment of life are recoverable in a § 1983 action" for wrongful death. 396 F.Supp.3d 265, 277 (S.D.N.Y. 2019). The court relied primarily on a Seventh Circuit decision in *Bass ex rel. Lewis v. Wallenstein,* 769 F.2d 1173, 1176, 1187 (7th Cir. 1985) and a prior 2001 case from the Southern District in *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239 (S.D. N.Y. 2001). *Id*. at 278-9. *Bass ex rel. Lewis*, in turn, held that the Illinois wrongful death statute was "inconsistent with the compensatory and deterrent policies underlying § 1983," and listed the types of damages recoverable in a federal constitutional wrongful death case as including "damages for loss of life." Judge Chin did not distinguish or even discuss the Sixth Circuit's *Blaty* or *Tinch* cases and did not attempt to define what "loss of enjoyment of life damages" consisted of, or how they would be measured.

It should also be noted that this Court in *Scism v Ferris*, 2022 WL 2915745, at *9 (N.D.N.Y. July 25, 2022), in ruling on the admissibility of certain evidence, cited to *Collado* as authority for the proposition that damages for loss of enjoyment of life are recoverable in a § 1983 action. The *Scism* decision, however, did not address the Circuit split or the lack of authority from the Second Circuit itself for the proposition. *Id*. The *Scism* decision appears to assume that the *Collado* decision was stating settled Circuit law, when in fact Judge Chin was actually giving

his opinion on what the law *should be* in the Second Circuit.

We raise this issue for the Court to attempt to account for the *true* state of the law on this question as an issue the Court will be required to deal with in this case. In sum, we respectfully submit that the following is the case:

(1) The New York wrongful death statutory remedy does not permit the recovery of so-called post-death "loss of enjoyment of life" damages.

(2) There is no statutory authority under § 1983 or § 1988 for the recovery of so-called post-death "loss of enjoyment of life" damages.

(3) There is no Second Circuit Court of Appeals or Supreme Court authority for the recovery of so-called post-death "loss of enjoyment of life" damages under § 1983.

(4) There is a Circuit split, in other circuits, over whether so-called post-death "loss of enjoyment of life" damages are recoverable in § 1983 wrongful death cases.

(5) Even the case law advocating for so-called post-death "loss of enjoyment of life" damages cannot provide or describe a concrete way that the Jury could even measure such damages.

(6) If there is no concrete way to measure what post-death "loss of enjoyment of life" damages consist of, then there is no way to determine what evidence is and is not relevant to prove or disprove such a category of damages.

(7) There is no *accepted* jury instruction for telling the Jury how to measure post-death "loss of enjoyment of life" damages. This invites the Jury to speculate.

For the foregoing reasons, Defendant submits that post-death "loss of enjoyment of life" damages should not be argued or charged to the Jury. And, given that there

is no statutory or Second Circuit Court of Appeals authority that the Court do so, the better course, and more appropriate exercise of the Court's discretion, is to defer on the issue until the Second Circuit has ruled on this issue.

Finally, to the extent that the *Valenzuela* decision side-stepped the problem in defining this amorphous category of damages by arguing that "pain and suffering" damages are equally speculative, it was not truly making a fair comparison. Every juror, and every person, has a reserve of personal experience in suffering pain under a variety of circumstances. They can draw on those common experiences to fashion a correlative monetary remedy. By way of contrast, assigning a monetary number to compensate for an unlived portion of a person's life is the definition of rank speculation for which there is no point of reference.

### F. <u>Demonstrative Timeline Video</u>

Defendant will be offering multiple demonstrative exhibits to help explain or illustrate other admissible testimony or evidence. Demonstratives are not true exhibits and usually do not go back in the Jury room during deliberations. However, "[i]t is appropriate and fairly commonplace for an expert witness to use demonstrative exhibits to make his testimony more understandable to a lay jury." *Giles v. Rhodes*, No. 94-CV-6385, 2000 WL 1425046, at *3 (S.D.N.Y. Sept. 27, 2000)

The Court "possesses broad discretion to determine the mode by which evidence is presented to the jury," and that "discretion generally encompasses the authority to allow the use of demonstrative aides, including the display of charts or tables accurately summarizing the content" of other admissible evidence. *Briese Lichttenchnik Vertriebs Gmbh v. Langton*, No. 09-CV-9790, 2013 WL 12061874,

at *3 (S.D.N.Y. Dec. 18, 2013).[9] "Demonstrative evidence, including such items as a model, map, drawing, chart, photograph, tangible item, computer animation, or demonstration is distinguished from real evidence in that it has no probative value itself, but serves merely as a visual aid to the jury in comprehending the verbal testimony of a witness or other evidence." Handbook of Fed. Evid. § 401:2 (9th ed.). "Thus, demonstrative evidence illustrates and clarifies." *Id.*

"The use of charts, diagrams, and other visual aids to summarize other evidence is generally permissible in the sound discretion of the trial court, particularly when used to organize complex testimony or transactions for the fact finder, which in this case is the district judge." *Asarco LLC v. Nl Indus., Inc.*, 106 F. Supp. 3d 1015, 1024 (E.D. Mo. 2015) (citing *United States v. Caswell,* 825 F.2d 1228, 1235 (8th Cir. 1987); *Veliz v. Crown Lift Trucks*, No. CIV. 84-2746, 1989 WL 61829, at *1 (E.D.N.Y. June 1, 1989) ("It is, of course, firmly established that the decision whether to admit evidence of experimental tests or demonstrations is a matter left to the sound discretion of the trial judge."); *see also United States v. Burt*, 495 F.3d 733, 740 (7th Cir. 2007) (citing McCormick on Evidence § 212 (2006)).

