UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK                 19-678 **(BKS/MJK)**
-------------------------------------------------------------------X
TANAJEE MADDOX as Administratrix of the
Estate of GARY TERRANCE PORTER,               **Plaintiff's Trial Brief**
                            Plaintiff,
         -against-
SYRACUSE POLICE OFFICER KELSEY
FRANCEMONE sued herein in her capacity
as an individual,
                            Defendant.
-------------------------------------------------------------------X

Plaintiff offers the following trial brief in further support of her above-entitled action.

This is a relatively straight forward case premised on an alleged violation of the Fourth Amendment via the use of deadly, excessive force.

It is well established law that in a suit alleging the use of all force, including but not limited to deadly, excessive force, liability on the Defendant's actions is judged by the reasonableness standard.  Graham v. Connor, 490 U.S. 386 (1989)

"It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."O'Bert ex rel. Est. of O'Bert v. Vargo, 331 F.3d 29, 36 (2d Cir. 2003) In terms of what the officer believes, the officer's mindset is measured by "the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Cowan ex rel. Est. of Cooper v. Breen, 352 F.3d 756, 762 (2d Cir. 2003).  (McDonald v City of Troy, 542 F Supp 3d 161, 169 [NDNY 2021])

In the instant matter, Plaintiff intends to prove by a preponderance of the credible

-1-

evidence that the Defendant could not have reasonably believed that Porter was the man in a white shirt discharging a weapon. This Defendant will be shown by Dr. Valentin to have irresponsibly and unreasonably have fired at a vehicle full of people not suspected of crimes and then chased a man in a lime green shirt with a distinctive design on the back and shot at and killed him. However, even when standing directly over Porter who the witnesses have testified fell face first and clearly seeing the lime green shirt with a pronounced design on the back. (Exh, Porter's shirt City 3259).

Most likely, after she realized she had panicked and shot and killed the wrong man she created several less than honest stories to cover up her behavior.

First of all, she said she shot the man in the white shirt.

7 Q. And how many men laying on the

8 ground who were shot did you see that night?

9 A. One.

10 Q. Did that man have a neon green

11 shirt on, a white shirt or something else?

12 A. I remember him to have a white

13 shirt on.

14 Q. Was there a pattern on the back of

15 his shirt?

16 A. To my recollection, no.

(Francemone 28:7-16)

The Defendant testified she identified herself as a police officer; she gave the crowd

orders to drop their weapons**;** Porter had a gun; Porter was shooting the gun; and Porter turned multiple times to face her as he ran away from her shooting at him.( Francemone 31:16-19 *Defendant claims she identified herself*; 25:13-21 *Defendant claims she gave orders to the crowd*;29:13-15 *Defendant  claims  Porter had a gun*; 31:3-5 *Defendant claims Porter was shooting*;27:16-17 *Defendant claims Porter turned to face her*; 72:7-11Defendant *claims after Porter fell from being shot she said get back he has a gun he's armed*). Other than the two felons, Davis and Stackhouse, both of whom have reneged, not one witness corroborates Francemone identifying herself as an officer; not one witness corroborates Francemone giving commands before shooting; not one witness corroborates Francemone saying drop the weapon; not one witness has Porter shooting a gun; not one witness has Porter in possession of a gun; not one witness has Porter turning to face Francemone as he was running away from her as she was shooting at his back; and not one witness has Defendant saying, get back he has a gun after he fell due to her shooting him.   Clearly, Francemone created a series of lies knowing she had panicked and acted incorrectly.

    And the only witnesses who have backed up Francemone's factitious story were two convicted felons, both of whom have recanted in whole or in part.

    On May 7, 2023 Mr. Khalil Davis wrote to me and his letter states the following:

> To Whom it May Concern: I was coerced into making these statements, regarding the incident of June 2016.  I didn't see anything. I was still coming down off an drug high after being placed in the care of Upstate Medical Center in Syracuse NY 13205.  I can tell you this, before any shooting occurred, I left out of the Housing projects that the altercation transpired at. Please if you have any further, questions or concerns regarding that incident please feel free to reach out to me. May Alah bless you. Thank you.

