UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TANAJEE MADDOX as Administratrix of the Estate of Gary Terrance Porter,

                            Plaintiff,

v.

SYRACUSE POLICE OFFICER KELSEY FRANCEMONE, sued herein in her capacity as an individual,

                            Defendant.

5:19-cv-678 (BKS/MJK)

---

**Appearances:**

*For Plaintiff:*
Fred B. Lichtmacher
Mirela Kucevic
The Law Office of Fred Lichtmacher P.C.
159 West 25th Street, Room 510
New York, NY 10001

*For Defendant:*
John G. Powers
Mary L. D'Agostino
Ryan M. Poplawski
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

Susan Katzoff,
Corporation Counsel for the City of Syracuse
Todd M. Long
City of Syracuse Law Department
233 East Washington Street
300 City Hall
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.      INTRODUCTION**

Plaintiff Tanajee Maddox, as Administratrix of the Estate of Gary Terrance Porter, brings this action under 42 U.S.C. § 1983 against Defendant Syracuse Police Officer Kelsey Francemone asserting a claim for excessive force in violation of the Fourth Amendment. (Dkt. No. 1). Trial began on May 12, 2025. Presently before the Court are the following motions: (1) Defendant's motion to admit the grand jury testimony of non-party Khalil Davis, (Dkt. No. 134), and (2) Plaintiff's first motion in limine to preclude the admission of non-party Carlos Stackhouse's grand jury testimony except for possible impeachment or to refresh recollection, (Dkt. No. 287-1). The motions are fully briefed. (*See* Dkt. Nos. 73-16, 134, 157, 160, 287-1, 325). The Court originally denied Defendant's motion now under consideration without prejudice to renew. (Dkt. No. 185). Oral argument on Plaintiff's first motion in limine was held on November 8, 2024, and the Court reserved on this motion. (11/08/2024 Minute Entry; Dkt. No. 387). At the final pre-trial conference held on April 29, 2025, the parties discussed the admission of Davis and Stackhouse's grand jury testimony in the event that either refuses to testify. (Dkt. No. 485).[1] For the reasons that follow, Defendant's motion to admit Davis' grand jury testimony is granted (in the event he refuses to testify) and Plaintiff's motion to exclude Stackhouse's grand jury testimony is denied.

---

[1] The parties also agreed that if the grand jury testimony is admitted, Davis and Stackhouse could be impeached with clips from the recorded police interviews. (Dkt. No. 485, at 98–99).

## II. DISCUSSION

### A. Davis and Stackhouse's Pre-trial Statements

#### 1. Davis

Davis was interviewed by detectives on June 22, 2016, regarding the June 19, 2016 shooting of Mr. Porter. (*See* Dkt. No. 73-1, ¶ 22; *see generally* Dkt. No. 73-9). In July, Davis testified in front of the grand jury regarding what he witnessed prior to Porter's death, including that he saw Porter shooting his gun. (Dkt. No. 73-7, at 11–15; *see generally id.*). Davis was 18 at the time of his grand jury testimony. (*Id.* at 3).

On April 16, 2021, following the commencement of this lawsuit, Defendant's counsel attempted to take Davis' deposition. (*See* Dkt. No. 73-5, at 4). However, Davis repeatedly stated he would not answer any questions. (*See e.g.*, *id.* at 6 ("I'm not answering no questions."); *id.* at 9 ("I just told you respectfully I don't want to do it. . . . Add on five, six, ten more years, I don't care, you heard?"); *id.* at 11 ("I will not answer no questions, no questions from none of these people.")). The Court subsequently issued Davis an Order to Show Cause, (Dkt. No. 80), and, when Davis failed to respond, the Court made a finding of civil contempt, (Dkt. No. 89). Davis was brought for a deposition in front of the Court on August 18, 2023, but Davis again refused to participate. (*See* 08/18/23 Minute Entry).[2] To date, Davis' civil contempt has not been purged.

