UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK                5:19-CV-678 (BKS/MJK)
-----------------------------------------------------------------------X
TANAJEE MADDOX as Administratrix of the
Estate of GARY TERRANCE PORTER,                 PLAINTIFF'S POST TRIAL MOTIONS
                                                FOR A NEW TRIAL PURSUANT TO
                                                FED. R. CIV. P. 59 AND
                                                FOR THE DEFENDANT NOT TO BE
                              Plaintiff,        GRANTED QUALIFIED IMMUNITY


            -against-
SYRACUSE POLICE OFFICER KELSEY
FRANCEMONE sued herein in her capacity
as an individual,
                              Defendant.
-----------------------------------------------------------------------X

Counsel for Plaintiff Tanajee Maddox Administratrix for the estate of Gary Porter,

respectfully offers the following post trial motions.

**Motion for a New Trial Pursuant to Fed.R.Civ.P. 59 (a) & (d)**

Pursuant to Fed.R.Civ.P. 59 (a) (1) the grounds for a new trial states "The court may, on

motion, grant a new trial on all or some of the issues—and to any party—as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at

law in federal court...

So too pursuant to Fed.R.Civ.P. 59 (d) the Court can on it's own initiative or for reasons not

in the motion "may order a new trial for any reason that would justify granting one on a party's

motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely

motion for a new trial for a reason not stated in the motion. In either event, the court must specify

the reasons in its order."

Fed R. Civ P 59 was adopted to clarify district court's power to correct its own mistakes in

time period immediately following entry of judgment. <u>Innovative Home Health Care v. P.T.-O.T.</u> <u>Assocs.</u>, 141 F.3d 1284, 40 Fed. R. Serv. 3d (Callaghan) 1043, 1998 U.S. App. LEXIS 7681 (8th Cir. 1998). The mistakes the Court made in this matter require plaintiff be granted a new trial.

**Defendant is Clearly Not Entitled to Qualified Immunity**

Qualified immunity must not be granted to Defendant Police Officer Kelsey Francemone as there was quite literally not one piece of credible evidence that the plaintiff's decedent had a gun. In the alternative, the plaintiff must be granted a new trial.

Out of the possible 3-400 people in attendance at the Father's Day event, defense counsel could only find three people who stated Porter had a gun; Francemone, Carlos Stackhouse and Khalil Davis. And Francemone and Davis' testimony, was to put it euphemistically, questionable as to its veracity. Francemone's testimony was only consistent for its inconsistency; Stackhouse, finally being able to be cross examined, stated emphatically, that Porter did not have a gun; and Khalil Davis told two vastly different stories strongly indicating he probably was not present during the shooting or that he saw nothing, making his grand jury testimony effectively useless. Despite plaintiff finding numerous witnesses, all of whom testified Porter did not have a gun, defense counsel could only find the two felons, one who reneged, and the grossly inconsistent testimony of the defendant to allegedly prove its case.

**The Khalil Davis Police Interview**

The Davis police interview, given while he was in custody, was offered in its entirety into evidence for impeachment purposes at trial. Some of the more absurd and provably incorrect statements made by Davis were the following:

MR. DAVIS:

She kept telling him drop the gun. She wasn't gonna shoot him. I'm gonna tell you all like that. But he didn't drop the gun until the last minute. Like she had to shout. Like she had to repeatedly tell him to drop the gun, drop the gun. But she aimed like she aimed. He got shot in his chest. He got shot in his chest, right? It's chest shot, right?

May 20, 2025 85:16-22

Porter was not shot in the chest. This is one of the fictions created by Davis, evidencing the fact that he never saw the shooting. And the fact that Davis had to ask the officers interviewing him if Porter was even shot in the chest, further supports the fact that he did not see Porter get shot.

Another absurdly off point statement by Davis was the following:

...She was shooting. **But every last one of her shots hit somebody in that parking lot.** She came right up. She went right here. But it was a lot of gunfire right here but everybody back that was in the parking lot was turning this way like this. So they don't know if somebody shooting from this way, this way, or that way. They didn't know that they getting shot from the back. That's it. That's all right here.

May 20, 2025 87:8-16 (emphasis added)

It is undisputed that no one was shot except for Porter and Tennyson, much less "everyone in that parking lot." Once again reenforcing the point that Davis was either not present or not in position, or condition, to observe the shooting.

And Davis makes himself out to be remarkably brave, and conveniently in a position to see everything, while standing out in the open when everyone else seemed to understandably be in hiding:

DAVIS: Yeah. I'm telling you all this because I'm literally -- I'm off the porch. Everybody else on the porch. Everybody yelling at me to come back to the porch. I'm off the porch. I'm watching everything

like this. I'm like oh, I'm just watching everything.

