UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TANAJEE MADDOX as Administratrix of
the Estate of GARY TERRANCE PORTER,

Plaintiff,

- v -

SYRACUSE POLICE OFFICER KELSEY
FRANCEMONE sued herein in her capacity as
an individual,

Defendant.

Civil Action No.: 5:19-CV-0678
(BKS/MJK)

---

### REQUEST FOR JUDGMENT
### ON THE DEFENSE OF QUALIFIED IMMUNITY

Defendant Francemone asserted the defense of qualified immunity in her Answer. *See* Dkt.

No. 14, ¶ 35. Prior to trial, the Parties stipulated that qualified immunity was one of the issues to

be decided by the Court as a matter of law, and Defendant Francemone specifically requested that

the Court charge the Jury with special interrogatories to assist it in resolving the defense. *See* Dkt.

Nos. 269 [joint pretrial stipulation], 296 [Defendant's proposed verdict form including proposed

special interrogatories].

It is well settled that once the facts of a case have been resolved by the Jury *via* special

interrogatories, the affirmative defense of qualified immunity is then to be decided by the Court as

a matter of law based on those decided facts. *See Walker v. Schult*, 45 F.4th 598, 617–18 (2d Cir.

2022) (citing, *inter alia, Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007)).

At the conclusion of trial on Friday, May 23, 2025, the Court directed the parties to submit

briefing on the impact of the Jury's responses to the Special Interrogatories with respect to the

issue of qualified immunity, which remains to be decided by the Court. Officer Francemone

therefore submits the following briefing to assist the Court in resolving this issue as a matter of law.

**QUALIFIED IMMUNITY STANDARD**

Qualified immunity provides "breathing room"[1] to police officers to perform their dangerous duties, which often require split-second decisions, without the threat that their actions will be second-guessed by lay jurors who lack police training and who may—with well-intentioned hindsight—make subjective judgments on whether an officer's response to a unique situation violates the Fourth Amendment to the U.S. Constitution.

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021). To that end, this affirmative defense shields an officer from money damages *unless* the plaintiff establishes "(1) that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct."[2] *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (emphasis added)).

Stated differently, qualified immunity exists *unless* there is a clearly established constitutional rule—articulated in a prior case with sufficiently similar facts—that would have put a reasonable officer on notice that the specific conduct at issue was unlawful under sufficiently

---

[1] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").

[2] In *Pearson v. Callahan*, 555 U.S. 223 (2009) the U.S. Supreme Court receded from the rigid two-step framework for analyzing qualified immunity established in *Saucier v. Katz*, 533 U.S. 194 (2001), and held that trial courts may exercise discretion in deciding which of the two-step framework to address first.

similar circumstances. *See Pearson*, 555 U.S. at 232. Indeed, in *White v. Pauly*, 580 U.S. 73 (2017), the Supreme Court observed that "general level" applicability of the *Graham* and *Garner* standards is often "'*inherently incapable of giving fair and clear warning' to officers*" *Id*. at 79.[3] (emphasis added); *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam) ("*Graham*'s and *Garner*'s standards are cast at a high level of generality," which cannot always define what is clearly established under the law); *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (general statements of the law are insufficient save in obvious cases).

In *Mullenix v. Luna*, 577 U.S. 7, 12-12 (2015) and *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004), the U.S. Supreme Court cautioned that it is not sufficient for a district court to evaluate qualified immunity based on the *Tennessee v. Garner's* "general test" for excessive force, but that a court need look to the *specific* situation the officer confronted and determine whether there exists a case that "squarely governs" those facts. *Id*. at 13 (the "correct inquiry … was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the "'situation [she] confronted'" based on a case that *squarely governs"* those facts)*.* As this Court has previously observed, "'specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Rose v. City of Utica*, No. 14-CV-01256, 2018 WL 2041621, at *10 (N.D.N.Y. Apr. 19, 2018) (Sannes, C.J.) (quoting *Kisela*, 584 U.S. at 104); *see also Mullenix*, 577 U.S. at 12.

Even factually similar cases may not serve as controlling precedent for qualified immunity purposes if the application or balance of the *Graham* factors differs materially. *See Rivas-Villegas*,

---

[3] (quoting *United States v. Lanier,* 520 U.S. 259, 271 (1997)).

