**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TANAJEE MADDOX as Administratrix of the Estate of
GARY TERRANCE PORTER,

                                        5:19-cv-00678 (BKS/MJK)

                              Plaintiff,

v.

SYRACUSE POLICE OFFICER KELSEY
FRANCEMONE, sued herein in her capacity as an
individual,

                              Defendant.

**Appearances:**

*For Plaintiff:*
Fred B. Lichtmacher
The Law Office of Fred Lichtmacher P.C.
Attorneys for Plaintiff
159 West 25th Street, Room 510
New York, New York 10001

*For Defendant:*
John G. Powers
Mary L. D'Agostino
Ryan M. Poplawski
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, New York 13202

Susan Katzoff
Corporation Counsel for the City of Syracuse
Todd M. Long
City of Syracuse Law Department
233 E. Washington Street
300 City Hall
Syracuse, New York 13202

1

## MEMORANDUM-DECISION AND ORDER

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## I.    INTRODUCTION

Plaintiff Tanajee Maddox, as Administratrix of the Estate of Gary Terrance Porter, brought this action under 42 U.S.C. § 1983 against Defendant Syracuse Police Officer Kelsey Francemone asserting a claim for excessive force, in violation of the Fourth Amendment. (Dkt. No. 1, at ¶¶ 1, 4). The case proceeded to a jury trial, which began on May 12, 2025. (Dkt. No. 594). On May 23, 2025, the jury returned a verdict in favor of Plaintiff on her Fourth Amendment claim against Defendant and awarded Plaintiff $10,000 in compensatory damages for conscious pain and suffering. (Dkt. No. 543). The jury subsequently answered three special interrogatories. (Dkt. No. 545). Presently before the Court is Defendant's request for judgment on the defense of qualified immunity. (Dkt. No. 574). The request is fully briefed. (Dkt. Nos. 574, 584, 592-1). Also before the Court is Plaintiff's motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. (Dkt. No. 573). That motion is also fully briefed. (Dkt. Nos. 573-1, 585, 591). For the reasons that follow, the Court finds that Defendant is entitled to qualified immunity, and Plaintiff's motion for a new trial is denied.

## II.    TRIAL EVIDENCE[1]

Plaintiff Tanajee Maddox is the daughter of the decedent, Gary Terrence Porter, and is the administratrix of his estate. (Dkt. No. 269, at 1). On June 19, 2016, Porter attended a Father's Day barbecue that occurred in a courtyard at the James Geddes Housing Project, located between Otisco Street to the north, Tully Street to the south, and Skiddy Park to the west. (*Id.* at 2).

---

[1] The Court includes only the facts relevant to the pending motions. These facts are drawn from the evidence presented to the jury at trial, including the facts stipulated to by the parties in their pretrial stipulations, which were read to the jury. (*See* Dkt. Nos. 269; 602, at 64-67). The Court indicates where facts are disputed.

Defendant Police Officer Kelsey Francemone testified that she received an "officer safety" intelligence communication several days prior to the barbecue, (Dkt. No. 598, at 98), which indicated that the Father's Day event had "a potential for violence from other groups." (Def. Trial Ex. D-012).

Porter arrived at the Father's Day event in a black Chevrolet Malibu, which parked in the Stone Court parking lot off of Tully Street in the James Geddes Housing Project. (Dkt. No. 269, at 2). The event was attended by several hundred people and continued late into the evening. (*Id.*). At some point after 11:00 P.M., gunfire involving multiple shooters occurred "in the vicinity of the Father's Day Barbecue." (*Id.*). The parties agree that at least some of the gunfire occurred in the Stone Court parking lot, (*see, e.g.*, Dkt. Nos. 596, at 70; 598, at 121), and that Porter was in the Stone Court parking lot after the gunfire began, near the Malibu. (Dkt. Nos. 596, at 101; 597, at 49-52; 600, at 30-31).

The jury heard police radio traffic from the night of the barbecue. (*See* Dkt. No. 598, at 106; Def. Trial Ex. D-16). At 11:12 P.M., Defendant declared, "I got shots fired!" over the radio. (Dkt. No. 598, at 115; Def. Trial Ex. D-16, at 1). Defendant ran south from Otisco Street toward the gunfire in the Stone Court parking lot. (Dkt. No. 269, at 2-3). The parties do not dispute that, at some point after Defendant reached the Stone Court parking lot, Defendant shot Porter in the back as he was running away from her. (*See* Dkt. Nos. 598, at 6, 38, 140-41; 269, at 3). However, at trial the parties disputed whether Porter had a gun and whether he was participating in the gunfire before he was shot.

Defendant testified that, as she approached the Stone Court parking lot, she saw three men shooting guns by the Malibu. (Dkt. No. 598, at 125-26). Defendant believed that the men were firing their weapons toward the southeast, and that Porter was one of the shooters. (*Id.* at

3

13, 51, 126). She discharged her weapon toward the shooters near the Malibu, but her gun malfunctioned, and she took a knee to fix it. (*See* Dkt. No. 598, at 20, 127-30, 132). Defendant said that she and Porter were both "very close" to the Malibu at the time of the malfunction. (*Id.* at 21). Defendant testified that she then perceived Porter shooting at her from "about three feet from [her] head[.]" (*Id.* at 133, 136, 178). Defendant said that she stood up and "backpedaled" along a fence parallel to Porter, who was pointing a gun at her, and that Porter continued to turn and point the gun over his shoulder at her as he began running to the west. (*See id.* at 133, 137). Defendant testified that she "could see the gun in his hand the entire time." (*Id.* at 137). Defendant said she gave Porter "numerous commands to drop the gun," but she did not see Porter drop or throw the gun at any time. (*Id.* at 36, 137).

The jury heard prior testimony from another witness, Khalil Davis, who also testified that Porter was one of the people shooting on the night of the barbecue. (Dkt. No. 600, at 66-67). Davis testified that he saw Porter run toward a police officer with a gun in his hand, that the officer told Porter repeatedly to drop the gun, and that Porter started running west. (*Id.* at 70). According to Davis, Porter turned toward the officer and threw the gun, which skidded through the grass. (*Id.*). Davis said it was dark, and that he didn't think that the officer had seen Porter throw the gun. (*Id.* at 70-71). According to Davis, another man picked up the gun and ran off with it. (*Id.* at 70).[2]

The jury heard from defense witness Carlos Stackhouse, who attended the Father's Day barbecue when he was twelve years old. (Dkt. No. 600, at 149-150). Stackhouse testified that he saw a police officer shoot Porter, "the man in the lime green shirt," in the back. (*Id.* at 163). He

---

[2] The jury also heard that Davis was a convicted felon, (*id.* at 127-28), and that, at a later deposition, Davis refused to answer any questions and stated he "was tricked into answering" questions when he was younger, (*id.* at 183-185).

4

said that he saw the man in the lime green shirt throw "something" to the ground, but he didn't know if it was a gun. (*Id.* at 160). But the jury also heard that, in July of 2016, Stackhouse testified under oath that he saw a man in a lime green shirt with a gun in his hand run past Defendant. (*Id.* at 158-59).[3] In 2016, Stackhouse testified that the man in the lime green shirt "took out his gun and was shooting," and then threw his gun to the ground before he was shot in the back. (*Id.* at 160). At trial, however, Stackhouse testified that he was "told to help the police" by his parents, and that he didn't see Porter firing a gun. (*Id.* at 174, 180).