Demonstrative evidence does not have to be disclosed during discovery. *Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 217–18 (S.D.N.Y. 2021) ("there is *no requirement* for pretrial disclosure of such materials at a specific time.") (emphasis added); *see also Chen-Oster v. Goldman, Sachs & Co.,* 114 F. Supp. 3d 110, 130 (S.D.N.Y. 2015) (same). According to the *Rodriguez* court, it is only generally desirable that such exhibits be disclosed "a reasonable time before trial." *Rodriguez*, 535 F. Supp. 3d at 217 (citing *United States v. Dioguardi*, 428

---

[9] *aff'd sub nom. Briese Lichttechnik Vertriebs GmbH v. Langton*, 589 F. App'x 536 (Fed. Cir. 2015).

F.2d 1033, 1038 (2d Cir. 1970)). It is "within the district court's discretion to require parties to make pretrial disclosures of such materials by specific deadlines" *Rodriguez*, 535 F. Supp. 3d at 217. No such deadline was set here.

If the demonstrative aid (1) will assist the trier of fact in understanding testimony or evidence; and (2) is not misleading in the Rule 403 sense, it is admissible. *Rodriguez*, 535 F. Supp. 3d at 218-19.

Defendant intends to offer a demonstrative video during the testimony of expert Edward Flosi. The video contains all admissible evidence including: (1) photographs of the Father's Day barbecue and the surrounding area; (2) surveillance video from two different vantage points within the Complex; (3) social media videos capturing different portions of the events in question; and (3) an overlay of the police radio traffic occurring at the same time. The video is necessary and useful because it accurately relates three distinct forms of evidentiary media that all record the same events at the same time, specifically: the "427 Tully Street" surveillance video, the "Schoeneck Court North" surveillance video, and the police radio traffic. Because all three of these media sources distinctly identify the point in time when shots were first fired, they can all be synchronized to show what is happening from two different vantage points and on police radio all on the same timeline. The video is very useful showing that timeline, which would be otherwise unavailable to the Jury, if they were merely to consider each of these pieces of admissible evidence separately.

We provide the video in advance to the Court and opposing counsel to review. It should be considered **Exhibit "A"** to this Trial Brief and was delivered to the Court on September 9, 2024 for conventional filing. It will be provided to opposing counsel by e-mail.

### G. Taking witnesses out of order

As the Court is aware, Messrs. Stackhouse and Davis will be produced to testify on Thursday October 24, and the parties have agreed that they will be taken out of order that day if necessary.

In addition, Defendant's witness Conor Dupree, who was an ambulance driver who treated and transported Mr. Porter to the hospital, is going on a two-week vacation starting October 23, 2024. As a result, he will *only* be able to testify on October 21 and 22. We have notified opposing counsel regarding this availability, but Attorney Lichtmacher has refuses to consent to taking Mr. Dupree being taken out of order. Mr. Dupree's testimony will not be very lengthy and we respectfully request that the Court approve of his testimony be taken out of order over Plaintiff's objection.

### H. Sequestration of witnesses

Defendant requests pursuant to Rule 615 of the Federal Rules of Evidence that all fact witnesses be excluded from the courtroom so that they do not hear the testimony of other witnesses. This request does not apply to party witnesses or expert witnesses.

### I. Remote testimony

As set forth in Dkt No. 240, the Defendant has requested—and the Court has granted permission—for one of Defendant's experts, Dr. Reisberg, to testify via remote teleconferencing.

### J. Fidelity to a party's proposed order of witnesses

In order to prevent confusion, allow for appropriate preparation, to foster civility, and ultimately with the goal of preserving judicial economy, Defendant respectfully requests that the order of witnesses for each party be established each night before the next day of trial.

## **CONCLUSION**

This Trial Brief is submitted for the limited purpose of highlighting key legal issues expected at trial. It is not the intent of this Trial Brief to anticipate every legal issue that may arise at trial or capture every aspect or nuance of the applicable legal standards, or to otherwise describe or summarize the evidence that will come in at trial.


Dated: September 9, 2024
      Syracuse, New York

Respectfully submitted,

By:    s/ John G. Powers, Esq.
    HANCOCK ESTABROOK LLP
    John G. Powers, Esq. (508934)
    Mary L. D'Agostino, Esq. (520301)
    1800 AXA Tower I
    100 Madison St.
    Syracuse, NY 13202
    (315) 565-4500

    and

    CORPORATION COUNSEL
    CITY OF SYRACUSE
    Todd M. Long, Esq.
    City of Syracuse
    233 E. Washington St., Suite 300
    Syracuse, NY 13202
    (315) 448-8400

    COUNSEL FOR DEFENDANT

4874-8522-3137, v. 17