(5/7/23 letter from Khalil Davis to Fred Lichtmacher)

The other witness who at one point supported Francemone's fictitious account of the events was Carlos Stackhouse, now serving time for manslaughter. He was twelve at the time of the incident and may not have even been present. At his deposition, he testified as follows:

```
11 Q. Is it fair to say when a 13 year old
12 speaks to, if he has the misfortune to have to
13 speak to a district attorney or an assistant
14 district attorney, is it fair to say that the 13
15 year old would try to be kind of compliant with
16 what the district attorney wants to hear?
17 A. Yes.
18 Q. Now, you said earlier today that you
19 don't remember these events, is that correct?
20 A. Yes.
21 Q. And you're telling the truth now, aren't
22 you?
23 A. Yes.
```

Stackhouse 34:11-23

Stackhouse had turned 13 at the point in time when he testified to the grand jury.

In a crowd which by all accounts apparently consisted of hundreds of people, the SPD could only find two felons to support Francemone's account. Plaintiff was able to find two dozen.

**Qualified Immunity**

Defendant is not entitled to qualified immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Brown v. City of New York, 862 F.3d 182, 190 (2d Cir. 2017) (citing Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)). In other words, "[an] officer is entitled to qualified immunity if (1) his conduct

does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established right." Hartline v. Gallo, 546 F.3d 95, 102 (2d Cir. 2008), abrogated on other grounds, (citing Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995)); see also Manganiello v. City of New York, 612 F.3d 149, 165 (2d Cir. 2010).

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id.

Ryan v. Bell, 2024 U.S. Dist. LEXIS 698

Francemone shot an unarmed man, in the back, as he was running away from Stone Court where the shootings were occurring. She has to construct the lie that Porter was turning around to face her to justify shooting at him, just as she has to construct the lies that he had a gun and that she had identified herself as an officer and ordered him to put down the fictitious gun. No reasonable officer could believe he could get away with these series of lies and have been deemed to act reasonably. Because she knows the truth destroys her case, she fabricates an entirely different scenario to excuse her actions.

**Grand Jury Testimony Should Not be Admitted into Evidence**

Having no testimony helpful to their cause, Defendant seeks to admit the dishonest and

rescinded testimony of the two felon witnesses.

This issue was fully briefed by the parties and has as of yet to be decided by this Court. However at Docket Entries 260 and 261 the Court has signed off on writs to prodce both Stackhouse and Davis to testify at trial. In light of this development their grand jury testimony as part of the Defendant's case-in-chief is no longer necessary. Obviously if they contradict their grand jury testimony they can be impeached with their former sworn statements. But until or if that happens or if they refuse to testify at trial, the grand jury minutes need not be entered in Defendant's case in chief.

Courts do allow for grand jury minutes to be entered into evidence where a witness is not available. However, that scenario is not as of yet in play. "After the hearing, held outside the presence of the jury (T: 214-50),3 the trial court ruled [*4] from the bench that Leubner's unavailability had been procured by Petitioner for the purpose of preventing her testimony. Accordingly, the trial court held, Leubner's grand jury testimony would be read into the record as part of the People's case-in-chief." (Butler v Annucci, 2022 US Dist LEXIS 124304, at *3-4 [WDNY July 13, 2022, No. 1:18-CV-00474-LJV-MJR])

Plaintiff has addressed other issues in her motions in limine and expects to be addressing additional issues in response to the Defendant's motions.

## While Plaintiff Waived Purely Economic Damages She Did not Waive Damages for Loss of Enjoyment of Life or Guidance for His Children

Plaintiff had no appreciable income when he died. Hiring an economist would have been a useless endeavor. However, loss of guidance for the loss of a parent, while measured in dollar amounts is not a purely economic harm.

-6-

In terms of guidance for his children Plaintiff will offer testimony from several witnesses about being an attentive father, how he contributed to his children's well being and generally what he did for his children and what he would continue to do.

### Plaintiff's Decedent Suffered Severe Emotional Trauma Running from the Defendant Shooting at his Back

Several witnesses will be testifying about Porter running for his life. While fortunately few of us will ever suffer from running away from someone shooting at him or her for no justifiable reason, it will be clear Porter was trying to escape from the Defendant needlessly shooting at his back. And there will also be testimony that due to Francemone's out of control behavior one of the last things Porter saw before he was killed was his pregnant fiancé being shot through the leg.

### Plaintiff will be Entitled to Damages for Loss of Enjoyment of Life

Plaintiff will be presenting testimony about how the Plaintiff's decedent enjoyed his life. He will seek to enter into evidence the social security administrations's chart estimating his life expectancy.

Dated: New York, New York
September 9, 2024

/s/
Fred Lichtmacher