The Court has issued a Writ of Habeas Corpus Ad Testificandum to the Superintendent of Sing Sing Correctional Facility to produce Davis to testify at trial. (*See* Dkt. No. 483).

---

[2] Davis answered a few of Plaintiff's counsel's questions before Magistrate Judge Baxter clarified that if Davis did not wish to participate in the deposition, subject to possible contempt sanctions, he would need to refuse to answer all questions. (*See* 08/18/23 Minute Entry)

3

### 2. Stackhouse

Syracuse Police Department Officer John Nye testified that he spoke with Stackhouse on June 28, 2016, at 2:47 AM while investigating a prowler complaint. Officer Nye documented Stackhouse's comments in a report. (*See* Dkt. No. 151-17, at 1). The report states that without prompting Stackhouse "began to tell [Officer Nye] about how he was there for the whole thing." (*Id.*). Stackhouse said that he saw "the guy with a gun who was shootin at someone," and that the female cop shot her gun at him after telling him to drop the gun. (*Id.*). Later that morning, at approximately 9:45 AM, Stackhouse was interviewed by a different detective about the shooting, with his mother present, (*see* Dkt. No. 125-1, ¶ 26; Dkt. No. 125-11, at 7; *see generally id.*), and his statement was memorialized in a written statement, (*see* Dkt. No. 125-12, at 2). Stackhouse also testified in front of the grand jury that he saw Porter shooting his gun during the altercation at the Father's Day Barbecue. (Dkt. No. 125-8, at 4–5). Stackhouse was 13 at the time of his interview and grand jury testimony. (*See* Dkt. No. 125-11, at 4; Dkt. No. 125-8, at 2).

Stackhouse sat for a deposition on March 30, 2021. (*See* Dkt. No. 125-7, at 5). During his deposition, he repeatedly stated that he did not remember the events of the Father's Day Barbecue or the events surrounding his statements to the police and grand jury testimony. (*See e.g.*, *id.* at 7 ("Q. And Mr. Stackhouse, were you at that Father's Day barbecue on June 19, 2016? A. I don't remember."); *id.* at 10 ("Q. When you were there at the grand jury on July 14th of 2016, did you testify truthfully? A. I don't remember."); *id.* at 15 ("Q. Now Mr. Stackhouse, did there come a time in 2016 where you met with the police to discuss what happened at the Father's Day barbecue in 2016? A. I don't remember.")). The Court also issued Stackhouse an Order to Show Cause, (Dkt. No. 135), which Stackhouse did not answer, (Dkt. No. 164, at 3).

The Court has issued a Writ of Habeas Corpus Ad Testificandum to the Superintendent of Upstate Correctional Facility to produce Stackhouse to testify at trial. (*See* Dkt. No. 482).

B.  **Prior Inconsistent Testimony**

Defendant argues that the grand jury testimony of Davis and Stackhouse is admissible for its truth as prior inconsistent testimony under Fed. R. Evid. 801(d)(1)(A). (*See* Dkt. No. 284, at 23; Dkt. No. 325, at 3).[3] Under Rule 801(d)(1)(A), "[a] statement is nonhearsay if '[t]he declarant [ (1) ] testifies' at trial, '[ (2) ] is subject to cross-examination about a prior statement, and [ (3) ] the statement is inconsistent with the declarant's testimony and [ (4) ] was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition.'" *United States v. Truman*, 688 F.3d 129, 142 (2d Cir. 2012) (quoting Fed. R. Evid. 801(d)(1)(A)). A witness' statement at trial is inconsistent with a prior statement for the purposes of Rule 801(d)(1)(A) if the witness "forgets or denies" his prior statements. *Id.* (quoting *United States v. Marchand*, 564 F.2d 983, 999 (2d Cir. 1977)). And when a trial witness, who is subject to cross-examination, "refuses to answer the same questions" posed in grand jury, his "refusal to answer is inconsistent with his prior testimony and the prior testimony is admissible under Rule 801(d)(1)(A)." *Id.* (citations omitted)