OFFICER LAMBERTON: So they're shooting at Little Dion. The guy that got killed is trying to return fire.

MR. DAVIS: Yeah, but I'm telling you all that he --I ain't seen when he got shot by them but I'm telling you all that that car had shot him first. Everybody keeps saying that the lady cop killed him. All right, she probably finished him but if anything, that first bullet already hit him.

May 20, 2025 90:18-91:4

There was only one gunshot which hit Porter, from Francemone's gun. Davis stated further:

MR. DAVIS: She wasn't gonna let nobody kill her. I respect her. And then she did. I ain't gonna let nobody kill me either. They let off like 15, 20 shots at her back. That's what she was [indiscernible] cause that's what I'm saying like everybody was turned this way so like ain't nobody know where the gunshots was coming from. So when those boys turned around and they seen that there was a cop, they started shooting at her too. Everybody started scattering after that because she started going crazy with the gun, boom, boom, boom, boom, boom, boom, boom, boom, boom. She hit everything.

OFFICER LAMBERTON: What did she hit? What do you think she hit?

MR. DAVIS: Everybody.

May 20, 2025 93:23-94:9

This is clearly not a story told by a person who witnessed the events at the barbeque, or who was in condition to comprehend what he was seeing, and his testimony must be completely disregarded.

Even more disconcerting is the fact that by the time Davis testified to the grand jury, his story had completely changed and was in line with that espoused by the defense counsel. As to who or what may have influenced him to change his story, plaintiff offers no opinion. But this remarkable

"transformation" undercuts any credibility Davis may have had, and is cause to completely reject his entire account of the event.

Davis' statement to the police is entirely inconsistent with the events at the barbeque. Porter was not shot in the chest, Francemone did not shoot everyone in the lot, and no one shot Porter before Francemone, "finished him off."

**The Testimony of Carlos Stackhouse**

Stackhouse was twelve years old on June 19, 2016. 145:25-146:2. Stackhouse offered the following, riveting, testimony at trial:

Direct Examination By Counsel for the Defense

Q    Now, isn't it true that at the party, after the gunfire started, that you saw a man in a lime green shirt and that he had a gun in his hand?

A    No.

Q    It's not true?

A    No.

May 20, 2025 154:15-20

Stackhouse testified further:

Q    ...and in fact Mr. Stackhouse, not only did you see him with a gun in his hand, you saw him fire the gun, isn't that true?

A    No.

Id.155:9-12

Q    And what you saw was the man in the lime green shirt ran two steps past her, took his gun out and was shooting and then the cop turned around and was shooting at him. That's what you saw,

right?

A       No.

Q       It's not what you saw?

A       No.

Id.156:1-7

Cross Examination by Counsel for Plaintiff

Q       I'm Fred Lichtmacher, I represent the estate of the man who was shot and killed at that

        Father's Day party. Did you know that man before you saw him get shot?

A       No.

Q       Do you know his family?

A       No.

Q       Do you know his name?

A       No.

Q       Okay.  So you said on direct examination -- I don't want to misquote you because you

        were speaking in a low voice, I'm an old man, I don't hear so well, so forgive me --

        you didn't see a man in a lime green shirt with a gun; did you just say that?

A       Yes.

Q       And is that the truth?

A       Yes.

Q       And you didn't see him fire the gun that you didn't see him have, correct?

A       Yes.

Id. 160:8-161:1

Q      Okay. At any time, did you get the impression that somebody wanted you to give a

specific story regarding this incident?

A      Yes, I just feel like I was helping, I feel like I was

helping out, that's all, but --

Q      I didn't hear a word you said.

A      I said, yes, I feel like I was just helping out at the time.

Q      And did you tell them the truth when you helped them?

A      Not 100 percent.

Q      And were you saying just what they wanted to hear you say?

A      Some, yeah.

Q      And you didn't really see Mr. -- can I tell him the name of the guy who was shot, your

Honor? It's not a secret here I think.

THE COURT: Well, ask him a question that he would understand.

Q      Okay. Did you see the man -- so you didn't really see the man in the lime green shirt have

a gun, did you?

A      No.

Q      And you really didn't see him shooting a gun because you didn't see him have one, did

you?

A      No.

Q      Did you see him throw something at some point?

A      Yes.

Q      And might that have been a cell phone?

A    Could have been.

Q    Could have been. How -- can you describe what you saw, in terms of the size of what you

saw?