595 U.S. at 5 (concluding that because prior precedent did not provide "fair notice," qualified immunity applied). For example, in *Rivas-Villegas*, the Supreme Court reversed the Ninth Circuit's denial of qualified immunity based on its determination that a prior Ninth Circuit case, *LaLonde v. County of Riverside*, 204 F. 3d 947 (9th Cir. 2000), governed the conduct at issue. *See Rivas-Villegas*, 595 U.S. at 5. The Supreme Court held, *inter alia*, that even though the factual scenarios facing the officers in each case were somewhat similar, the "severity of the crime" factor was much lower in *Lalonde*, and therefore *Lalonde* was "materially distinguishable" and therefore could not provide fair notice to the officers for the conduct at issue in *Rivas-Villegas*. *See id*. at 8-9; *see also id.* at 5 ("*LaLonde* did not give fair notice to [the involved officer]. He is thus entitled to qualified immunity.").

FACTS ESTABLISHED BY SPECIAL INTERROGATORIES,
STIPULATION, OR THAT WERE OTHERWISE UNDISPUTED

Here, the Jury has spoken regarding any uncertainties that would otherwise bar the application of qualified immunity. The factual record for granting qualified immunity is as follows:

(1)    Officer Francemone was aware that the James Geddes Housing Complex was a "hot spot" within the City of Syracuse for high gun crime, narcotics trafficking, and gang-related activities;[4]

(2)    Officer Francemone received advance intelligence from an "Officer Safety" bulletin that there would be Father's Day Cookout in the Complex, sponsored by a local gang, that would have the potential for gang-related violence;[5]

---

[4] Established during Officer Francemone's testimony and not otherwise disputed. *See* Dkt. No. 559 [Francemone Tr.] at 93:24-25, 4-10, 94:1-11.

[5] Established during Officer Francemone's testimony and by trial exhibit D-12, and not otherwise disputed. *See* Dkt. No. 559 [Francemone Tr.] at 98:1-25, 99:1-2; *see also* D'Agostino Decl., Ex. A (D-12).

(3)   "The Father's Day Barbeque was attended by several hundred people and continued into the late evening of June 19, 2016." Dkt. No. 269 [Pretrial Stipulation ¶ 5];

(4)   "A certain quantity of gunfire involving multiple shooters occurred after 11:00 p.m., in the vicinity of the Father's Day Barbeque." Dkt. No. 269 [Pretrial Stipulation ¶ 9];

(5)   Officer Francemone responded by herself to the gunfire "[running] south from her location at 310 Otisco Street toward the Stone Parking Lot" and was *"present for a portion of the gunfire*." Dkt. No. 269 [Pretrial Stipulation ¶ 10] (emphasis added).

(6)   "Shell casings recovered by the police during the early morning hours of June 20, 2016 in the Stone Court parking were forensically tested and revealed to have come from three other weapons that were fired in the vicinity of the parking lot, including a 9 mm gun, a .40 caliber gun, and a .45 caliber gun, that were different from the rounds fired by Officer Francemone's service weapon." Dkt. No. 269 [Pretrial Stipulation ¶ 12].

(7)   The gunfight in the Stone Court Parking Lot was chaotic.[6]

(8)   The decedent, Gary Porter, was armed during the incident. *See* Dkt. No. 545 [Special Interrogatories ¶ 1].

(9)   Officer Francemone reasonably perceived Mr. Porter to be one of the individuals discharging a weapon near the Black Malibu in the Stone Court Parking Lot. *See* Dkt. No. 545 [Special Interrogatories ¶ 2].

(10)  The individuals observed in Stone Court Parking Lot were engaging in violent, felony-level criminal conduct, which had the potential to cause death or serious bodily injury to the surrounding participants, police, and other innocent civilian

---

[6] *See, e.g.*, Dkt. No. 557 [T. Days. Tr.] at 163:19 ("it was still chaos out there"); Dkt. No. 553 [Rodriguez-Rijo Tr.] at 192:2-3 (acknowledging "it was chaotic too").

bystanders.[7]

(11)  "Officer Francemone discharged her .45 caliber service weapon a total of seven times." Dkt. No. 269 [Pretrial Stipulation ¶ 11].

(12)  Officer Francemone's first five shots were directed toward the rear of the Chevy Malibu in the Stone Court parking lot, which was the location of two active shooters.[8]

(13)  While accounts differ as to where he was *precisely* located, Officer Francemone's last two shots were directed at Mr. Porter in the area adjacent and west of the Stone Court parking lot.[9]

(14)  When Officer Francemone discharged her last two shots at Mr. Porter, she had a reasonable belief that Mr. Porter was still armed. *See* Dkt. No. 545 [Special Interrogatories ¶ 3].