Plaintiff's witnesses at trial testified that they did not see Porter with a gun at the barbecue, or at any point during the gunfire in the Stone Court parking lot. (Dkt. Nos. 596, at 71, 114, 133, 137; 597, at 20, 28, 167). The jury heard portions of the deposition of Porter's goddaughter, Knariana Hoyle, who stated that Porter "stayed with [her] at the time of the shooting" by the Malibu as it was being struck by bullets, and that he never had a gun. (Dkt. No. 596, at 70-71). Arian Drake, who testified that he knew Porter very well, (Dkt. No. 597, at 14), also stated that he "was with [Porter] the whole day[,]" that they were both by the Malibu during the gunfire, and that Porter didn't have a gun at any point, (*id.* at 20, 23-27). Two of the witnesses who attempted to render aid to Porter, Tayshira Rodriguez-Rijo and Zhayshel Hall Rodriguez, testified that they saw him running before he was shot, and that there was no gun in his hands as he ran or when he fell, but neither had seen what he was doing in the parking lot. (Dkt. No. 596, at 133, 186-88, 271-73). Tasheonna Days also testified that she saw Porter running just before Defendant shot him, and that she also didn't see anything in his hands as he was moving his arms. (Dkt. No. 597, at 167-68, 199).

---

[3] The Court instructed the jury that Stackhouse's police interview from 2016 was "not admissible for the truth of what Mr. Stackhouse said during the interview," only "to consider whether he [was] telling the truth on the witness stand." (Dkt. No. 600, at 175). The jury also heard that Stackhouse, like Davis, was a convicted felon. (*Id.* at 181).

After Porter was shot, the parties agree that he "came to rest on the ground in an adjacent courtyard[.]" (Dkt. No. 269, at 3). Defendant testified that, just after she shot Porter, she ordered him to show her his hands, and he pulled his left hand out from underneath him. (Dkt. No. 598, at 146). Defendant said she touched his left hand, while two of the women tending to Porter testified that Defendant touched his right hand. (*See* Dkt. Nos. 596, at 246, 260; 597, at 212; 598, at 43-44). Defendant testified that there was a "crowd of people behind" her, "trying to attack" her, and that she was "ripped right off of [Porter]." (Dkt. No. 598, at 147). The jury saw two videos of the scene that surrounded Porter after he was shot, which showed Defendant "on [her] knees" being tackled and pushed by a crowd. (Dkt. No. 598, at 155, 159; Def. Trial Exs. D-061, D-062).

Three of Plaintiff's witnesses testified that they attempted to render aid to Porter after he was shot: Tayshira Rodriguez-Rijo, Zhayshel Hall Rodriguez, and LaShea Smith. (*See* Dkt. Nos. 596, at 138, 246-48; 597, at 211-13). Tayshira Rodriguez-Rijo testified that she was right behind Defendant and Porter as they left the Stone Court parking lot, that Porter was alive when she reached him, and that "you could tell he was trying to speak[.]" (Dkt. No. 596, at 137, 142-44). Rodriguez-Rijo said that Porter looked "like he was in pain and in anguish, his facial expressions, just how tense his body was." (*Id.* at 152-53). Zhayshel Hall Rodriguez, said Porter had no expression on his face, that "his eyes were huge[,]" and that he was grunting, sweating profusely, turning gray, breathing, but that he "wasn't responsive to anything." (*Id.* at 252-53). LaShea Smith also said Porter was breathing heavily, but he never sat up or rolled over. (Dkt. No. 597, at 209-10).

At 11:18 P.M., an ambulance driven by paramedic Conor Dupree was en route to Porter. (Def. Trial Ex. D-063-A; Dkt. No. 599, at 64). Dupree testified that, when he arrived, he was

"impeded by people and vehicles," and that people were "screaming" and pulling at him. (Dkt. No. 599, at 65). The paramedics reached Porter at 11:23 P.M. (Def. Trial Ex. D-063-A, at 2). Dupree testified that Porter was not conscious or responsive at that point, and that Porter had the lowest possible value on the Glasgow Coma Scale.[4] (Dkt. No. 599, at 69-70, 76). Porter was transported to the hospital and died as a result of his gunshot wound. (Dkt. No. 269, at 3). He was pronounced dead at the hospital at 11:58 P.M. on June 19, 2016. (Pl. Trial Ex. 1, at 1).

During the incident, Defendant discharged her service weapon a total of seven times. (Dkt. No. 269, at 3). It was undisputed that Defendant discharged five shots toward the Malibu in the Stone Court parking lot and two shots toward Porter. (*See, e.g.*, Def. Trial Ex. D-070; Dkt. No. 602 at 137 ("The experts agree that Officer Francemone's first five shots were directed at the rear of the Malibu where there was an active shooter.") *id.* at 101, 136 (referring to last two shots at Porter). Shell casings recovered in the Stone Court parking lot, which "were forensically tested[,]" revealed  that there were "three other weapons that were fired in the vicinity of the parking lot . . . that were different from the rounds fired by Officer Francemone's service weapon." (Dkt. No. 269, at 3).

The jury heard expert testimony from Dana Greely, who performed a gunshot residue analysis on samples lifted from Porter's hands. (Dkt. No. 595, at 181; Greely Dep., at 32). Greely explained that her analysis detected gunshot residue in the sample from Porter's right hand, and not his left hand. (Greely Dep., at 75). According to Greely, an individual with residue on their hands "could have fired a weapon, could have been near a fired weapon or could have just come

---

[4] Dupree testified that the Glasgow Coma Scale "is a rough diagnostic [ ] to help determine how conscious somebody is." (Dkt. No. 599, at 76). Dupree also testified that the lowest value means there "will be no spontaneous eye opening, no response to painful stimuli. Literally, there's no—there's no response from anything." (*Id.*).

in contact with another item with gunshot residue on it[,]" but that her analysis could not allow her to determine which of these three possible scenarios was the most likely cause. (*Id.* at 32-33).

## III.    JURY VERDICT AND SPECIAL INTERROGATORIES

Following the close of proof, the Court instructed the jury regarding excessive force. (Dkt. No. 541, at 20-21). The Court instructed the jury, inter alia, that "[a] law enforcement official may only employ the amount of force reasonably necessary under the circumstances," and "[t]he use of deadly force to prevent escape is unreasonable unless the Defendant had probable cause to believe that Mr. Porter posed a significant threat of death or serious injury to the Defendant or others. (*Id.*).

The jury returned a verdict finding that Plaintiff proved her Fourth Amendment claim under 42 U.S.C. § 1983. (Dkt. No. 543, at 2). The jury awarded $10,000 in compensatory damages for conscious pain and suffering, and found Plaintiff was not entitled to damages for loss of enjoyment of life or an award of punitive damages. (*Id.* at 2-3).

After the jury returned its verdict for Plaintiff, the Court gave the jury three special interrogatories; the Court directed that the Defendant had the burden of proving facts by a preponderance of the evidence, and that their answers to the questions must be unanimous (Dkt. No. 544, at 2). The special interrogatories asked the jury:

Did Defendant Kelsey Francemone prove by a preponderance of the evidence:

(1) that Mr. Porter had a firearm at some point during the incident?

(2) that she had a reasonable, even if mistaken, belief that Mr. Porter was one of the individuals discharging a weapon near the black Chevrolet Malibu in the Stone Court Parking Lot?

(3) that she had a reasonable, even if mistaken, belief that Mr. Porter had a firearm on his person before she discharged her last two shots?