Davis and Stackhouse testified to the grand jury under oath. (*See* Dkt. No. 73-7, at 3; Dkt. No. 125-8, at 2). Therefore, if Davis or Stackhouse takes the stand in this trial, answers questions under cross-examination, *see Truman*, 688 F.3d at 142 (explaining the witness "answered every question posed to him in cross-examination about his prior state court testimony, and therefore he was 'subject to cross-examination' within the meaning of Rule 801(d)(1)(A)"), and testifies

---

[3] Defendant's trial brief does not refer to the specific portion of Rule 801 by name, but it is clear she is referring to Rule 801(d)(1)(A). (*See* Dkt. No. 284, at 23). Defendant does specify that the grand jury testimony is admissible under 801(d)(1)(A) in response to Plaintiff's first motion in limine, although only discusses this with respect to Stackhouse's testimony. (*See* Dkt. No. 325, at 3).

5

inconsistently with his prior grand jury testimony, his statements made to the grand jury would be admissible under Rule 801(d)(1)(A).[4]

### C. Residual Exception

Defendant alternatively seeks to admit the grand jury testimony subject to Rule 807 of the Federal Rules of Evidence, also known as the Residual Exception. (Dkt. No. 284, at 23–24; *see also* Dkt. No. 73-16, at 15–21). To admit a statement that would otherwise be hearsay under the residual exception, (1) the statement must be "supported by sufficient guarantees of trustworthiness–after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and (2) the statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)[5]; *see also Harig v. City of Buffalo*, 574 F. Supp. 3d 163, 176 (W.D.N.Y. 2021) ("To be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." (quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991))).

#### 1. Trustworthiness

In *U.S. v. Younkers Contracting Co.*, the court considered the question of whether to admit grand jury testimony under the prior version of the residual hearsay exception for

---

[4] If Stackhouse answers he does not remember in response to questions raised in cross-examination, this does not prevent him from being "subject to cross-examination," assuming he testifies willingly. *See United States v. Owens*, 484 U.S. 554, 561–64 (1988) (rejecting argument that a witness was not subject to cross-examination for purposes of Rule 801(d)(1)(C) because the witness had memory loss); *see also id.* at 561 ("Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions."); *United States v. Fiore*, 443 F.2d 112, 115 (2d Cir. 1971) (explaining that witness "was not subject to cross-examination by the defendant, both because he had refused to take the oath and thus was not a witness at all and because he had made it evident that he would refuse to give testimony of any sort").

[5] Rule 807 also contains a requirement that the proponent of the evidence "give[] an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). With certain exceptions, this "notice must be provided in writing before the trial or hearing." *Id.* This requirement had been met here. (*See e.g.*, Dkt. No. 284, at 23–24).

unavailable witnesses, identifying six factors other circuits have found relevant when "assessing the trustworthiness of hearsay." 701 F. Supp. 431, 437 (S.D.N.Y. 1988). These six factors include: whether the "[t]estimony was under oath"; whether the "[w]itness was represented by counsel"; whether the "[t]estimony concerns personal knowledge"; whether the witness recanted his testimony; whether the witness had a "motive to falsify given [his] relationship to the Government and defendants"; and whether "[c]orroborating evidence is available." *Id.* Other courts have considered similar factors in evaluating whether prior testimony is trustworthy for purposes of the residual exception. *See, e.g.*, *United States v. Clarke*, 2 F.3d 81, 84–85 (4th Cir. 1993) (finding "circumstantial guarantees of trustworthiness" where the witness "was questioned at the suppression hearing by his own counsel" and "cross-examined by a government attorney," the statement was "made voluntarily while under oath," the witness "knew that his statement could not be used against him at trial" and that "if he had lied, he could have been prosecuted for perjury," and the witness lacked a motive to give false testimony); *United States v. Earles*, 113 F.3d 796, 800 (8th Cir. 1997) (finding "circumstantial guarantees of trustworthiness" where the witness "testified under oath and under penalty of perjury at the grand jury proceeding," "related facts of which he had personal knowledge," "never recanted his testimony," and "extrinsic evidence [did not] cast doubt on the accuracy of that testimony").