A    Um, it was small and like -- I can't really remember the color because it was dark but it

was smaller.

Q    It wasn't shaped like a gun, was it?

A    Not necessarily, from what I was seeing, no.

Q    He wasn't pointing at anybody with that thing that might have been a cell phone, was he?

A    No.

Q    Okay. And you're telling the truth here today, aren't you, sir?

A    Yes.

Id. 162:22-164:11

Q    Mr. Stackhouse, why after all these years did you decide to tell the truth today about what

you saw?

A    Because when I was younger, when I was younger, I just thought I was helping, like I

didn't -- I was misguided, I didn't really -- that was mad traumatizing for me, like

honestly, but at the time I just thought I was helping. Now that I been through life a little

bit more, I don't know, I just understand things a little differently, that's all.

Id. 167:3-10

And on redirect Mr. Stackhouse reiterates that the decedent did not have a gun

Defense Counsel Redirect

Q    Okay. Is it your testimony as you sit here today that the man in the lime green shirt that

you saw did not have a gun?

A      No.

Q      It's not your testimony?

A      He did not have a gun.

Id. 170:20-25

Q      You saw the man in the lime green shirt get hit with a bullet, right?

A      Yes.

Q      Just like you saw him throw a gun, right?

A      Nah, I didn't see him throw -- no.

Q      So part of that statement that you gave to the police was true but the other part of that

       voluntary statement that you gave was not true?

A      Yes.

Q      And you're saying that the reason why you gave that false statement to the police was you

       were just trying to help them?

A      Yes.

Id. 173:12-24

ReCross by Counsel for Plaintiff

Q      So basically, Mr. Stackhouse, you're telling us today that you told the truth about

       everything except about the man in the lime green shirt having the gun, is that a fair

       statement?

A      Nah, there was some other things I didn't tell the truth about either.

Q      What else didn't you tell the truth about?

A       I ain't tell the truth of exactly where I went afterward.

Q       Okay. And you believed, if I understood you correctly, and please correct me if I'm

        wrong, I don't want to misrepresent you, I mean that, you believed that your parents

        would want you to help the police, is that correct?

A       Yes, that's what they told me to do.

Q       And what you really saw was the police shoot an unarmed man, is that correct?

A       Yes, I believe so, yes.

Q       That's what you saw?

A       Yes.

Id. 175:14-176:7

Q       Sure. So you didn't see him having a gun, correct?

A       No.

Q       And you didn't see him obviously firing a gun, correct?

A       No.

Q       And most of the questions you answered for them, most of them you answered honestly,

        correct?

A       Yes.

Q       And I take it your parents are people who respect and admire the police, correct?

A       Yes.

Q       Did you believe that your parents would be proud of you for helping the police?

A       Yes.

Id. 176:19-177:6

**The Inconsistent And Not Believable Testimony of the Defendant**

Francemone repeatedly stated she shot a man in a white shirt. Why, undoubtedly because there are videos of men in white shirts and at least one of a man in a white shirt shooting gun and Porter was not wearing a white shirt.

And incredibly, even though she chased him, shot him, stood over him, and touched his right hand to handcuff him, she did not find out he was wearing a lime green shirt until five years after the incident. 5/16/25 27:6-9. And at her deposition she testified she did not remember a pattern on the back of his shirt, but at trial, with the shirt being brought in and shown to the jury she had to admit it had a pattern on the back. Id. 48:3-5. According to Francemone, Porter was 2-3 feet away from her on the other side of the wire fence when he was allegedly shooting a gun. Id. 177:23-25. Nevertheless, somehow she did not get shot, she did not get the color of his shirt right, she did not get the design on his back correct, in other words, her testimony is impossible to believe.

Francemone alleges she touched Porter's left hand and not his right hand. Id. 43:5-9; 46:18-29. And the experts from both sides agreed that gun shot residue could be transferred from a person who had shot a gun by the shooter touching someone else. Yet there was no gunshot residue on Porter's left hand. (Lichtmacher Declaration). And the nurse witnesses testified that Francemone grabbed Porter's right hand, which would account for the gun shot residue on Porter's right hand, which is why the defendant created the fiction that she only touched his left hand. (Lichtmacher Declaration). And according to Francemone, Porter was dangerous, and she thought he had a gun, but she holstered her weapon. Id. 33:17-19. Francemone also is contradicted by the witnesses about her allegedly saying "stay away he has a gun" after she shot him in the back and he lay on the ground, which not one person in the crowd heard her say and which she alleges she said in a loud

voice several times. Id. 48:16-18.