(15)  The events unfolded rapidly for Officer Francemone, as only approximately 30 seconds elapsed from the time she arrived near the Stone Court Parking Lot to the time she called in the firing of her final two shots.[10]

### APPLICATION OF QUALIFIED IMMUNITY STANDARD

Based on the particular circumstances presented to Officer Francemone as found by the

---

[7] Established during the testimony of Officer Francemone and Edward Flosi. *See* Dkt. No. 559 [Francemone Tr.] at 126:6-20; Dkt. No. 561 [Flosi Tr.] at 30:5-16; 33:12-25, 34:1-9. This was not disputed by any of Plaintiff's witnesses.

[8] *See* D'Agostino Decl., Ex. C (D-70); Dkt. No. 559 [Francemone Tr.] at 16:19-25, 17:15-16, 130:20-22, 133:16-23; Dkt. No. 552 [Valentin Tr.] at 105:5-15; Dkt. No. 561 [Flosi Tr.] at 105:15-21; *see also* D'Agostino Decl. Ex. D (Hoyle Tr.) at 83:1-25 84:1-19 (as reflected in Officer Francemone's deposition designation, this portion was read to the Jury; *see* Dkt. No. 516).

[9] Dkt. No. 559 [Francemone Tr.] at 137:21-25, 138:1-5; Dkt. No. 555 [Drake Tr.] at 30:14-16; [Rodriguez-Rijo Tr.] at 180:4-17, 21-25, 181:1-12.

[10] *See* Dkt. No. 559 [Francemone Tr.] at 143:16-25, 144:1-4, Dkt. No. 561 [Flosi Tr.] at 64:21-25, 65:1-25, 66:1-25, 67:1-20; *see also* D'Agostino Decl., Ex. B (D-71-E). This timing of events was not disputed by any of Plaintiff's witnesses.

Jury, there was no case law as of June of 2016 that clearly established that her actions were a violation of the Fourth Amendment. Indeed, because Mr. Porter was armed at some point during the brief encounter, Officer Francemone reasonably believed he was an active participant in the gunfight she witnesses, *and he was* still armed at the time she discharged her last two shots, qualified immunity is appropriately granted. *See Tennessee v. Garner,* 471 U.S. 1, 11–12 (1985) ("[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force").

### A.    The state of the law in June 2016 did not clearly establish the unlawfulness of Officer Francemone's actions in response to an armed and fleeing gunman

As an initial matter, all of the *Graham* factors chart extremely high based on the undisputed, stipulated, and found facts by the Jury. Officer Francemone witnessed the decedent, together with others, in the Stone Court parking lot participating in violent felonies that could have caused death or serious bodily injury to herself or others. She was by herself, in the dark, in a chaotic and rapidly unfolding environment that called for split-second decision making. The Jury found that Mr. Porter was armed at some point during the incident and that Officer Francemone reasonably perceived Mr. Porter to: (1) have participated in the gunfight; and (2) to have been armed at the time she shot him while he was attempting to evade arrest by flight. *See* Dkt. No. 545. Any prior precedent purporting to establish the unconstitutionality of her response to the situation she faced on June 19, 2016 would have had to have approximated not only the circumstances that she confronted, but would also have to have had analogous *Graham* factor applicability. *See Rivas-Villegas*, 595 U.S. at 5 (concluding that if previous caselaw is "materially distinguishable" from the scenario faced by the officer, it does not provide "fair notice" to an officer).

The bottom line is that there is no factually analogous Second Circuit or Supreme Court precedent existing prior to June of 2016,[11] which describes circumstances analogous to those facing Officer Francemone, whose holding would have clearly established "beyond debate" to a reasonable officer that the Fourth Amendment prohibited her from firing two shots at an individual when she reasonably believed was still armed after having just participated in a gunfight in the Stone Court parking lot. Your undersigned has exhaustively reviewed the case law, as we are sure the Court has done so independently, and cannot locate any such precedent—or even anything remotely close. Under the well-established standard governing qualified immunity, this absence of clearly established law compels the conclusion that Officer Francemone is entitled to qualified immunity.

In fact, as will be discussed more fully below, the case law *supports* the constitutionality of Officer Francemone's actions rather than clearly establishing the opposite.