(Dkt. No. 545, at 2). The jury answered "Yes" to all three special interrogatories. (*Id.*).

8

## IV.    QUALIFIED IMMUNITY

### A.    Standard

"Qualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The qualified immunity standard is an objective standard, asking not whether the defendant officer acted in good faith or what [they themselves] knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). Even after a jury has found that an officer used excessive force, "the doctrine of qualified immunity will shield that officer from liability for damages if [their] 'conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 366 (citation omitted). Qualified immunity is an affirmative defense that a defendant bears the burden of proving. *Id.* at 367.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what [they are] doing violates that right.'" *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "The Supreme Court has explained that the 'clearly established right,' particularly in excessive force cases, 'must be defined with specificity.'" *Jones*, 963 F.3d at 224 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)). "Although the Supreme Court 'do[es] not require a case directly on point, [ ] existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

"[P]ursuant to the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), when an official raises qualified immunity as a defense, the court must consider whether: (1) [ ] the official violated a statutory or constitutional right, and (2) [ ] the right was 'clearly established' at the time of the challenged conduct." *Jones*, 963 F.3d at 224 (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)) (internal quotations omitted). "As it relates to the second step, the focus is 'whether it would be clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202)." "Because the 'use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness,' . . . the two [ ] inquiries may 'ultimately converge on one question in excessive force cases: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful[.]'" *Weather v. City of Mount Vernon*, 474 F. App'x 821, 822 (2d Cir. 2012) (first quoting *Saucier*, 533 U.S. at 202, then *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003)).

"The Supreme Court has made clear that '[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Jones*, 963 F.3d at 230 (quoting *Pearson*, 555 U.S. at 231). "However, qualified immunity only protects 'reasonable mistakes.'" *Id.* (quoting *Saucier*, 533 U.S. at 206). "A mistake of fact, [ ] in the absence of an additional jury finding that the mistake was reasonable (when there are disputed material facts on that question) is insufficient to support an officer's claim that [they are] entitled to qualified immunity[.]" *Id.* at 228. "[I]f there are unresolved factual issues which prevent an early disposition of the defense [of qualified immunity], the jury should decide these issues on special interrogatories." *Id.* at 225 (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)). "Once the jury has resolved any

disputed facts that are material to the qualified immunity issue . . . the court then may 'make the ultimate legal determination of whether qualified immunity attaches *on those facts*.'" *Walker v. Schult*, 45 F.4th 598, 618 (2d Cir. 2022) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). "'The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury,' or 'findings that were implicit in the jury's verdict.'" *Id.* (quoting *Zellner*, 494 F.3d at 371).

### B.    Analysis

Defendant asserts that "qualified immunity is appropriately granted" because the jury found that Porter "was armed at some point during the brief encounter," and that Defendant reasonably believed both (1) that Porter "was an active participant in the gunfight she witnesse[d]," and (2) Porter was "still armed at the time she discharged her last two shots[.]" (Dkt. No. 574, at 6-7) (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). Defendant argues that "no Second Circuit precedent[,]" nor any Supreme Court case law, "existed prior to June 2016 and . . . addressed circumstances comparable to those confronted by Officer Francemone, *i.e.* an armed individual whom she reasonably believed had participated in a gunfight and remained armed at the time she discharged her final two shots, that would have clearly established that the use of deadly force in such a situation was unconstitutional." (*See id.* at 12).

In opposition, Plaintiff argues that the Defendant's case law is distinguishable because "the plaintiffs in those instances had a weapon and [were] considered dangerous[.]" (Dkt. No. 584, at 2). Plaintiff asserts that there "is absolutely no credible testimony that Mr. Porter ever shot at Francemone and no gun was ever found on Mr. Porter[,]" and therefore the cases cited by Defendant "cannot apply to determine reasonableness[.]" (*Id.*). Plaintiff also asserts that the

special interrogatories "are vague in terms of timing as to when the jury believed that Mr. Porter was in possession of a firearm." (*Id.* at 4).

### 1.    The Special Interrogatories

Plaintiff's vagueness argument is based on the word "before" in the third interrogatory. (Dkt. No. 584, at 4). That interrogatory asked the jury whether Defendant proved "by a preponderance of the evidence that she had a reasonable, even if mistaken, belief that Mr. Porter had a firearm on his person **before** she discharged her last two shots?" (Dkt. No. 584, at 4-5). Plaintiff suggests that "before" could be "referring to before Mr. Porter arrived at the party, could be referring to when Mr. Porter was in Stone Court parking lot or even referring to before Mr. Porter allegedly tossed the gun." (*Id.* at 5). Plaintiff cites to *Romano v. Howarth* in support of his argument. *See* 998 F.2d 101, 104 (2d Cir. 1993) (noting Second Circuit "will reverse a judgment entered upon answers to questions which mislead and confuse the jury or which inaccurately frame the issues to be resolved by the jury." (quoting *Cann v. Ford Motor Co.*, 658 F.2d 54, 58 (2d Cir. 1981)).

As a preliminary matter, "[t]he 'failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection.'" *Morse v. Fusto*, 804 F.3d 538, 552 (2d Cir. 2015) (quoting *Jarvis v. Ford Motor Co.,* 283 F.3d 33, 56 (2d Cir. 2002)) (holding that, having failed to object to the form of the verdict sheet or jury instructions, party could not "now complain that it is impossible to know whether the verdict would have been different"). Plaintiff did not object to the special interrogatories, nor the verdict, before the jury was discharged. In any event, the Court agrees with Defendant that it is "simply not a reasonable assumption" that the jury read "before" to mean something other than *just* before. (Dkt. No. 592-1, at 17-18). Given that the third interrogatory refers specifically to Francemone's "last two

shots," and that the evidence at trial established that Defendant discharged her weapon five times near the Stone Court parking lot before she discharged her last two shots toward Porter, (*see, e.g.,* Dkt. No. 598, at 20, 127-30; Def. Trial Ex. D-070), the jury would have reasonably understood "before" to mean just before. *See also Carroll v. Trump*, 683 F. Supp. 3d 302, 325 n.71 (S.D.N.Y. 2023), *aff'd,* 124 F.4th 140 (2d Cir. 2024) ("The court must search for a reasonable way to read the verdicts as expressing a coherent view of the case[.]"). Plaintiff's citation to *Romano v. Howarth* is inapposite; in *Romano*, the Second Circuit reversed a district court on plain error review because it found that the jury instructions improperly explained the law, and it was "apparent that the jury was utterly confused by both forms." 998 F.2d at 107. Plaintiff does not challenge the jury instructions in this case, and she cites to no evidence of jury confusion.

### 2.    Clearly Established Right

Here, the first step of the qualified immunity analysis—the existence of a constitutional violation—was established by the jury verdict holding Defendant liable for use of excessive force against Porter.[5] *See Weather v. City of Mount Vernon*, No. 08-cv-192, 2011 WL 1046165, at *9, 2011 U.S. Dist. LEXIS 29297, at *23 (S.D.N.Y. Mar. 22, 2011) (holding first element of qualified immunity analysis established by the jury verdict finding defendant liable for excessive force), *aff'd,* 474 F. App'x 821 (2d Cir. 2012); *see also Matusak v. Daminski*, 755 F. Supp. 3d 325, 334 (W.D.N.Y. 2024) ("Where, as here, the existence of a constitutional violation is established by a jury verdict imposing liability against defendants for use of excessive force, the

---

[5] The Court is aware that that "the reasonableness of a mistake of fact regarding the use of force does not pertain to the ultimate qualified immunity determination, but rather whether there was a constitutional violation in the first instance[.]" *Jones*, 963 F.3d at 231. However, during the trial the parties did not address or discuss what effect a reasonable mistake of fact by Defendant would have on the question of her liability. Further, Defendant has not challenged the sufficiency of the evidence to support the jury's liability verdict. As such, the Court does not review the jury's determination that Plaintiff established the existence of a constitutional violation.

remaining task 'is to determine whether the right at issue was clearly established—that is, whether it was objectively reasonable for [defendants] to believe [their] acts did not violate those rights.'" (quoting *Jones*, 963 F.3d at 225)).