With respect to Davis' grand jury testimony, he testified under oath, (*see* Dkt. No. 73-7, at 3), and his testimony related to his personal knowledge of what happened at the Father's Day Barbecue, (*see id.* at 5 ("Q[:] Khalil, were you there back on Father's Day, June 19th, 2016? A[:] Yes, sir."). His narrative of events was largely consistent with what he had previously told the police during his recorded interview three days after the incident. (*Compare* Dkt. No. 73-7, at 10–15 (testifying to, among other things, that Porter had a gun, that he and the female police

7

officer ran towards each other, that the officer told Porter multiple times to drop his gun, and that another individual picked up the gun after Porter dropped it), *with* Dkt. No. 73-9, at 10–11 (same)). While Davis has later made statements that cast doubt on his prior testimony, (*see* Dkt. No. 73-5, at 6 (seeming to indicate he "was tricked into answering" questions regarding the incident); Dkt. No. 287-3, at 1–2 (stating in letter to Plaintiff's counsel dated May 7, 2023, that he "was coerced into making these statements regarding the incident of June, 2016," and that he "didn't see anything")), Davis appears to have voluntarily spoken to the police in the hopes that they would then "help [him] out," (*see* Dkt. No. 73-9, at 53; *see also id.* at 51 (Officer Lamberton stating that while he "can't make any promises, [he] will go to bat for [Davis]" and that Davis had "good information")). Additionally, during Davis' aborted first deposition, he "apologize[d]" for his previous statements, suggesting that he may not have been lying, but rather, does not want to hurt those close to Porter. (*See* Dkt. No. 73-5, at 10 ("I apologize for giving that statement when I was young and I —I apologize to the Tennyson family and the Maddox family, I apologize.")). And at the grand jury proceedings, Davis, in custody at the time, agreed that "no promises or threats" were "made to get [him] to talk here today." (Dkt. No. 73-7, at 4). Considering the totality of these circumstances, the Court finds there are sufficient guarantees of trustworthiness surrounding Davis' grand jury testimony.

As to Stackhouse's grand jury testimony, this too was provided under oath, (Dkt. No. 125-8, at 2), and based on his personal knowledge, (*see id.* ("Q[:] Okay. Carlos were you at the Father's Day party by Skiddy Park just a few ago on June 19th? A[:] Yes, I was.")). Plaintiff cites to inconsistencies between Stackhouse's initial statements to the police and his memorialized police statement, (Dkt. No. 151, at 15), noting that Stackhouse first described the decedent "shooting at someone" but later told the police he was shooting in the air, (*compare*

8

Dkt. No. 151-17, at 1, *with* Dkt. No. 125-12, at 2). Stackhouse's grand jury testimony is, however, largely corroborated by what he had previously told the police in his interview nine days after the incident. (*Compare* Dkt. No. 125-8, at 4–5 (testifying that he saw Porter "r[u]n two steps past [the female police officer], took his gun out and was shooting then the cop turned around and was shooting at him and then he um, shot his gun to the ground and was running and then he got about um, ten feet away and then she shot him in the back"), *with* Dkt. No. 125-11, at 18–19 (describing a man in a lime green shirt running "a little bit" past the female police officer, that the man "was shooting towards the air," and that the officer "started shooting towards him and then he turned around and saw her and started . . . running")).