Another convenient falsehood told by Francemone was that she shot Porter in the side, but she has now been forced to admit that is incorrect. Id. 46:12-17. And this falsehood is created to lead the jury to believe Porter was turning to face her, which is also contradicted by every witness who saw the incident. (Lichtmacher Declaration). And remarkably, Francemone alleges, five years after the incident, at her deposition that even though her bullet was found in his clothing it was "unknown" if Porter was shot by her. Id. 6:16-7:6

This series of falsehoods were not testified to by accident. Each one of these "mistakes" gives more of an excuse for Francemone to shoot Porter. And it is not a coincidence that she makes no mistakes which would make it less excusable for her to have shot and killed Porter. She only makes "mistakes" which help her case.

Defense expert Reisberg testified about what great detail someone would remember about a gun being shot at her. But Francemone provides no details about the alleged gun. (Lichtmacher Declaration).

When Francemone approached and shot at the Malibu, the witnesses made clear that she never said drop the gun. (Lichtmacher Declaration). Something Francemone denies:

Q And in fact, yes or no, Officer, have you alleged you

saw a man in that vicinity near the rear driver's side door

of a black sedan wearing a yellow shirt shooting a gun?

A That's correct.

Q And you allege, you allege that you yelled, police,

drop your gun, show me your hands?

-12-

A It would be farther up from this picture, but yes.

Id. 10:6-12

In yet another falsehood, Francemone testified that when she approached and shot at the car there was no one was in the car. Id. 128:23-129:1. But the witnesses made clear the car was crowded with people when Francemone, with complete disregard for human life, shot at the car. (Lichtmacher Declaration).

<strong>Primeau's Testimony</strong>

Counsel for the defendant may have done something somewhat unethical during trial. Marc Primeau, a respected expert on video technology, was called by the defense to try to identify a man in a white shirt, seen shooting a gun, as actually wearing a lime green shirt, as was Porter. That man, was shooting a gun and numerous shell casings were found by the SPD in the area on Tully street from which that man was shooting. (Lichtmacher Declaration). Counsel said Porter was shooting a gun by the rear driver's side door of the black sedan. But the shell casings found next to that door were shown to be different than the shell casings on Tully street where the man with the white shirt was shooting. (Lichtmacher Declaration). Counsel tried to mislead the court and the jury into believing that man was Porter. But when the discrepancy in the shell casings was noted, counsel changed its story and tried saying Porter was shooting a revolver which does not eject shell casings.

Primeau was manipulated by counsel by not being given adequate information to identify, or disqualify, the man shooting a gun on Tully Street as someone wearing a lime green shirt. Primeau had recommended to the attorneys who hired him he be allowed to do certain testing which would have been beneficial to his determinations and the lawyers denied him permission to do so:

Q And did you place a replica of the same bright yellow

-13-

shirt like the shirt worn by the decedent into view of the

camera at the location under similar conditions at night, et

cetera, to match to the shirt worn by the unknown subject?

A I did not.

Q Why not?

A I recommended that that be a part of the analysis, I

was never approved to do so.

Q You were never what?

A Approved to do so.

Q Who didn't approve you to do so?

A That's difficult to say, who was the ultimate decision

maker.

Q Well, was it somebody in your firm or was it the

attorneys who hired you, or somebody else?

A It would be the attorneys who hired me, that's correct.

Q They didn't approve you to do that?

A That is correct, that's my understanding, yes.

Id. 54:8-25

    In light of the fact that he was paid $20,000, presumably to do the most thorough analysis

possible, one has to wonder what counsel was afraid of if the additional testing had been done[1].

---

[1]    This attorney received phone calls from adversary counsel during discovery
saying they had a video tape which definitively showed Porter shooting a gun, and I was asked to
dismiss this case. But Primeau, to his credit and veracity, made no such conclusion. And in light

And there was information withheld from Mr,. Primeau:

Q Now did the people who hired you inform you if multiple

other men wearing white shirts and baseball hats were at the

barbecue?

A I don't recall specifically, no.

Q Did the people who hired you to appear here today show

you several photos of people in white shirts and baseball

caps present at the barbecue?

A Can you repeat the question?

Q Sure. Did they show you several pictures of people

with white shirts and baseball hats, the people who hired

you?

A If I understand your question correctly, you're

referencing the known exhibits in my presentation?

Q No. I'm asking if you were looking at other gentlemen

who were wearing similar, forgive the word, ensembles?

A I understand the question now. So if I understand your

question correctly, you're asking if I evaluated multiple

unknown subjects?