<u>Second Circuit Case Law</u>

The *sine qua non* for constitutionality under the so-called "fleeing felon rule" is whether the fleeing target "poses a significant threat of death or serious physical injury to the officer or others" at the time of the officer fired. *See Garner*, 471 U.S. at 3. The Jury's factual finding that Officer Francemone reasonably believed that Mr. Porter was armed *at the specific time she fired* conclusively establishes, at the very least, that a qualified immunity finding is required. *See* Dkt. No. 545 [Special Interrogatories ¶ 3].

---

[11] *Miller v. City of New York*, No. 23-93, 2024 WL 3271998, at *4 (2d Cir. July 2, 2024) ("This doctrine shields government officials from damages suits under 42 U.S.C. § 1983 unless the unlawfulness of their conduct was 'clearly established' *by Supreme Court or Second Circuit precedent* at the time of the alleged violation." (emphasis added)).

In 2019, Judge Geraci, collected cases regarding this issue, stating that "***in most of the cases where a fleeing suspect possessed a firearm, courts have found officer shootings to be reasonable.***" *Scott v. City of Rochester*, No. 17-CV-6311, 2019 WL 4016165, at *5 (W.D.N.Y. Aug. 26, 2019) (collecting cases) (emphasis added). In describing the legal landscape that compelled a finding of qualified immunity at summary judgment, the district court stated that the various cases applying the rule "all have their own factual nuances, but *at the very least* they demonstrate that the constitutional question presented here—the reasonableness of using deadly force on an armed, fleeing, potentially dangerous suspect—is unsettled." *Id*. (emphasis added).

For example, in *Jackson v. Dinkins*, the plaintiff was one of multiple individuals in a vehicle discharging firearms at officers. No. 95-CV-3003, 1998 WL 27124, at *1 (S.D.N.Y. Jan. 26, 1998). At some point during the gunfight, the plaintiff exited and began running away from the vehicle. *See id.* As he was fleeing, he was shouting at the officers that he was unarmed. *Id*. An officer initially fired at him one time, striking his wrist. *Id*. The plaintiff took evasive action, by ducking and running towards a sidewalk, when a second bullet struck him in the right side toward his back. *Id*. There is no indication from that record that any warnings were given to him after he exited the vehicle.

The officers moved for summary judgment on the plaintiff's Fourth Amendment excessive force claim. As to the first shot, the district court observed that the officers observed the plaintiff emerging from a vehicle whose passengers had just committed armed robbery and "engaged … in an ongoing gun battle" with the officers. The district court found that no reasonable jurors could find that the officer firing the first shot was acting unreasonably. *See id*. at *2.

As to the second shot, the court found that the officers "were confronted with someone they believed to be an armed felon who, by his own testimony, was taking evasive action and

attempting to get away." *Id*. Under the circumstances, the district court found that "[n]o reasonable juror could find that it was unreasonable in these circumstances for the police to continue firing at a dangerous fleeing felon." *Id*. (citing *Garner*, 471 U.S. at 11). Finding Fourth Amendment violation, the court did not even reach qualified immunity. *Id*. ("Because of the view the Court takes of the merits, there is no need to reach defendants' alternative defense of qualified immunity.").

In *Greenwald v. Town of Rocky Hill*, a district court considered a police shooting where, after a confrontation with the police, the plaintiff ran away from them armed with a shotgun. No. 3:09CV211 VLB, 2011 WL 4915165, at *2-3 (D. Conn. Oct. 17, 2011). The plaintiff disputed that he had been pointing the gun at the officers[12] and denied that the officers had ever given him warnings. *See id*. At a certain point during the pursuit, one of the officers fired twice at the plaintiff, and thereafter took him into custody. *Id*. at *3. Taking the facts in a light most favorable to the plaintiff's version of the events, the district court nonetheless found that "a reasonable officer could conclude that [plaintiff] posed a significant and immediate threat of death or serious injury under the circumstances presented at the time." *Id*. at *8. Accordingly, the district court granted qualified immunity. *Id*. at *10.