The Court therefore must determine whether the right the jury found Defendant to have violated was "clearly established" at the time of her conduct. *See Jones*, 963 F.3d at 224. Plaintiff appears to argue that the Court should make its qualified immunity determination under the assumption that Porter was not armed during the incident. (*See* Dkt. No. 584, at 2 ("Mr. Porter never had a gun as no gun was ever found and no credible evidence exists that he did have a gun.")). But the jury specifically found that Porter "had a firearm at some point during the incident[,]" (Dkt. No. 545, at 2), and the Court is "not permitted to find as a fact a proposition that is contrary to a finding made by the jury," *see Walker*, F.4th at 618 (quoting *Zellner*, 494 F.3d at 371). For the purposes of determining whether Defendant is entitled to qualified immunity, the Court must accept that Porter had a firearm at some point during the incident, that Defendant had a reasonable, even if mistaken, belief that Mr. Porter was one of the individuals discharging a weapon near the Malibu in the Stone Court parking lot, and that she had a reasonable, even if mistaken, belief that Porter had a firearm "on his person before she discharged her last two shots[.]" (Dkt. No. 545, at 2).

Thus, the question is whether it was clearly established on June 19, 2016 that a police officer could not lawfully use deadly force where the officer, after responding to gunfire in a public parking lot, had a reasonable (even if mistaken) belief that an individual—who was in fact armed at some point during the incident—was discharging a weapon in a public parking lot, and the officer had a reasonable (even if mistaken) belief that the individual had a firearm on his person before she shot him in the back. Plaintiff has cited no authority, and the Court is aware of

14

none, holding that it would be clear to any reasonable officer that such conduct was unlawful

under these circumstances. *See Jones*, 963 F.3d at 224 (quoting *Saucier*, 533 U.S. at 202).

Defendant accurately observes that "the case law *supports* the constitutionality of Officer

Francemone's actions rather than clearly establishing the opposite[,]" (Dkt. No. 574, at 8), and

cites numerous cases from the Second Circuit, Supreme Court, and other Circuits in support of

this proposition. (*See generally id.* at 8-21 (citing, inter alia, *Scott v. City of Rochester*, No. 17-

cv-6311, 2019 WL 4016165, at *5, 2019 U.S. Dist. LEXIS 144452, at *12 (W.D.N.Y. Aug. 26,

2019) ("[I]n most of the cases where a fleeing suspect possessed a firearm, courts have found

officer shootings to be reasonable." (citation omitted)); *Jackson v. Dinkins*, No. 95-cv-3003,

1998 WL 27124, at *2, 1998 U.S. Dist. LEXIS 643, at *5-6 (S.D.N.Y. Jan. 26, 1998) (granting

summary judgment on excessive force claim in favor of defendant police officers; officers who

shot fleeing suspect "had every good reason to believe the exiting passenger was armed");

*Greenwald v. Town of Rocky Hill*, No. 09-cv-211, 2011 WL 4915165, at *11, 2011 U.S. Dist.

LEXIS 119331, at *31 (D. Conn. Oct. 17, 2011) (granting defendant police officers summary

judgment on excessive force claim where "reasonable officers would agree that [the defendant]

had an objectively reasonable belief that [the plaintiff] was an immediate threat to his own life

and the lives of others and that he reacted reasonably to that threat"); *Kisela v. Hughes*, 584 U.S.

100, 105-06 (2018) (holding that, even assuming officer violated Fourth Amendment when he

used deadly force, officer was entitled to qualified immunity; circumstances were "far from an

obvious case in which any competent officer would have known that shooting [the respondent]

would violate the Fourth Amendment"))).

Plaintiff cites two cases in her argument to the contrary, (*see* Dkt. No. 584, at 7-8), but

both cases were decided after June of 2016, and "a reasonable officer is not required to foresee

judicial decisions that do not yet exist in instances where the requirements of the Fourth

Amendment are far from obvious[,]" *see Kisela*, 584 U.S. at 107. In any event, both cases are

inapposite. *See Thomas v. Wellenreuther*, No. 21-1400, 2022 WL 1026047, at *1, 2022 U.S. App.

LEXIS 9209, at *3 (2d Cir. Apr. 6, 2022) (affirming judgment of district court finding defendant

police officer liable for excessive force; at time of second gunshot, defendant "knew that

whatever weapon [the plaintiff] had was thrown away from [the plaintiff] and was not in [the

plaintiff]'s possession" and defendant therefore knew that plaintiff was unarmed); *Jones*, 963

F.3d at 234 (reversing district court finding that defendant officer was entitled to qualified

immunity in excessive force case where jury had not been asked whether officer's mistaken

belief was reasonable, and therefore answers to special interrogatories were "insufficient to

shield [the defendant] with qualified immunity"; officer's "subjective mistake of fact, like a

mistake of law, must be reasonable").[6]

Plaintiff asserts that this case differs from the caselaw cited by Defendant in support of

her request for qualified immunity, because "no gun was ever found on Mr. Porter." (Dkt. No.

584, at 2). But the Court has to accept the jury's findings that Mr. Porter had a firearm at some

point during the incident, and that Defendant had "a reasonable, even if mistaken, belief" that he

was one of the individuals discharging a weapon near the Malibu, and that she had "a reasonable,

---

[6] Plaintiff also argues that "if the [C]ourt chooses to believe the fact that Mr. Porter was armed as he was running away and choosing to take into account the jury's answer to the special interrogatories given to them, then essentially the [C]ourt is giving importance to not only Francemone's testimony but Davis's testimony as well." (Dkt. No. 584, at 3-4). Defendant correctly observes that it "is unclear as to what Plaintiff means" when he "refers to Mr. Davis's 'second version' of the events." (Dkt. No. 592-1, at 10 n.4). In any event, the jury was free to credit or discredit any portion of Francemone or Davis's testimony. *See Hoyte v. Nat'l R.R. Passenger Corp.*, No. 04-cv-5297, 2006 WL 2053383, at *3 n.2, 2006 U.S. Dist. LEXIS 50308, at *8 n.2 (S.D.N.Y. July 24, 2006) ("[I]t is fully within the jury's fact-finding discretion to credit portions of a witness's testimony and discredit others."). Further, as noted above, the Court does not *choose* to take into account the jury's answers to the special interrogatories; the Court is "not permitted to find as a fact a proposition that is contrary to a finding made by the jury." *See Walker*, F.4th at 618.

even if mistaken, belief" that he had a firearm on his person before she discharged her last two

shots. (Dkt. No. 545, at 2).