The Court has considered the fact that Stackhouse was only 13 years old at the time of his statements, and the leading nature of the questioning before the grand jury. But the record does not support Plaintiff's argument that Stackhouse's testimony "was coerced." (*See* Dkt. No. 151, at 15). Stackhouse voluntarily began speaking about the shooting to two friends in front of an officer who was investigating a prowler complaint nine days after the incident. (Dkt. No. 151-17, at 1). Stackhouse's police interview occurred in the presence of Stackhouse's mother, and the detective asked Stackhouse several open-ended questions regarding the critical events. (*See, e.g.*, Dkt. No. 125-11, at 18 ("Detective: Okay. So then what happens? Mr. Stackhouse: They—a man came out with a, a lime green—shirt. I guess he—she caught—he ran past her a little bit. She got her gun and started shooting. She heard it, turned around and chased him."); *id.* at 19 ("Detective: And then what happened? Mr. Stackhouse: And then that's when he dropped his gun and he was, he was running through, like, he was running normal and then you could see, like, his back where she shot.")). In testifying before the grand jury, while some questions were leading, (*see, e.g.*, Dkt. No. 125-8, at 3 (Q[:] Now there were a lot of people out there, weren't

9

there? A[:] Yes)), other questions merely confirmed what he had told the detective at his interview, (*see e.g.*, *id.* at 4 ("Q[:] Did you see him fire the gun? A[:] Yes."), or were open ended, (*see e.g.*, *id.* at 4–5 ("Q[:] And what happened? A[:] The man with the lime green shirt ran two steps past her . . .")). Additionally, when Stackhouse was later deposed, he did not explicitly recant his earlier testimony he gave to the grand jury. (*See generally* Dkt. No. 125-7).[6] The Court therefore finds there are sufficient guarantees of trustworthiness with respect to Stackhouse's testimony as well.

### 2. Materiality, Probity, and the Interests of Justice

It is clear that both Davis and Stackhouse's grand jury testimony is both material and probative. Testimony that Porter had a gun and was shooting during the altercation at the Father's Day Barbecue is highly probative to the central question in the case, i.e., whether Defendant had "probable cause to believe that [Porter] pose[d] a significant threat of death or serious physical injury to [Defendant] or others." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) (citation omitted). And as Defendant has indicated, Davis and Stackhouse are the only non-party witnesses who have provided testimony that "if believed, tends to vindicate [Defendant's] actions regarding the threat Mr. Porter posed at the time the force was used." (*See* Dkt. No. 73-16, at 20; *see also id.* at 8–9). Thus, the Court finds that, if Davis and Stackhouse do not testify, their grand jury testimony is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2).

---

[6] While in the deposition Stackhouse said he did not remember certain events, some of his answers could be construed as indications that he was previously lying. He at one point indicated, in response to being shown a portion of the videotaped police interview, that he was not telling the truth in the video, and afterwards, when asked to confirm he was not telling the truth, he stated he did not remember. (Dkt. No. 125-7, at 31). He also denied having been to a housing development next to Skiddy Park and knowing certain individuals that had been referenced in his statement to the police. (*See id.* at 21–26).

Additionally, the Court finds that the interests of justice are served by admitting Davis and Stackhouse's grand jury testimony under such circumstances. *See Earles*, 113 F.3d at 801 (stating "the interests of justice were served by the admission of" witness' grand jury testimony where it was admitted after the witness' "continuing refusals to testify at trial"); *accord United States v. Carlson*, 547 F.2d 1346, 1355 (8th Cir. 1976).

Accordingly, if Davis and Stackhouse refuse to testify, the Court finds the Defendant may admit the grand jury testimony for its truth.[7]

### III. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to admit Davis' testimony, (Dkt. No. 134), is **GRANTED** if Davis refuses to testify at trial; and it is further

**ORDERED** that Plaintiff's first motion in limine to exclude Stackhouse's grand jury testimony from being admitted, (Dkt. No. 287-1), is **DENIED**.

**IT IS SO ORDERED.**

Dated: May 19, 2025
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[7] The Court also notes that counsel will be allowed to impeach Davis or Stackhouse's credibility under Rule 806 if the grand jury testimony is admitted under the Residual Exception. *See* Fed. R. Evid. 806 ("When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.").