Q Yes.

---

of the evidence of the shell casing evidence, and the withheld evidence not given to Mr. Primeau,
this clearly, was to put it euphemistically, an error by defense counsel.

A I did not, no.

Q Okay. And was it -- were you ever offered those to

examine?

A I don't understand the question.

Q Sure. Did the attorneys offer them to you and you

decided not to examine them?

A No, that's not the case.

Q Were you ever even informed that such photos exist?

A I don't understand the question.

Q Sure. Were you informed that there are in fact several

videos and photos of people in white shirts with baseball

hats on at the barbecue?

A I was not given that information throughout the course

of my investigation, no, and if it was, I don't recall.

Q You really cannot conclude with any reasonable degree

of certainty to a scientist in your area of expertise that

the video you were shown was in fact a video of Porter, can

you?

A Can you repeat the question?

Q Absolutely. You really cannot conclude with any

reasonable degree of certainty to a scientist in your area of

expertise that the video you were shown was a video of

Porter, can you?

A The only thing that I can offer as an opinion is that

those two subjects are in the same class, but no, to identify

that as my understanding as the decedent, to the exclusion of

all others, there is insufficient evidence in the video

images to do so.

Id. 55:20-57:16

Francemone claims that Porter was shooting a gun next to the rear drivers side door of the

sedan. And counsel for the defense even highlighted the shell casings. But those shell casings do not

match the shell casings near the man in the white shirt shooting a gun as seen on the video, the man

the defense would have liked Primeau to confirm was Porter, but which to his credit, he could not

do. It would not be impossible to conclude that the defense was perpetrating a hoax, in attempting

to identify the man shooting a gun on Tully Street as Porter.

### Pursuant to the Totality of the Circumstances Plaintiff is
### Entitled to a New Trial

This Court can and should order a new trial, as under the totality of circumstances, claimant's

right to fair trial has been denied.

### The Inconsistency Between the Jury's Answers to the Qualified Immunity Questions and
### the Verdict on Liability, Weighs in Favor of the Plaintiff Being Entitled to Either a New
### Trial, Or Denial of Qualified Immunity

"The verdict must be inconsistent with the facts adduced at the trial if the reviewing court is

to reverse it on the ground of an improper compromise by the jury." Maher v. Isthmian Steamship

Co., 253 F.2d 414, 416-417 (2d Cir.1958)). There are two reasons demonstrating the jury in this case

-17-

made an improper compromise in the instant matter. First, for any jury to find that a man's brutally

caused loss of life is worth only $10,000 can only indicate the jury improperly compromised.

Second, the findings of the jury on the Special Interrogatories is entirely inconsistent with the

verdict.

In Maher, the court stated, "the record itself viewed in its entirety must clearly demonstrate

the compromise character of the verdict, otherwise it is not error for the trial judge to refuse to set

the verdict aside on this ground." Id. at 419. The Second Circuit has found: " We may infer that a

verdict is a compromise where damages are awarded in an amount inconsistent with the theory of

liability offered at trial together with other indicia such as a close question of liability." Atkins v.

New York City, 143 F.3d 100, 104 (2d Cir. 1998). (Fox v City Univ. of NY, 187 FRD 83, 93 [SDNY

1999])

### The $10,000 Verdict was the Product of an Improper Compromise

Plaintiff is not arguing for an additur, which is not allowed in this Court. Rather the plaintiff

argues for an entirely new trial or if the Court is inclined to do so, to merely reject the jury's answers

to the special interrogatories.

A case not directly on point but significant by analogy is Carey v Piphus, in which the US

Supreme Court held that a "§ 1983 plaintiff is entitled to nominal damages only in the absence of

proof of actual injury." Carey v. Piphus, 435 U.S. 247, 248, 98 S. Ct. 1042, 1044, 55 L. Ed. 2d 252

(1978).  The Second Circuit has held that where the plaintiff has been subjected to excessive force,

compensable injury would normally follow. Wheatley v. Beetar, 637 F.2d 863, 867 (2d Cir. 1980).

However, to recover compensatory damages plaintiff must prove that his injuries were proximately

caused by the constitutional violation. Gibeau, 18 F.3d at 110. However, "if it is clear from the

undisputed evidence, however, that the plaintiff's injuries were caused by the use of excessive force, then the jury's failure to award some compensatory damages should be set aside and a new trial ordered." Atkins v New York City, 143 F3d 100, 103 [2d Cir 1998])**.** It is impossible to reconcile an award of $10,000 in an action premised on the use of excessive force, which is what the jury found, with the death of a 41 year old male with no serious medical history.