Finally, in *Rose v. City of Utica*, the police shot a young man who had discharged a shotgun in a local park. 2018 WL 2041621 (N.D.N.Y., Apr. 19, 2018) (Sannes, J.). This Court considered the question of "whether it was clearly established, on July 14, 2013, that a police officer could not lawfully use deadly force in a situation where an armed individual had reportedly been firing a shotgun inside a public park, did not react to the approaching officer's command to drop the

---

[12] ("Greenwald reasons that since he was not aiming his rifle at the Defendant Officers then the Officers could not have a reasonable belief that he was posing a significant threat of death or serious injury.").

shotgun, and turned toward the officer while holding the shotgun in his hands." *Id*. at *11. In evaluating precedent prior to that incident, this Court noted (and similar to the *Scott* decision discussed *supra*) that the critical factual issue distinguishing the prior case law between constitutional and unconstitutional conduct is whether the subject is armed at the time they are shot, described as follows:

> *O'Bert* is likewise unhelpful to the extent Plaintiffs rely on its particular fact pattern, as it is not analogous to the facts presented here. Crucially, the person shot in *O'Bert* was unarmed ... *O'Bert* does not speak at all to the scenario encountered by [the police officer], and the Court has not been made aware of any clearly established authority holding that the conduct at issue in this case was unlawful. On the contrary, courts have found qualified immunity in situations involving armed individuals.

*Id*. This Court held that it was "aware of no authority, much less 'clearly established' authority, holding that such conduct would violate the Fourth Amendment" and that the police officer "had to make a split-second decision regarding an active shooter holding a shotgun, and Plaintiffs have failed to identify any authority clearly establishing that his decision to shoot violates the Fourth Amendment." *Id*. at *11-12.

The centrality of the question of whether the officer reasonably believes that a fleeing subject was armed at the time of the police response is borne out in *Thomas v. Wellenreuther*, No. 21-1400, 2022 WL 1026047 (2d Cir. Apr. 6, 2022), which was issued by the Second Circuit nearly six years after the incident at issue here. There, an off-duty officer fired an initial shot as the plaintiff was running from a gas station he had just robbed. The finder of fact found that the officer "could reasonably have believed that [plaintiff] had a real gun" at the time of the first shot, even though he only had a BB gun. *Id*. at *1. Accordingly, the officer was found to have not violated the Fourth Amendment as to the first shot. *Id*. at *2. However, after the first shot, the plaintiff threw the gun away, which the officer admitted to seeing. After the gun was thrown away, the officer

fired again when he saw the plaintiff reach into his waistband and spin around toward the officer. Because the finder of fact found that the officer could not "have reasonably believed that [plaintiff] was reaching for or facing him with a gun at the time when [the officer] fired the Second Gunshot;" the court determined that the finder of fact could have reasonably found a Fourth Amendment violation. *Id.*

Thus, no Second Circuit precedent existed prior to June 2016 and which addressed circumstances comparable to those confronted by Officer Francemone, *i.e.*, an armed individual whom she reasonably believed had participated in a gunfight and remained armed at the time she discharged her final two shots, that would have clearly established that the use of deadly force in such a situation was unconstitutional. Accordingly, qualified immunity is warranted in Officer Francemone's favor.

<u>Supreme Court Case Law</u>

Nor is there any clearly established case from the U.S. Supreme Court, which has concluded that a Fourth Amendment violation occurred under facts like those Officer Francemone faced on June 19, 2016.[13] The Supreme Court's cases applying the "fleeing felon rule" following *Garner* have largely been focused vehicle pursuit cases, which are factually distinct from the foot pursuit and gunfight scenario at issue here. *See, e.g., Mullenix*, 577 U.S. at 12-14; *Brosseau,* 543 U.S. at 198; *Scott v. Harris*, 550 U.S. 372, 383-84 (2007); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

---

[13] In *Tennessee v. Garner*, the Court considered the shooting of a fleeing subject who had (1) just committed *a non-violent criminal offense* and (2) on whom, the responding officer "saw no sign of a weapon" and was "reasonably sure" that he was unarmed. *Garner*, 471 U.S. at 4. Thus, the *Garner* case itself does not present a basis to deny qualified immunity.

However, in *Kisela v. Hughes* a police officer shot the plaintiff, Ms. Hughes, who was holding a large knife, after hearing over the radio that she was "engaging in erratic behavior with a knife." 584 U.S. at 101. The officer did not view the plaintiff as a threat to himself, but only fired after she had (according to him) disregarded two commands to drop the knife and had taken a few steps toward another woman (Ms. Chadwick) who was positioned nearby. *Id*. The officer stated he shot the plaintiff because "although the officers themselves were in no apparent danger, he believed [the plaintiff] was a threat to Chadwick." *Id*. at 105. Information learned after the event— *i.e.*, with the benefit of hindsight—revealed that the plaintiff and Chadwick were friends, that Chadwick did not view the plaintiff as being a threat to her, and that the plaintiff had not done anything threatening or violent with the knife.