In light of the jury's answers to the special interrogatories, and because Plaintiff has cited

no caselaw to the contrary, the Court cannot conclude that Defendant violated a "clearly

established" right within the meaning of the qualified immunity case law, such that it would be

clear to any reasonable officer that Defendant's conduct was unlawful in the situation she

confronted. *See Jones*, 963 F.3d at 224; *see also Ekukpe v. Santiago*, 823 F. App'x 25, 30 (2d Cir.

2020) ("The inquiry is 'whether *any* reasonable officer, out of the wide range of reasonable

people who enforce the laws in this country, *could* have determined that the challenged action

was lawful.'" (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016))). Accordingly, the

Court finds that Defendant is entitled to qualified immunity on Plaintiff's claim for excessive

force. *See also Matusak*, 755 F. Supp. 3d at 344 (finding, after jury verdict for plaintiff on

excessive force claim, that defendants were entitled to qualified immunity "[b]ecause reasonable

officers could disagree as to whether the force used by [defendants] was constitutionally

excessive").

## V.    RULE 59 MOTION

Although the Court has found that Defendant is entitled to qualified immunity, the Court

has considered and decided, in the alternative, Plaintiff's motion for a new trial.

### A.    Standard

Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may "grant a new trial

. . . for any reason for which a new trial has heretofore been granted in an action at law in federal

court." In determining whether to grant a new trial under Rule 59, the Court must consider

whether "the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of

justice." *See Stampf v. Long Island R.R.*, 761 F.3d 192, 202 (2d Cir. 2014) (alteration in original)
(quoting *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005)). "A court considering a
Rule 59 motion for a new trial must bear in mind . . . that the court should only grant such a
motion when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp. v. Town of Hyde Park*, 163
F.3d 124, 134 (2d Cir. 1998) (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir.
1992)). In general, "on a Rule 59 motion the court 'may weigh the evidence and the credibility of
witnesses and need not view the evidence in the light most favorable to the verdict winner.'"
*Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442, 466 (S.D.N.Y. 2014) (quoting *ING Glob.
v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014)). However, "a judge
should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute
his or her assessment of the credibility of witnesses for that of the jury simply because the judge
disagrees with the jury." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012)
(citation and internal quotation marks omitted).

### B.    Analysis

Prior to arguing that Plaintiff is entitled to a new trial, Plaintiff appears to ask the Court to
disregard the testimony of certain defense witnesses as not credible. (*See* Dkt. No. 573-1, at 2-5
(arguing that Khalil Davis's testimony "must be completely disregarded"), 11-13 (summarizing
inconsistencies between Plaintiff's witnesses' testimony and Francemone's testimony), 13-17
(asserting that Defendant's expert "was manipulated by counsel by not being given adequate
information")). But it was "fully within the jury's fact-finding discretion to credit portions of a
witness's testimony and discredit others." *See Hoyte*, 2006 WL 2053383, at *3 n.2, 2006 U.S.
Dist. LEXIS 50308, at *8 n.2. Further, the Second Circuit has observed that where "a verdict is
predicated almost entirely on the jury's assessments of credibility, such a verdict generally should

not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle*, 670 F.3d at 418-19. The Court does not find this to be an egregious case.

### 1.    Improper Compromise

Plaintiff argues that a new trial is warranted because "the jury in this case made an improper compromise[.]" (Dkt. No. 573-1, at 17-18). First, Plaintiff asserts that the fact the jury returned "only $10,000" for Plaintiff "can only indicate the jury improperly compromised." (*Id.* at 18). Second, Plaintiff argues that "the findings of the jury on the Special Interrogatories [are] entirely inconsistent with the verdict." (*Id.*).[7] Defendant disagrees, arguing that Plaintiff never objected to any inconsistency prior to the release of the jury, that there is no inconsistency between the general verdict and the special interrogatories, and that Plaintiff cannot "meet her burden of justifying a new trial based on the contention that the $10,000 damages verdict was insufficiently low." (Dkt. No. 585, at 6-11).

"For a court to conclude that a jury's verdict reflects an impermissible compromise, 'the record itself viewed in its entirety must clearly demonstrate the compromise character of the verdict.'" *Buchwald v. Renco Grp.*, 539 B.R. 31, 57 (S.D.N.Y. 2015) (quoting *Ajax Hardware Mfg. Corp. v. Indus. Plants Corp.*, 569 F.2d 181, 184 (2d Cir.1977)), *aff'd sub nom. Matter of Magnesium Corp. of Am.*, 682 F. App'x 24 (2d Cir. 2017). A verdict must be "inconsistent with the facts adduced at trial if the reviewing court is to reverse it [because] of an improper compromise of the jury." *Id.* (quoting *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 416-17 (2d Cir. 1958)). "A substantial reduction in damages, out of keeping with the evidence and

---

[7] Plaintiff also asks the Court again, if it "is inclined to do so, to merely reject the jury's answers to the special interrogatories." (Dkt. No. 573-1, at 18). But as explained above, the Court "is not permitted to find as a fact a proposition that is contrary to a finding made by the jury." *See Walker*, 45 F.4th at 618. Plaintiff cites no authority to the contrary.

despite a finding of liability, is a common feature of compromise verdicts, although even substantially reduced damages in conflict with the theory of liability offered at trial are not enough; there must also be 'other indicia' of compromise such as 'a close question of liability' or difficult injury deliberations." *Id.* (citing *Atkins v. New York City*, 143 F.3d 100, 104 (2d Cir.1998); *Diamond D Enters. USA, Inc. v. Steinsvaag,* 979 F.2d 14, 17 (2d Cir.1992)).

### a.    Damages Award

Plaintiff states that she "is not looking for an additur," but rather "an entirely new trial[.]" (Dkt. No. 573-1, at 18). Plaintiff argues that "it is impossible to reconcile an award of $10,000 in an action premised on the use of excessive force, which is what the jury found, with the death of a 41-year-old male with no serious medical history." (*Id.* at 19). However, Plaintiff fails to acknowledge that she waived "any claim for economic damages, including any claim for loss of Mr. Porter's future wages, loss of Mr. Porter's earning capacity, loss of financial support for Mr. Porter's children, loss of economic gifts or benefits Mr. Porter's children would have expected to receive from him, and any other out-of-pocket loss to the Estate." (Dkt. No. 541, at 23).[8] The jury was specifically instructed that Plaintiff was "limited to recovery for damages sustained from the conscious pain and suffering experienced by Mr. Porter from the moment of his physical injury to the moment of death, and damages for loss of enjoyment of life." (Dkt. No. 541, at 23). As Defendant correctly observes, Plaintiff "*waived* most categories of damages before the [j]ury even deliberated[,]" and the $10,000 award is based on "the exceedingly narrow categories of damages they were presented to consider." (Dkt. No. 585, at 13-14).

---

[8] During the trial, the Court also granted Defendant's Rule 50 motion to dismiss Plaintiff's request for "pecuniary damages of funeral expenses and hospital or medical expenses[,]" which Plaintiff agreed he could not maintain. (Dkt. No. 598, at 187).