For the jury to have found, correctly, that the defendant used excessive force, but incorrectly that the decedent had a gun is entirely inconsistent. Therefore this supports plaintiff being entitled to a new trial.

In <u>Hundley v. District of Columbia</u>, the estate of the decedent was found not to have waived its right to challenge verdict in which jury found that police officer was not liable upon claims of assault and battery and excessive force in connection with decedent's shooting death, while simultaneously rejecting, in written interrogatory under Fed. R. Civ. P. 49(b), officer's version of events as to issue of self defense with regard to estate's negligence claim where (1) estate objected to written interrogatory at trial; (2) district court dismissed jury after receiving verdict without asking parties whether they had any objections to verdict; and (3) estate raised inconsistent verdict argument—based on previously objected-to written interrogatory—in its post-trial motion for judgment as matter of law or new trial. <u>Hundley v. District of Columbia</u>, 494 F.3d 1097, 377 U.S. App. D.C. 451, 2007 U.S. App. LEXIS 17517 (D.C. Cir. 2007), reh'g, en banc, denied, 2007 U.S. App. LEXIS 26153 (D.C. Cir. Nov. 6, 2007), reh'g denied, 2007 U.S. App. LEXIS 26154 (D.C. Cir. Nov. 6, 2007), reh'g, en banc, denied, 2007 U.S. App. LEXIS 26158 (D.C. Cir. Nov. 6, 2007), reh'g denied, 2007 U.S. App. LEXIS 26159 (D.C. Cir. Nov. 6, 2007).

At trial, after the verdict was announced the plaintiff was so distraught by her perception of

racism being encouraged as a motivation to the jury in assessing the fatal shooting of a Black man

to be worth only $10,000 she wanted us at that time to take no action and to let the case go away.

Therefore, we made no objection at that time to the insanely contradictory verdict and special

interrogatories. After examining the record, and having time to think about it, the plaintiff has had

a change of heart and premised on what the plaintiff perceives to be the invocation of racism

throughout the trial, as well as in jury selection, she will be appealing the verdict to the Second

Circuit, if it cannot be sorted out at this stage.

This Court should exercise its discretion and grant a new trial to the plaintiff. The Court

erred in granting great leeway to the defense in allowing it to speak in tremendous detail about

incidents occurring after the shooting. While the Court probably was not aware of the extent defense

counsel would abuse it being granted the ability to speak about the post shooting events, nevertheless

the defense took the opportunity and ran with it, invoking racial animosity in the jury which

translated into the jury believing Porter had to have a gun. While plaintiff does not question the

Court granting defendant some latitude in this regard, it is doubtful the Court understood the extent

counsel would take that ruling and run with it to the extent it did.

**Whether Intentional or Not, Counsel for the Defendant Invoked**
**Fear of Violent Minorities, Making it More Palatable**
**For the Jury to Believe Porter Had a Gun.**

The defense tactic in offering testimony about how wildly out of control the residents who

saw the shooting were, aroused fear of minorities in the jury, causing it to be more palatable to

believe there was a race riot, and therefore everyone there may have been armed. This invocation of

racial hatred, served no legitimate evidentiary purpose but to instill fear of minorities, and sympathy

for the defendant, in the jury.

-20-

In the opening the defense counsel posted the word "SYMPATHY" and from that point on counsel stressed sympathy for the officer who shot and killed an unarmed man.

The Court indulged defense counsels repeated efforts to elicit "evidence" of the out of control crowd after Porter was shot. While the Court may not have envisioned to what extent or to what end this evidence would be used, whether it was intentional or not, the defense aroused fear of violent minorities, and such fear contributed to the jury, with virtually no credible evidence Porter had a gun, placing a gun in Porter's hands as well as inviting sympathy for the poor officer who suffered some exceedingly minor injuries at the hands of non parties. While no attack on an officer is justified, nevertheless the constant invocation of sympathy for the officer with evidence entirely irrelevant to the circumstances of the shooting, denied the plaintiff the right to a fair trial. Again, whether or not it was a planned tactic is not the issue, but nevertheless with mention of the incidents after the shooting of Porter, which are totally irrelevant to why he was shot, the jury was essentially told the rioting crowd was deadly and therefore they could have believed Porter was armed. And the effort to employ this tactic began in counsel's opening:

> "At that moment, she felt a foot kick her in the rear end. Two hands grabbed her and yanked her back. She realized that she was about to start wrestling with additional people. She had a gun in her hand. She immediately reholstered it and she tried to fight off these people. They were punching her, they were kicking her, they spit on her, they were trying to take her equipment off her belt, and she couldn't get free of those individuals until the next police officer got on the scene."