The Ninth Circuit identified a number of facts that were in dispute such as the reasonableness of the officer's belief that the woman was a threat and a question of fact as to whether the woman heard the warnings from the police. *See Hughes v. Kisela*, 862 F.3d 775, 784 (9th Cir. 2016). Relying on those apparent factual disputes, the Ninth Circuit reversed the trial court's qualified immunity determination.

The Supreme Court rejected those factual disputes as immaterial to the qualified immunity analysis. It held that the facts of the case justified qualified immunity because the officers' threat assessment (even if it was reasonably mistaken) was not sufficiently similar to prior controlling case law. *See Kisela*, 584 U.S. at 106. The Court acknowledged the potential questions of fact as to whether the plaintiff was *actually* a threat and whether the plaintiff had heard the police commands. *Id*. at 106. Nonetheless, because none of the cited cases by the Ninth Circuit matched the factual threat scenario presented to Officer Kisela, qualified immunity applied.

In comparing the Supreme Court's 2018 decision in *Kisela* to the facts here, it is important

first emphasize that the circumstances in *Kisela* fall well short, under the *Graham v. Connor* factors, of the heightened threat level and urgency faced by Officer Francemone in this case. In terms of "the severity of the crime at issue,"[14] Officer Kisela had not witnessed the plaintiff commit any crime and her previously reported erratic behavior might (at best) be described as disorderly conduct, a violation under New York law. Officer Kinsela was not in any danger himself and was flanked by other officers. *Id* at 101, 105. In addition, prior to him firing, the plaintiff appeared calm, and the individual the officers believed was potentially threatened—Ms. Hardwick—had informed both the officers and the plaintiff to "take it easy." *Id*. at 101-102. Nor was the plaintiff "actively resisting arrest"[15] or "attempting to evade arrest by flight."[16] *See id*. Thus, there was nowhere near the same application of the *Graham* factors in terms of severity of the crime *or* the threat level present for Officer Francemone. Still, however, the officer utilizing deadly force was granted summary judgment in *Kisela* based principally on the fact that the plaintiff was armed with a weapon and she was a *potential* threat to Ms. Hardwick.

Given that the circumstances Officer Francemone faced on June 19, 2016 were significantly more uncertain, chaotic, and imminently dangerous at the time she fired her final two shots at Mr. Porter, *Kinsela* should serve as a guiding precedent requiring the application of qualified immunity in this case.

<u>Feasibility of Warnings</u>

Should Plaintiff argue here that there remains a disputed question about whether the Jury agreed that warnings were given, any question on that issue would still not defeat qualified immunity. This is because no clearly established precedent from the Supreme Court or Second

---

[14] *Graham*, 490 U.S. at 396.
[15] *Graham*, 490 U.S. at 396.
[16] *Graham*, 490 U.S. at 396.

Circuit holds that, under the specific circumstances present here, that a pre-shot warning was feasible or constitutionally required to avoid a Fourth Amendment violation. *See Kinsela*, *supra* (question of fact as to whether the plaintiff heard the warnings was not dispositive to the qualified immunity question); *c.f., Smith v. Sawyer*, No. 117CV00077, 2020 WL 1493911, at *1 (N.D.N.Y. Mar. 27, 2020) (Sannes, C.J.) ("Moreover, Plaintiffs point to no "controlling decisions ... the [C]ourt overlooked" suggesting that a warning was required here").

Under *Garner*, warnings are required only "where feasible. *Garner*, 471 U.S. 1, 11-12. Police use of force expert Edward Flosi testified that a warning is not "feasible," where taking the "two to five seconds" necessary to give a warning and wait for a response, might allow the subject to shoot the officer.[17] This testimony was undisputed in the record.

In *White v. Pauly*, the Supreme Court reviewed the denial of qualified immunity at the summary judgment stage to an officer who had failed to issue a warning before shooting at an armed individual. 580 U.S. at 77. In the decision being reviewed, a majority panel of the Tenth Circuit had concluded that "that a reasonable officer in White's position would believe that a warning was required despite the threat of serious harm—was clearly established…." *Id*. But, the Supreme Court reversed, holding that the Tenth Circuit had "misunderstood the 'clearly established' analysis" and attempted to apply the holding of *Tennessee v. Garner* at too high a level of generality and reiterated that clearly established law must be particularized to the facts of the case and not defined by broad legal principles. *Id*. at 79.

What the Tenth Circuit should have done was locate a case "where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment."

---

[17] Dkt. No. 561 [Flosi Tr.] at 37-38.