The jury was also instructed that compensatory damages "must be based on the evidence presented at trial[,]" and that "[c]onscious pain and suffering means pain and suffering of which there is some level of awareness by Mr. Porter[,]" (Dkt. No. 541, at 23). Plaintiff's evidence of Porter's conscious pain and suffering was limited to the testimony of the three witnesses who attempted to render aid to Porter after he was shot. Their testimony was mixed; one witness testified that Porter was alive when she reached him, that "you could tell he was trying to speak," (Dkt. No. 596, at 142-44), and that he looked "like he was in pain and in anguish[.]" (*id.* at 152-53). But another witness said Porter had no expression on his face and that he "wasn't responsive to anything," (*id.* at 252-53), and the third witness also testified that Porter was not moving at all, (*see* Dkt. No. 597, at 209-10). Moreover, the undisputed evidence at trial showed that the duration of Porter's suffering would have been limited: the parties agree that the gunfire in Stone Court parking lot began at some point "after 11 P.M," (Dkt. No. 269, at 2), and by the time paramedics reached Porter at 11:23 P.M, (Def. Trial Ex. D-063-A, at 2), Porter was not conscious or responsive, (Dkt. No. 599, at 69-70, 76). Porter was pronounced dead at the hospital at 11:58 P.M, (Pl. Trial Ex. 1, at 1) and there was no evidence that he regained consciousness at any point in the interim.

Plaintiff has cited to no case law demonstrating higher awards in comparable cases, as might indicate that the damages award in this case was unreasonably low.[9] In light of the evidence that Porter was unconscious very shortly after he was shot, and the very limited evidence that he was in any pain or suffering while he was still conscious, the Court does not

---

[9] Plaintiff does not seek an additur or a new trial limited to damages. As such, the Court does not conduct an inquiry into awards granted in comparable cases to determine whether the award in this case was appropriate. *See White v. New York State Off. of Child. & Fam. Servs.*, No. 11-cv-309, 2021 WL 282561, at *3, 2021 U.S. Dist. LEXIS 16061, at *5 (N.D.N.Y. Jan. 28, 2021) ("To decide what an appropriate award should be, the court must consider awards granted in comparable cases, while recognizing that 'no two cases are exactly alike[.]'" (quoting *Dotson v. City of Syracuse*, No. 04-cv-1388, 2011 WL 817499, *14, 2011 U.S. Dist. LEXIS 20374, at *36 (N.D.N.Y. Mar. 2, 2011) (additional internal citations omitted))).

find that the $10,000 award for conscious pain and suffering was inconsistent with the facts

adduced at trial. *See Buchwald*, 539 B.R. at 57.[10] The Court therefore does not find that the

verdict represents "a substantial reduction in damages, out of keeping with the evidence and

despite a finding of liability," as would indicate the verdict was a result of an improper

compromise. *See id.*[11]

### b. Inconsistency Between Verdict and Special Interrogatories

Plaintiff argues that "[f]or the jury to have found, correctly, that the defendant used

excessive force, but incorrectly that the decedent had a gun is entirely inconsistent." (Dkt. No.

573-1, at 19). Defendant accurately observes that Plaintiff never explains why the jury's findings

are inconsistent. (Dkt. No. 585, at 8). Further, Defendant argues that Plaintiff never objected to

any purported inconsistency prior to the release of the jury, and that in any event there is no

inconsistency between the general verdict and the special interrogatories. (*Id.* at 5-10).[12]

"It is well established that a party waives its objection to any inconsistency in a jury

verdict if it fails to object to the verdict prior to the excusing of the jury." *Anderson Grp., LLC v.

City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) (quoting *Kosmynka v. Polaris Indus.,

Inc.,* 462 F.3d 74, 83 (2d Cir.2006)). "The timely objection requirement is 'not merely a

technicality'—it serves 'to give the court and the opposing party the opportunity to correct an

---

[10] Defendant notes that Plaintiff does not challenge the jury's decision not to award damages for loss of enjoyment of life, and Defendant argues that the evidence of this category of damages was "similarly lacking." (Dkt. No. 585 at 22). Since Plaintiff has not challenged this award, the Court has not considered it.

[11] Moreover, the Court could not set the verdict aside even if the Court found that the jury had compromised on the amount of damages awarded to Plaintiff, because Plaintiff would also need to demonstrate "other indicia of compromise." *Buchwald*, 539 B.R. at 57 (internal quotations and citation omitted); *see also Fox v. City Univ. of New York*, 187 F.R.D. 83, 93 (S.D.N.Y. 1999) ("[A] verdict can be set aside if the jurors compromise on the question of liability, but not if they compromise on the amount of damages."). For the reasons discussed below, Plaintiff has not demonstrated any other such indicia. (*See* discussion *infra* Section V.B.1.b.).

[12] Because the Court decides there is no inconsistency between the verdict and the special interrogatories, the Court does not reach Defendant's third argument—i.e., that even if the verdict was inconsistent with the special interrogatories, "the Court should nonetheless enter Judgment in favor of Officer Francemone on the special interrogatories." (Dkt. No. 585, at 10).

error in the conduct of the trial.'" *Id.* at 46, 49 (finding that district court erred in reaching the merits of party's argument regarding the inconsistency of jury verdict and ordering a new trial on that ground; party waived its inconsistency argument by raising it for the first time in its post-trial motion papers).

Here, Plaintiff's counsel asserts that his client "was so distraught" after the verdict was announced that "she wanted [them] at that time to take no action and to let the case go away[,]" and they therefore "made no objection at that time" to the allegedly contradictory verdict and special interrogatories. (Dkt. No. 573-1, at 19-20). While the Court is sympathetic to counsel's position, "counsel's duty to preserve issues trumps any discomfort counsel may experience in voicing a timely objection." *See Anderson Grp., LLC*, 805 F.3d at 48 (citations omitted) (rejecting counsel's argument that it could not voice an objection without interrupting the district judge; "hesitancy to incur the judge's displeasure" was not a reason to overlook failure to timely object).

Plaintiff's citation to *Hundley v. District of Columbia* is inapposite; in *Hundley*, a case from the D.C. Circuit, the plaintiffs "repeatedly objected at trial to the proposed written interrogatory." 494 F.3d 1097, 1103 (D.C. Cir. 2007). Here, Plaintiff did not object to either the verdict form or the proposed jury instructions. (Dkt. No. 601, at 187-88, 191). Plaintiff made "one suggestion" with respect to the special interrogatories, but the suggestion did not relate to any potential for inconsistency in the event of a liability verdict. (*See id.* at 204-05). Plaintiff's failure to object to the special interrogatories, and to object to the alleged inconsistency after the verdict was read, supports the Court's finding of waiver in this case. *See also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 552 (S.D.N.Y. 2011) (holding that plaintiff waived objection to alleged inconsistency by failing to argue that the proposed verdict form

might produce inconsistent findings, and by failing to object after the verdict was read and before jury was discharged), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

Even if Plaintiff had not waived her inconsistency argument, it would fail on the merits. The Second Circuit has held that, "[w]hen confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency. Before a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt to reconcile the jury's findings, by exegesis if necessary." *Ferreira v. City of Binghamton*, 975 F.3d 255, 277 (2d Cir.) (quoting *Turley v. Police Dep't of New York*, 167 F.3d 757, 760 (2d Cir.1999)), *certified question accepted,* 35 N.Y.3d 1105 (2020), and *certified question answered,* 38 N.Y.3d 298 (2022); *see also Henry v. Dinelle*, 929 F. Supp. 2d 107, 121 (N.D.N.Y. 2013) ("It must be remembered that, '[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'" (quoting *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd*., 369 U.S. 355, 364 (1962))). "In looking for consistency," a court must "bear in mind that the jury was entitled to believe some parts and disbelieve other parts of the testimony of any given witness." *Ferreira*, 975 F.3d at 277 (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001)).