May 12, 2025 124:13-21

> "The firefight having stopped, the crowd came back and they were angry. Kelsey is pulled

off of-away from Sergeant Ryan again and she is in what is the second fight of her, of the

night for her. The second physical fight with the crowd. And we're going to watch a little

video."

May 12, 2025 125:3-7

"That's Kelsey Francemone on her knees, six set of arms on her. We're going to play the rest

of this, you're going to see her get pushed to the ground, and you are going to see a bunch

of people get up, jump on top of her."

May 12, 2025 125:16-20

These statements had nothing to do with the events leading up to Francemone shooting

Porter, and they invoked racism and fear of minorities which allowed the jury to believe all the

people on the scene, who from all appearances seem to all be minorities, were criminals, and made

it much more palatable for the jury to believe Porter, had a gun. And this had absolutely nothing to

do with whether or not Porter had a gun. And even Francemone admits that no one was beating her

before she shot Porter. May 16, 2025, 164:22-24

While the Court may have envisioned a scenario in which the events after the shooting were

relevant, certainly no such relevant evidence was elicited at trial. It is apparent that counsel for the

defendant took advantage of the Court's rulings litigated pretrial and ran with it in unexpected and

unacceptable directions.

**Defense Counsel Presented New Facts in its Closing with no Supporting Evidence**

In an attempt to fix Francemone's numerous factual errors, defense counsel in his closing

created out of thin air, with no testimony or other evidence supporting the alleged facts, two brand

new alleged "facts" first that Porter jumped over the fence, with no factual support by any witness,

as well as now having Porter allegedly firing a revolver which would not expel shell casings.

Similar efforts to introduce unsupported facts to a jury in a force case recently led to Judge Hurd granting plaintiff a new trial in Lee v. City of Troy, 339 F.R.D. 346, 2021 U.S. Dist. LEXIS 169748 (N.D.N.Y. 2021). Because of police officer's counsel playing up regional bias and repeatedly attacking veracity without a good faith basis of claimant's edited version of video from security camera of claimant's arrest, which differed from officer's edited version, new trial on claimant's cause of action for use of excessive force was warranted under totality of circumstances as claimant's right to fair trial was denied through counsel's unsupported attacks on legitimacy of claimant's video and irrelevant attacks on claimant's character. Lee v. City of Troy, 339 F.R.D. 346, 2021 U.S. Dist. LEXIS 169748 (N.D.N.Y. 2021).

### This Court Should Have Honored Plaintiff's Batson Challenges and Should Not Have Allowed the Defense to Strike Two People of Color for Cause Where No Cause Existed

Two major mistakes this Court made were in jury selection. Plaintiff invoked Batson to challenge the striking, for cause, of two people of color from the jury panel. Only three people of color were present forming the potential jury panel. Two of the three were struck by defense counsel for cause. Such cause was not adequate and in this regard the Court erred.

**Juror No 0089 Should Not Have Been Allowed to Be Struck for Cause**

MR. POWERS: [Seat] Number 33, [Juror No. 0089].

THE COURT: That's defendant's fourth peremptory.

MR. LICHTMACHER: We might make a Batson challenge

here. There's very few people of color who came into the

courtroom, we didn't see anything she said that would justify

knocking her out.

THE COURT: It's a he.

MR. LICHTMACHER: He, excuse me, knocking him out,

excuse me, my bad.

MR. POWERS: Yeah. In response, the reason that we

are striking him is because two of his family members have

been shot and several of his family members have been

arrested.

MR. LICHTMACHER: Yeah, but he didn't say any of

his family members were shot by police officers, I don't see

where the bias arises here.

MS. KUCEVIC: He also said that none of them had

died, they had just been shot, and he said he can be fair.

May 12, 2025 197:6-23

Yet another juror was struck for cause who should not have been.

MR. LICHTMACHER: Are we going to revisit it it if

another person of color is struck?

May 12, 2025 197-198

**Juror No. 0115 Should Not have Been Allowed to Be Struck for Cause**

MR. LICHTMACHER: That African-American woman.

Okay, now we're going to make a Batson challenge. You know,

again, you know, this is now two-thirds of the -- you're

leaving one person of color possibly on the jury. Only three

people walked in, who were people of color. You know, my

client's entitled to have some representation by her

community on the jury. And I don't think there's strong

argument to knock this person out, nor did I think there was

a strong argument to knock the other person out. With all

due respect to Mr. Powers who I get along with, seems to be

racially motivated.