*Id*. Given that there was no prior case that held "under similar circumstances" to those facing the officer would have clearly established the "failure to shout a warning" was a constitutional violation, then the officer was entitled to qualified immunity. *Id*. at 80.

In 2022, the Second Circuit also that an alleged failure to give warnings is not an impediment to finding qualified immunity where there is "an immediate threat to the safety of officers and the community." *McKinney v. City of Middletown*, 49 F.4th 730, 741 (2d Cir. 2022). ("deploying a police dog may be objectively reasonable," even "without a warning," when there is "an immediate threat to the safety of officers and the community").

Here, Mr. Porter was a threat to others, the community, *and* Officer Francemone because the Jury found that not only was he armed *at some point* during the 62-second encounter, but that Officer Francemone reasonably believed that he actively participated in the firefight in the Stone Court parking lot (which Officer Francemone witnessed) a short time before her pursuit of him. *See* Dkt. No. 545 [Special Interrogatories ¶¶ 1-2]. *And*, most importantly, he was *still* an immediate threat to Officer Francemone and others *because she reasonably perceived him as still being armed* when she discharged her last two shots. *Id.* at ¶ 3.

As of June 2016, there was no clearly established case law requiring Officer Francemone to issue a warning while actively pursuing an armed individual whom she had just witnessed engage in felony-level gun violence, and who could have turned and posed a deadly threat at any moment during the chase. *See, e.g., Hicks v. Scott*, 958 F.3d 421, 437 (6th Cir. 2020) ("[w]hen the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible"); *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) ("[w]e decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily

have cost the officer his life").

**B.    Case law from other circuits also supports finding qualified immunity.**

In *Pipkins v. City of Hoover, Alabama*, decided two months ago, the Eleventh Circuit considered a district court's finding of qualified immunity in a police shooting case. 134 F.4th 1163, 1170 (11th Cir. 2025). The defendant police officer had heard two gunshots while on foot in a mall parking lot and ran towards the gunfire. *Id.* at 1169. He observed a crowd of shoppers running away and a stationary man who appeared to be injured. *Id.* at 1170. As he approached the injured party, the officer noticed another armed man (who would turn out, in hindsight, to be a good Samaritan gun owner also running toward the gunfire) also running towards the apparent victim. *Id.* While he was ten feet behind the man running with a gun, the officer shot the man *without giving any warning* and killed him. *Id.* The Eleventh Circuit affirmed the trial court's grant of summary judgment finding that the officer did not violate the Fourth Amendment because the officer had probable cause to believe, albeit mistakenly, that the decedent was the shooter and that based on his close proximity to the armed decedent and the rapid unfolding of the event, that providing a warning was not feasible. Id. at 1171-73. It appears as though the Eleventh Circuit did not even reach the issue of qualified immunity, finding the officer's actions to be constitutionally proper in the first instance.

In *Argueta v. Jaradi*, the Fifth Circuit considered a district court's denial of qualified immunity in a summary judgment motion brought by a defendant officer in a fleeing felon scenario. *Argueta v. Jaradi*, 86 F.4th 1084, 1087-88 (5th Cir. 2023). There, Officer Jaradi began following the plaintiff's car after he allegedly ran a few stop signs. When the plaintiff pulled over, he stepped out of the car and began running, keeping his right arm down by his side and concealing his right hand. *Id.* at 1087. Officer Jaradi fatally shot Mr. Argueta twice after the plaintiff left his

car, and one more time while he was on the ground, when it became obvious that the plaintiff had a gun. *Id*. For purposes of its decision, the Fifth Circuit assumed that no warnings had been given and that the officer had not confirmed the presence of the firearm until after the shooting. The Fifth Circuit nonetheless overruled the trial court's decision and granted summary judgment on qualified immunity grounds because the officers reasonably perceived Mr. Argueta to be a deadly threat as he was fleeing. *Id*. at 1092-93. In ruling on the question of whether a failure to give a warning changed the outcome, the Fifth Circuit stated:

> neither party has presented, and we have not located, clearly established law holding that a furtive gesture signaling an immediate threat to officers followed by deadly force without warning constitutes a violation of the suspect's federal rights.... For this reason, we conclude that whether [Officer] Jaradi issued a warning prior to firing is immaterial here.

*Id. at* 1093.