Here, the Court finds no irreconcilable inconsistency. As Defendant notes, the jury "could have made its determination of reasonableness on a myriad of different conclusions or factual findings[.]" (Dkt. No. 585, at 8). As one example: given that the jury found that Porter "had a firearm at some point during the incident[,]" (Dkt. No. 545, at 2), the jury could have credited Khalil Davis's testimony that Porter threw the gun as he was running, and another man picked it up and ran off with it, (Dkt. No. 600, at 70)—which would explain why Defendant did not find a gun underneath Porter at the scene, (*see* Dkt. No. 598, at 53), and why witnesses who saw Porter

running did not see a weapon in his hands, (*see, e.g.,* Dkt. Nos. 596, at 133, 272; 597, at 199).

The jury could have therefore found that Defendant was reasonably mistaken in her belief that

Porter had a firearm on his person before she shot him. *C.f. Ali v. Kipp*, 891 F.3d 59, 66 (2d Cir.

2018) ("The law is clear that the jurors were not required to accept the entirety of either side's

account, but were free to accept bits of testimony from several witnesses and to make reasonable

inferences from whatever testimony they credited." (internal quotations and citation omitted)).

To the extent Plaintiff suggests that the liability verdict is inconsistent with a

determination that Defendant is entitled to qualified immunity, that argument fails; if an officer

proves the facts that show they are entitled to qualified immunity, "judgment must be entered in

[their] favor, notwithstanding [their] having violated the plaintiff's rights and caused damages."

*See Aczel v. Labonia*, 584 F.3d 52, 57 (2d Cir. 2009). Because the verdict is not inconsistent, and

because Plaintiff has pointed to no other indicia of improper compromise, a new trial is not

warranted. *See In re Vivendi Universal*, 765 F. Supp. 2d at 554; *Buchwald*, 539 B.R. at 57.

### 2.    Racial Bias

Plaintiff asserts that the Court "indulged defense counsels['] repeated efforts to elicit

'evidence' of the out of control crowd after Porter was shot[,]" and this evidence "aroused fear of

violent minorities," which "contributed to the jury, with virtually no credible evidence Porter had

a gun, placing a gun in Porter's hands[.]" (Dkt. No. 573-1, at 21). Plaintiff argues that events that

unfolded after Porter was shot "are totally irrelevant to why he was shot[,]" and that while "the

Court may have envisioned a scenario in which the events after the shooting were relevant,

certainly no such relevant evidence was elicited at trial." (*Id.* at 21-22). Defendant disagrees,

noting that Plaintiff fails to "identify any specific statements by Defendant's counsel (either in

opening statements, closing arguments, or witness examination) that were purportedly designed

to inflame racial prejudices among jurors." (Dkt. No. 585, at 23). Defendant also notes that Plaintiff repeatedly placed the events immediately following Porter's shooting in dispute at trial, and that Plaintiff stipulated to the evidence she now challenges. (Dkt. No. 585, at 22-33).

A trial court has considerable discretion in determining whether evidence is admissible. *See Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 346 (2d Cir. 1999). "Where there has been an objection, a new trial is warranted if the [c]ourt's evidentiary ruling was 'clearly prejudicial to the outcome of the trial,' taking into account 'the record as a whole.'" *Graham v. City of N.Y.*, 128 F. Supp. 3d 681, 705 (E.D.N.Y. 2015) (quoting *Johnson v. Strive E. Harlem Emp Grp.*, 990 F. Supp. 2d 435, 450 (S.D.N.Y. 2014)). "But where [the moving party] did not object, a new trial is warranted only for plain error 'so serious and flagrant that it goes to the very integrity of the trial.'" *Johnson*, 990 F. Supp. 2d at 450 (quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005)).

Here, Plaintiff has not cited to an evidentiary objection made at trial, nor has she identified any specific evidentiary ruling that she contends was erroneous. As such, a new trial would be warranted only for plain error. *See id.* The Court finds no such error. Not only did Plaintiff fail to object to the two videos shown to the jury of the scene that surrounded Porter after he was shot, which showed Defendant "on [her] knees" being tackled and pushed by a crowd, (Dkt. No. 598, at 155-59; Def. Trial Exs. D-061, D-062), but Plaintiff *stipulated* to their admission, (Dkt. No. 595, at 20).[13] *See Oliver v. New York State Police*, No. 15-cv-00444, 2023 WL 246698, at *3, 2023 U.S. Dist. LEXIS 8233, at *10 (N.D.N.Y. Jan. 18, 2023) (rejecting as

---

[13] Prior to trial, Plaintiff filed two motions in limine, arguing that "Defendant's testimony that she was 'beat up' after she shot Porter must not be offered into evidence[,]" and that defense counsel "should be precluded from entering evidence of alleged rioting after Porter was shot. (Dkt. No. 287-1, at 19, 29). Later, in her supplemental briefing, Plaintiff specifically objected to Defendant's Exhibit 62 as irrelevant and prejudicial. (*See* Dkt. No. 427, at 20). At the final pretrial conference, Defendant noted that Plaintiff had stipulated to Exhibit 62, and Plaintiff agreed that Exhibit 62 was admissible. (Dkt. No. 485, at 84-85).

meritless plaintiff's argument that the court's evidentiary rulings were unfair; "[n]ot only did [the p]laintiff fail to object to any of [the d]efendants' exhibits, but [the p]laintiff stipulated to the admission into evidence of all [of the d]efendants' thirty-nine exhibits"), *aff'd sub nom. Oliver v. D'Amico*, No. 22-979, 2024 WL 2013670, 2024 U.S. App. LEXIS 11099 (2d Cir. May 7, 2024). Plaintiff also repeatedly asked witnesses whether they saw Defendant attempt to render aid to Porter after he was shot, putting Defendant's actions after the shooting at issue. (*See, e.g.,* Dkt. No. 596, at 138, 212, 248). Finally, the state of the scene after Porter's shooting was relevant to Defendant's theory as to why no gun was recovered. (*See, e.g.,* Dkt. Nos. 598, at 53; 599, at 43-44). Therefore, Plaintiff's motion for a new trial on the basis that the Court improperly admitted evidence of the scene after Porter's shooting is denied.

### 3.    Defense Counsel's Closing Argument

Plaintiff next argues that defense counsel "created" two "brand new alleged 'facts'[,]" with no supporting evidence or testimony, during closing argument: that Porter jumped over a fence when he left Stone Court parking lot, and that Porter was "firing a revolver which would not expel shell casings." (Dkt. No. 573-1, at 22-23). Defendant argues that these statements were "inferences drawn from multiple previously established facts and/or inferences[,]" and that defense counsel was permitted to argue these inferences "during summation to reconcile other pieces of evidence[.]" (Dkt. No. 585, at 35-37).

"[A] party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as '[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'" *Marcic*, 397 F.3d at 124 (quoting *Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 271 (2d Cir.1999). "In particular, where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de*

*minimis* in the context of the entire trial." *Id.* (quoting *Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 540 (2d Cir.1992)). Where the moving party failed to raise an objection during closing argument at trial, the court reviews only for plain error. *See Coan v. Dunne*, No. 15-cv-00050, 2022 WL 369012, at *4, 2022 U.S. Dist. LEXIS 22062, at *10 ((D. Conn. Feb. 8, 2022), *aff'd,* No. 21-2012, 2023 WL 7103275, 2023 U.S. App. LEXIS 28592 (2d Cir. Oct. 27, 2023). On review for plain error, "a new trial will be granted only for error that was so serious and flagrant that it goes to the very integrity of the trial." *Marcic*, 397 F.3d at 124 (internal quotations and citation omitted). The Second Circuit has "warned that the plain error exception should only be invoked with extreme caution in the civil context." *FIH, LLC v. Barr*, No. 20-489, 2021 WL 5286659, at *5, 2021 U.S. App. LEXIS 33752, at *14 (2d Cir. Nov. 15, 2021) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)).