THE COURT: And what's the response?

MR. POWERS: The argument, Judge, in and of itself

is racially oriented, that a person of color is

necessarily --

THE COURT: But what's your response to his

objection?

MR. POWERS: My response is there's only three

people of color, we have no objection to [Juror No. 0120], we

do not find her -- we find her to be a perfectly fine juror,

but again, [Juror No. 0115] has had several family members

who have been the victims of shooting, she's had family

members who have been arrested. And again, anything that's

going to establish an emotional connection between the family

-25-

of Mr. Porter and the jurors is of potential concern to me.

MS. KUCEVIC: Your Honor, if I may, she did state

that she can be fair. She also stated she has had positive

experiences with cops, with police officers before. She said

that she lives in the neighborhood where, you know, she

understands that there's some cops who do the wrong thing,

some who do the right thing and she can be fair. I

understand that, you know, Counsel Powers is stating that,

you know, a family member has been shot, I mean, I personally

have been in criminal trials before, it's, you know,

especially in the city, we've had tons of jurors have had

family members that have, you know, been shot or been a

victim of a crime. If they state that they can be fair, that

doesn't necessarily mean that they should be, you know,

sought out just because they're a victim of a crime.

MR. LICHTMACHER: And again, it wasn't developed by

counsel about, you know, circumstances of the shooting, it

wasn't alleged that it was a shooting by a police officer,

and we'll now be knocking out two-thirds of the

African-American jurors or minority jurors when there's so

few here.

THE COURT: The only question for the court is

whether Mr. Powers has articulated a race-neutral explanation

for the strike that the court finds credible, and to have had

family members who've been victims of shooting would be a

race-neutral explanation for a strike.

May 12, 2025 200-202

**Juror No 0114 Should Have Been Struck for Cause**

Yet a friend of one of the defense team was not allowed to be struck for cause:

JUROR NO. 0114: I know Ryan Poplawski.

THE COURT: Okay. And how do you know him?

JUROR NO. 0114: He's -- friends.

THE COURT: You're friends?

JUROR NO. 0114: Yep.

THE COURT: How long have you been friends?

JUROR NO. 0114: Probably 10 years.

THE COURT: And do you see each other socially?

JUROR NO. 0114: Once in a while

Id. 64:17-25

Not allowing this biased juror to be struck for cause was clear error by the Court and

standing alone entitles plaintiff to a new trial.

"A prospective juror may be excused for cause based on many forms of bias. As the

Second Circuit has explained, Juror partiality can . . . take various forms: actual, implied, or

inferred. See United States v. Torres, 128 F.3d [38,] 43 [(2d Cir. 1997)].

Actual bias is "bias in fact," id., generally evidenced by "express proof," such as a juror's admission to "a state of mind prejudicial to a party's interest." United States v. Haynes, 398 F.2d [980,] 984 [(2d Cir. 1968)].

Implied bias is "bias conclusively presumed as a matter of law" from circumstances in which an average person in the position of the prospective juror would be prejudiced. United States v. Torres, 128 F.3d at 45. Inferred bias exists "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." Id. at 47.

This is a circumstance of implied bias. Juror Number 0114 has been a friend of defense counsel for ten years and sees him socially.

Only three people of color attended jury selection and the stated reasons for knocking two of them out were frivolous. By contrast, a friend of counsel was not allowed to be struck for cause, which is more on point for bias than anything said by the two Black potential jurors who were struck.

### Not Disclosing the Grand Jury Minutes was Error

In a matter in which there was no useful video footage of the relevant events, and which boiled down to a he said she said, not unsealing the grand jury minutes, particularly for a defendant who was caught in so many contradictions, greatly biased the plaintiff. Unsealing applications took place over the course of years and I cannot remember a trial in which such minutes were not unsealed.

### Khalil Davis' Letter Should Have Been Allowed into Evidence Without Conditions

Davis' letter admitting he lied to the grand jury should have been allowed into evidence

without conditions attached to it, particularly a condition which would have created a trial within a trial in which this attorney had to defend myself against fictitious charges orchestrated by somebody. Davis grand jury minutes were allowed into evidence and so should his statement recanting the fictions he told.

**Conclusion**

This Court should exercise its discretion to grant Plaintiff a new trial. Or in the alternative, this Court should strike the jury's findings on qualified immunity as entirely inconsistent with the verdict.

Dated: New York, New York
       July 1, 2025

                                                    _____/s/_____
                                                    Fred Lichtmacher 513193

-29-