In *Wilkerson v. City of Akron, Ohio*, the Sixth Circuit considered an officer's use of deadly force on a fleeing subject where the district court found qualified immunity. *See Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 483 (6th Cir. 2018). There, two officers and the plaintiff engaged in a struggle on the ground during which the plaintiff's firearm accidentally discharged. The plaintiff then pushed himself off the ground and began running away. One of the officers pursued the plaintiff and fired two shots in quick succession without providing any warnings. *Id*. at 480. The plaintiff ultimately died from one of the gunshot wounds. The Sixth Circuit did not even reach the question of qualified immunity, finding that the shooting was *not* a Fourth Amendment violation because the plaintiff's actions, *even as running away*, placed the officers and others in "serious danger, knowing [plaintiff] had a gun and knowing it had discharged." *Id*. at 483. Relative to the absence of warnings, the Sixth Circuit held:

> Nor was a warning feasible. In the span of two seconds, Thomas had cleared several yards. Danzy was racing after him, aiming as he ran. As far as Danzy knew, Thomas

18

still had the once-discharged weapon (as the evidence shows he did), and nothing prevented Thomas from turning to fire upon the officers.

*Id*. at 483.

In *Ford v. Childers*, the Seventh Circuit considered a scenario where an officer fired on a masked individual exiting a bank striking him in the back. 855 F.2d 1271, 1272 (7th Cir. 1988). The officers had received a report of a robbery at a bank and observed patrons through the window raising their arms in response to a man extending his arm. As the bank robber fled, he had a bag in his hand and the officers could not see his other hand. Although the officers claimed they had shouted, "Halt, police," the plaintiff testified that he heard no warning. The Seventh Circuit nonetheless affirmed a directed verdict finding that the officer's conduct did not violate the Fourth Amendment.

In *Liggins v. Cohen*, the Eighth Circuit considered a police shooting where the plaintiff, a sixteen-year-old, was paralyzed from police gunfire. *See* 971 F.3d 798 (8th Cir. 2020). The shooting arose from a police interdiction of two brothers (one of whom was armed). The officer had pulled into a parking lot behind the residence being investigated and observed the plaintiff running out the back yard holding a firearm. *See id.* at 800 A few seconds after leaving his vehicle, the officer fired four shots at the plaintiff without giving any warning. *Id*. The shots were fired in rapid succession and the plaintiff dropped the gun after the first shot, but was struck by the last three shots.

The district court denied summary judgment on qualified immunity. The Eighth Circuit reversed finding that a reasonable officer would have been justified in discharging his firearm in the manner of the defendant. *See id*. at 801. Relative to the lack of warnings, the Eight Circuit stated as follows:

With only a second or two to react as he rounded the parked truck, Cohen had reasonable grounds to believe that the fleeing subject who was running toward the back of the property could raise the gun and shoot. It would take only an instant to do so if the person were ready to fire. The young man was fleeing with gun in hand, and the officers presented an obstacle to his escape. This was a split-second decision for the officer. It was not practical in that moment for Cohen to discern whether B.C. was carrying the gun in an unusual manner or to shout a warning and wait for him to react. There was simply no time. "***When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible***." *Hicks v. Scott*, 958 F.3d 421, 437 (6th Cir. 2020) (internal quotation and alteration omitted). ***In dangerous situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject actually points a weapon at the officer or others***. *Malone v. Hinman*, 847 F.3d 949, 954-55 (8th Cir. 2017); *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Given the convergence of events, it was not unreasonable for the officer to use force as he did.

*Id*. at 801 (emphasis added); *see also Thompson*, 257 F.3d at 898 ("[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun.").

\*      \*      \*

As the foregoing cases demonstrate, the Jury responses to the Special Interrogatories, when considered together with the other undisputed facts, compel a finding that Court must grant Defendant Officer Kelsey Francemone the affirmative defense of qualified immunity. She respectfully requests that the Court enter Judgment doing so.

Dated: July 1, 2025                                         Respectfully submitted,
      Syracuse, New York                                HANCOCK ESTABROOK LLP

                          By:

                                   John G. Powers, Esq. (508934)
                                   Mary L. D'Agostino, Esq. (520301)
                                   Ryan M. Poplawski, Esq. (520238)
                                   1800 AXA Tower I

100 Madison St.
Syracuse, NY 13202
(315) 565-4500

SUSAN KATZOFF, ESQ. – CORPORATION
COUNSEL FOR THE CITY OF SYRACUSE

By: Todd M. Long, Esq. (519301)
233 East Washington Street, Room 300
Syracuse, NY 13202
(315) 448-8400

*Counsel for Defendant*