Here, Plaintiff made no objection during closing and did not request a curative instruction at any point. As such, Plaintiff must demonstrate plain error "so serious and flagrant that it goes to the very integrity of the trial" in seeking a new trial. *See Marcic*, 397 F.3d at 124. The single paragraph Plaintiff dedicates to this argument in her brief does not meet this heavy burden. Plaintiff's citation to *Lee v. City of Troy* is factually distinct and not applicable here. *See* 339 F.R.D. 346, 364-71 (N.D.N.Y. 2021) (ordering new trial where defense counsel repeatedly told jury that critical video evidence was fabricated by plaintiff, where there was "no discernible support in the record" for such assertion, and defense counsel also invoked improper regional bias in closing argument).

The Court has considered the record as a whole, as well as Defendant's explanation of the facts supporting these inferences, and does not find that defense counsel made any statements during closing that would entitle Plaintiff to a new trial. Defendant has provided a detailed

explanation of the trial evidence from which a jury could infer that Porter jumped over a fence when he left Stone Court parking lot, and that Porter was firing a revolver. (*See* Dkt. No. 585, at 35-37). Defense counsel was "entitled to broad latitude" in the inferences they could suggest to the jury during closing arguments, so long as counsel did not misstate the evidence. *See Porter v. United States*, No. 08-CV-1497, 2008 WL 5451011, at *4, 2008 U.S. Dist. LEXIS 105206, at *14 (E.D.N.Y. Dec. 31, 2008) (quoting *United States v. Smith,* 778 F.2d 925, 929 (2d Cir.1985)). And the verdict here was rendered after a two-week trial, in which the parties introduced substantial testimony and physical evidence in support of their arguments. *See Marcic*, 397 F.3d at 127-28 ("To the extent that [ ] counsel's statements were improper, they were not objected to, and occurred in the context of a summation spanning thirty-seven pages of trial transcript, at the end of a week-long trial in which voluminous evidence was introduced that sufficed to support the jury's verdict."). On this record there is no plain error warranting a new trial.

### 4.    Batson Challenges

Plaintiff argues that the Court erred when it allowed Defendant to strike two people of color, Jurors Nos. 0089 and 0115, over Plaintiff's objection.[14] (Dkt. No. 573-1, at 23-27). Defendant disagrees, asserting that counsel met its burden in articulating a race-neutral reason for striking these jurors. (Dkt. No. 585, at 40-41).[15]

"When a party raises a *Batson* challenge, the trial court uses a three-part burden-shifting framework to assess whether the challenged peremptory strike is based on an impermissible

---

[14] The Court notes that Jurors 0089 and 0115 were not struck for "cause[,]" as Plaintiff suggests; both jurors were struck as part of Defendant's peremptory challenges. (Dkt. No. 594, at 196, 199).

[15] Plaintiff also argues that another juror, Juror No. 0114, should have been struck for cause. (Dkt. No. 573-1, at 27). But Juror No. 0114 was not selected for the jury, because he was struck as one of Plaintiff's peremptory challenges. (Dkt. No. 594, at 196). Defendant notes that Plaintiff "provides no argument, authority, nor justification for how she is even aggrieved by this decision, let alone why it would justify a new trial." (Dkt. No. 585, at 42-43 (citing, inter alia, *Cruz v. Jordan*, 357 F.3d 269, 271 (2d Cir. 2004) ("[E]ven if the district court had erred by refusing to dismiss a biased juror for cause, Cruz's claim would likely fail, because Cruz has not sufficiently alleged that he was injured by such an error.")). The Court agrees, and will not grant a new trial on this basis.

discriminatory motive." *United States v. Martinez*, 621 F.3d 101, 108 (2d Cir. 2010) (citing

*Batson v. Kentucky*, 476 U.S. 79, 93-98 (1986)). "First, the objecting party must make a prima

facie case that opposing counsel exercised a peremptory challenge on the basis of a protected

class." *Id.* "Second, if a prima facie case is established, the burden shifts to the challenged party

to present a nondiscriminatory reason for striking the jurors in question." *Id.* at 109. "This race-

neutral explanation need not be 'persuasive, or even plausible' for the non-movant to meet [their]

obligation at step two of the *Batson* procedure and thereby advance the inquiry to the third step."

*Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006). "Finally, if a valid reason is articulated, the

trial court considers the totality of the circumstances to determine whether the objecting party

has carried its burden of proving purposeful discrimination by a preponderance of the evidence."

*Martinez*, 621 F.3d at 109. *See also Shabazz v. Howard*, No. 23-6471, 2024 WL 2952351, at *2,

2024 U.S. App. LEXIS 14250, at *5 (2d Cir. June 12, 2024) ("While the district judge is required

to 'explicitly adjudicate the credibility of the non-moving party's race neutral explanations for

peremptorily striking potential jurors,' no 'talismanic recitation of specific words' is required."

(quoting *Messiah*, 435 F.3d at 198)).

Plaintiff makes no new legal argument in asserting that the Court erred in allowing

Defendant to strike Juror Nos. 0089 and 0115. When Plaintiff's counsel originally objected to the

strikes, Defense counsel responded with race-neutral explanations for striking the jurors in

question. (*See* Dkt. No. 594, at 197 ("[T]he reason that we are striking [Juror No. 0089] is

because two of his family members have been shot and several of his family members have been

arrested."), 200 ("[Juror No. 0115] has had several family members who have been the victims

of shooting, she's had family members who have been arrested. And again, anything that's going

to establish an emotional connection between the family of Mr. Porter and the jurors is of

potential concern to me.")). The Court held that Defense counsel had articulated a race-neutral explanation for both strikes. (*Id.* at 198, 201-02). With no new argument from Plaintiff, there is no basis for a new trial because of the denial of Plaintiff's Batson challenges.

In sum, Plaintiff has failed to show that she is entitled to a new trial.[16] The Court is not otherwise persuaded that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice. Accordingly, Plaintiff's motion for a new trial is denied.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's request for judgment on the defense of qualified immunity, (Dkt. No. 574), is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, (Dkt. No. 573), is **DENIED** in its entirety; and it is further

**ORDERED** that the Clerk is directed to enter judgment against Plaintiff and in favor of Defendant, in accordance with the above.

**IT IS SO ORDERED.**

Dated: <u>September 17, 2025</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[16] Plaintiff makes two additional arguments in the final two pages of his brief: (1) the Court erred in denying Plaintiff's motion to unseal Defendant's grand jury testimony, (*see* Dkt. No. 520), and (2) a certain letter from Khalil Davis should have been allowed into evidence "without conditions[,]" (Dkt. No. 573-1, at 28-29). Both of these arguments are made in two sentences each, with no citation to legal authority. "The Court need not, and will not, consider arguments raised in such a 'perfunctory manner.'" *See Frommer v. MoneyLion Techs. Inc.*, No. 23-cv-6339, 2024 WL 2158589, at *6, 2024 U.S. Dist. LEXIS 86769, at *22 (S.D.N.Y. May 14, 2024) (quoting *Tolbert*, 242 F.3d at 75).